UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KENT JOHNSON,

                       Petitioner,

        v.                                           9:07-CV-0334
                                                      (TJM/GHL)

ISRAEL RIVERA,

                       Respondent.

_____

APPEARANCES:                      OF COUNSEL:

KENT JOHNSON
04-A-4785
Petitioner *pro se*
Coxsackie Correctional Facility
Box 999
Coxsackie, NY 12051

HON. ANDREW M. CUOMO            FREDERICK H. WEN, ESQ.
Office of the Attorney General         Assistant Attorney General
State of New York
Counsel for Respondent
120 Broadway
New York, New York 10271

THOMAS J. MCAVOY, SENIOR U.S. DISTRICT JUDGE

## <u>MEMORANDUM-DECISION & ORDER</u>

      Petitioner Kent Johnson, *pro se*, is an inmate in the custody of the New York State

Department of Correctional Services.  After a jury trial in August of 2004 in Albany County Court,

Petitioner was found guilty of Criminal Possession of a Controlled Substance in the First Degree

and Criminal Possession of a Controlled Substance in the Third Degree.  Dkt. No. 12-16, Trial

Transcript ("TT") at 350.  Petitioner was sentenced, as a second felony offender, to an indeterminate

prison term of twenty years-to-life for the former charge, to run concurrently with an indeterminate

ten-to-twenty year prison term for the latter term.  Dkt. No. 12-17, Sentencing Transcript ("ST") at

3, 5.

Petitioner's conviction was affirmed by the Appellate Division, Third Department, and leave to appeal to the Court of Appeals was denied. *People v. Johnson*, 30 A.D.3d 773 (N.Y. App. Div. 2006); *leave denied* 7 N.Y.3d 813 (2006).

In the interim, Petitioner filed a *pro se* motion to vacate the judgment under N.Y. C.P.L. § 440.10 ("CPL § 440 motion"). Dkt. No. 12-8 (Ex. H). On February 8, 2006, the motion was denied. Dkt. No. 12-12 (Ex. L). Leave to appeal to the Appellate Division was also denied. Dkt. No. 12-14 (Ex. N).

Petitioner, through counsel, also filed a motion for resentencing under Penal Law § 70.71. Dkt. No. 12-9 (Ex. I). On February 6, 2006, the trial court granted the motion, resentencing him to a determinate fourteen-year term for his first-degree criminal possession of a controlled substance conviction, plus five years of post-release supervision. Dkt. No. 12-11 (Ex. K), at 2. This sentence was to run concurrent to the previously-imposed indeterminate ten-to-twenty years sentence for the third-degree criminal possession of a controlled substance conviction. *Id.* at 3. The court rejected other arguments that he was ineligible for resentencing, and found that his other claims either lacked merit or were not "appropriate for resolution on a postjudgment motion." Dkt. No. 12-12 (Ex. L).

Petitioner submitted a fifty-three page petition in which he petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the following grounds: (1) he was improperly selectively prosecuted; (2) the prosecution improperly elicited evidence regarding his incarceration; (3) the trial court improperly admitted evidence regarding Petitioner's incarceration; (4) the trial court erred by giving an accomplice charge with respect to a witness's testimony; (5) he was deprived of due process when the trial court admitted hearsay testimony; (6) trial counsel was

2

ineffective; (7) the trial court failed to conduct appropriate inquiries; and (7) he was improperly

resentenced under the Rockefeller Drug Law Reform Act.  Dkt. No. 1.  For the reasons which

follow, the petition is denied.

# I. BACKGROUND

The background was succinctly summarized by the Appellate Division as follows:

On January 22, 2004, [Petitioner] enlisted the assistance of Kristina Pagan to aid him in transporting drugs from New York City to Albany County.  [Petitioner] placed a plastic bag containing separate bags of cocaine in Pagan's knapsack and gave Pagan $40 for a bus ticket and an additional $100 as travel expense back to New York City in the event problems arose.  [Petitioner] and Pagan then purchased bus tickets to Albany under false names.

In Albany, police officers Eugene Duda and Carmen Frangella were engaged in drug interdiction at the Albany bus terminal when they observed [Petitioner] and Pagan exit their bus.  As a result of their suspicious conduct, the officers approached the taxicab in which [Petitioner] and Pagan were seated and began questioning them.  Upon smelling the scent of acetone[1] emanating from Pagan's knapsack, Duda asked for and received Pagan's consent to search the knapsack. The search revealed cocaine and both [Petitioner] and Pagan were arrested.

Thereafter, [Petitioner] was indicted and charged with one count of criminal possession of a controlled substance in the first degree and one count of criminal possession of a controlled substance in the third degree.  While that indictment was pending, Pagan, having revealed that the drugs in question belonged to [Petitioner], pleaded guilty to criminal possession of a controlled substance and testified against [Petitioner] at his ensuing trial.  At the conclusion of the trial, [Petitioner] was found guilty as charged and was sentenced to prison terms of 20 years to life on the first degree conviction and 10 to 20 years on the third degree conviction, said sentences to run concurrently.

*Johnson*, 30 A.D.3d at 774-75.

# II. DISCUSSION

## A.     Applicable Standard of Review

_____

[1]  Acetone is a substance commonly mixed with cocaine. *Johnson*, 30 A.D.3d at 774, n.1.

When reviewing a habeas petition, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.  28 U.S.C. § 2241(c).  Relief does not lie for errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *DiGuglielmo v. Smith*, 366 F.3d 130, 136-137 (2d Cir. 2004).   Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief to a state prisoner on a claim that was adjudicated on the merits in state court proceedings unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1); *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Campbell v. Burgess*, 367 F. Supp. 2d 376, 380 (W.D.N.Y. 2004).

A decision is adjudicated "on the merits" when it finally resolves the claim, with res judicata effect, based on substantive rather than procedural grounds.  *Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001).  This is so, "even if the state court does not explicitly refer to either the federal claim or to relevant federal case law."  *Id.* at 312.  To determine whether a state court has adjudicated a claim "on the merits," a federal habeas court must examine three "clues" to classify the state court decision as either (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law; or (2) fairly appearing to rest primarily on state procedural law.[2]  *Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006).  "Absent a clear and express statement of reliance on a state procedural bar," decisions in the first category are deemed to have been made "on the merits" of the federal claim.  *Id.*

A decision on the merits is contrary to clearly established federal law when it is either

---

[2]  The three "clues" to the basis of a state court's decision are (1) the face of the state court opinion; (2) whether the state court was aware of a procedural bar; and (3) the practice of state courts in similar circumstances.  *Jimenez*, 458 F.3d  at 145, n. 16.

contrary to Supreme Court precedent on a question of law or opposite to a relevant Supreme Court case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). A state court unreasonably applies federal law when the state court correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Although "[s]ome increment of incorrectness beyond error is required" in order to grant a federal habeas application, that increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (quotation marks and citation omitted); *see also Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006), *cert. denied*, 549 U.S. 1215 (2007). The state court's determination of a factual issue is presumed to be correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005), *cert. denied*, 546 U.S. 884 (2005); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001).

**B.    Exhaustion**

Respondent argues that Petitioner has not exhausted his claims that (1) the prosecutor committed misconduct by eliciting evidence of Petitioner's incarcerated status through letters Petitioner wrote to Pagan, and the trial court erred in admitting those letters; and (2) the trial court erred in giving an accomplice liability charge to the jury. Dkt. No. 11-1, at 19-20. Respondent claims that counsel raised these claims on direct appeal only under state evidentiary rule and case law analysis. *Id.* at 19. Respondent therefore argues that these claims should be deemed exhausted, but dismissed as procedurally defaulted. *Id.* at 20.

An application for a writ of habeas corpus may not be granted until the prisoner has

exhausted all remedies available in state court unless there is an "absence of available state corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b). To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively. Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in the habeas corpus petition. Substantive exhaustion requires that a petitioner "fairly present" any constitutional claims to the highest state court in the same factual and legal context in which it appears in the habeas petition. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Fama v. Comm'r of Corr. Servcs.*, 235 F.3d 804, 808 (2d Cir. 2000); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).

"To establish that a federal claim was raised in state court, a petitioner must, in the state courts, (1) have relied on federal case law employing federal constitutional analysis; (2) relied on factually similar state cases employing federal constitutional analysis; (3) asserted the claim "in terms so particular as to call to mind a specific right protected by the Constitution"; or (4) alleged a set of facts well within ordinary constitutional litigation." *Stone v. Stinson*, 121 F. Supp. 2d 226, 236 (W.D.N.Y. 2000)(citing *Daye*, 696 F.2d at 194). The requirement that the state court have been given a reasonable opportunity to pass on the federal habeas claim is satisfied if the legal basis of the claim made in state court was the "substantial equivalent" of that of the habeas claim. *Picard*, 404 U.S. at 278. However, where no real avenue remains by which the claim could be raised, a claim is deemed exhausted. *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995).

On direct appeal, appellate counsel argued that the prosecutor committed misconduct by offering evidence of Petitioner's incarceration through letters Petitioner wrote to Pagan, and that the

trial court erred by admitting the letters.  Dkt. No. 12-1 (Ex. A) at 17-19.  In rejecting these arguments, the Appellate Division found, "Clearly, the letters at issue were of considerable probative value and were properly offered by the People and admitted into evidence by County Court."  *Johnson*, 30 A.D.3d at 775.

Appellate counsel also argued that the trial court erred in instructing the jury as to accomplice testimony.  Dkt. No. 12-1 (Ex. A) at 25-28.  In disagreeing, the Appellate Division reasoned, "Here, by pleading guilty to criminal possession of a controlled substance, Pagan conclusively established her complicity and County Court quite properly rendered an accomplice instruction to the jury."  *Johnson*, 30 A.D.3d at 775 (citing *People v. Sweet*, 78 N.Y.2d 263, 267 (1991)).

Appellate counsel placed no reliance on federal case law nor on factually similar state cases.  Dkt. No. 12-1 (Ex. A), at 17-19, 25-28.  Moreover, he made no assertion of the claims "in terms so particular as to call to mind a specific right protected by the Constitution;" nor did he allege a set of facts well within ordinary constitutional litigation.  *Id.*  Thus, Petitioner has not fairly presented his current arguments to the state courts.

Moreover, there is no longer a state court in which Petitioner can raise his current arguments.  He cannot present the arguments to the Court of Appeals in the future because he is entitled to only one leave application.  Moreover, raising these arguments in a C.P.L. § 440.10 motion would be futile because Petitioner failed to raise these arguments on direct appeal.  C.P.L. § 440.10(2)(c) bars collateral proceedings when a criminal defendant has failed to raise the grounds on direct appeal.  Thus, since no remaining avenue exists in which Petitioner could raise these claims, they are deemed exhausted but procedurally defaulted.  *Coleman v. United States*, 501 U.S.

722, 732 (1991); *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001); *Spence v. Superintendent, Great Meadow Corr. Fac.*, 219 F.3d 162, 170 (2d Cir. 2000).

This Court may review these claims only if Petitioner demonstrates cause for the default and resulting prejudice, or that the failure of the federal court to review the claim will result in a "fundamental miscarriage of justice" *i.e.*, that he is innocent. *Calderon v. Thompson*, 523 U.S. 538, 559 (1998); *Coleman*, 501 U.S. at 748-750.  To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule.  *Coleman*, 501 U.S. at 753; *Restrepo v. Kelly*, 178 F.3d 634, 638-39 (2d Cir. 1999).  When a petitioner has failed to establish adequate cause for his procedural default, the court need not determine whether he suffered prejudice, since federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated.  *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985).

Petitioner fails to show that some objective external factor impeded his ability to comply with the relevant procedural rule.  Thus, Petitioner has not established cause for the default. Petitioner also fails to show that a fundamental miscarriage of justice will result from no federal review of the claims.  Accordingly, Petitioner's claims are denied.

## C.    Selective Prosecution

Petitioner claims that the prosecutor committed misconduct by "selectively" prosecuting him. Dkt. No. 1 at 52.  He claims that Pagan was charged with a lesser offense because she is a female.  *Id.*  Respondent argues that this claim should be "summarily dismissed because both [Petitioner] and Pagan were arrested and charged at the same time; it was only because Pagan chose to plead guilty to a lesser charge that she testified against petitioner."  Dkt. No. 11-1, at 22.

In his CPL § 440 motion, Petitioner similarly argued that the prosecution unfairly charged Pagan with a lesser offense because she was a female.  Dkt. No. 12-8 (Ex. H) at Aff. at 14-15.  The trial court found that this claim "was not appropriate for resolution on a post judgment motion.  That claim could be raised on appeal and thus must be denied (CPL 440.10[2][b].)" Dkt. No. 12-12 (Ex. L) at 3.

To support a claim of selective prosecution, a petitioner bears the heavy burden of making a prima facie showing of "intentional and purposeful discrimination." *U.S. v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974); *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996).  A petitioner must demonstrate (1) that, "compared with others similarly situated, [he] was selectively treated; and (2) [that] such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Crowley v. Courville*, 76 F.3d 47, 52-53 (2d Cir. 1996) (citations omitted).  "In the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties."  *Armstrong*, 517 U.S. at 464 (internal quotation marks omitted).  As Petitioner must make a "credible showing of different treatment of similarly situated persons," "mere assertions and generalized proffers on information and belief are insufficient." *United States v. Sanders*, 17 F. Supp. 2d 141, 145 (E.D.N.Y. 1998) (citing *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992)), *aff'd*, 211 F.3d 711 (2d Cir. 2000).

Petitioner's claim is purely speculative.  Unsubstantiated conclusions, opinions, or speculation cannot serve as a basis for habeas relief.  *See Wood v. Bartholomew*, 516 US 1, 8 (1995) (asserting that federal courts should not grant "habeas relief on the basis of little more than speculation with slight support").  Moreover, the mere fact that Petitioner was prosecuted for one

offense while Pagan was prosecuted for another offense does not support a claim of selective prosecution.[3]  Accordingly, the petition on this ground is denied.

**D.    Petitioner's Admissions**

Petitioner claims that his due process rights were violated when the court admitted testimony consisting of statements Petitioner made to Pagan before the drugs were transported.  Dkt. No. 1 at 22-23.  Respondent argues that this claim is without merit.  Dkt. No. 11-1, at 28-31.

The Appellate Division rejected Petitioner's claim, as follows:

> [D]efendant contends that Pagan's testimony concerning conversations with him preparatory to transporting the drugs to Albany constituted hearsay and was thus improperly admitted into evidence.  Suffice to say that admissions and confessions are exceptions to the hearsay rule and are admitted into evidence as declarations against penal interest by an unavailable declarant.

*Johnson*, 30 A.D.3D at 775 (citation omitted).

This determination was not contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

Here, Pagan testified that Petitioner asked her if she would like to take a trip with him to Albany "to carry the drugs for him because he was coming up here to handle his business," which she understood to mean "[b]asically come and bring his drugs up here that w[ere] being sold."  TT. at 118.  The statement constitutes an admission by a party, and it is well-established under traditional rules of evidence, a party's admission does not constitute hearsay and therefore is not excluded under the hearsay rule.  *Avincola v. Stinson*, 60 F. Supp. 2d 133, 154 (S.D.N.Y. 1999) (quotation marks and citations omitted).  Accordingly, the petition on this ground is denied.

---

[3]  *See Welch v. Artus*, No. 04-cv-205S, 2007 WL 949652, at *55 (W.D.N.Y. Mar. 29, 2007) (noting same).

**E.      Effectiveness of Trial Counsel**

Petitioner argues that trial counsel was ineffective for the following reasons: (1) Counsel

waived Petitioner's right to a hearing to suppress the drugs; (2) Counsel failed to object to the

admission of certain evidence and to a jury charge, and failed to adequately cross-examine several

witnesses; (3) Counsel failed to adequately investigate the case; (4) Counsel failed to use certain

letters to impeach Pagan; (5) Counsel allowed Petitioner to testify in a narrative fashion; and (6)

Counsel labored under conflicts of interest.  Dkt. No. 1.

On direct appeal, Petitioner raised the aforementioned claims, as well as numerous other

alleged reasons why counsel was ineffective.[4]  The Appellate Division rejected Petitioner's

---

[4]  On direct appeal, Petitioner, through counsel, argued that trial counsel provided ineffective assistance by: (1) failing to adequately object to the introduction of evidence of Petitioner's incarceration, or to seek a curative instruction; (2) failing to subpoena a videotape of the bus terminal; (3) refusing to send an investigator to speak to the cab driver; (4) trying to "coerce" Petitioner to plead guilty; (5) refusing to use inculpatory letters to Petitioner from Pagan; (5) improperly "denigrat[ing]" Petitioner before the court; (6) admitting that he lacked knowledge regarding drugs and drug testing procedures; (7) failing to adequately question the People's drug-testing expert witness; (8) failing to object to the accomplice jury charge; and (9) waiving Petitioner's right to challenge the legality of the arrest and to seek suppression of the drugs.  Dkt. No. 12-1 (Ex. A) at 19-24, 28, 29-32.
    In his *pro se* supplemental brief, Petitioner argued that trial counsel was ineffective for: (1) failing to properly investigate the case by obtaining the bus terminal videotape or by talking to the taxi cab driver (Dkt. No. 12-2 (Ex. B), at 21-22, 25, 34-35, 54); (2) apparently failing to request that the trial court instruct the jury regarding corroboration (*id.*, at 22); (3) pressuring Petitioner to plead guilty (*id.* at 23-24, 28, 29, 54); (4) having an actual conflict with the prosecutor by having a personal relationship with her (*id.* at 23, 29, 35); (5) improperly waiving the "*Mapp*" hearing and for failing to adequately explain what a *Mapp* hearing was or the consequences of waiving the hearing (*id.* at 26, 54-55); (6) deceiving the trial court by stating that he would obtain a videotape of the bus terminal (*id.* at 27); (7) failing to adequately cross-examine Officer Duda (*id.* at 32-35, 37); (8) failing to object to the admittance of a bus ticket into evidence and failing to view this evidence (*id.* at 33); (9) advising Petitioner to testify in a narrative format without advising Petitioner of the "consequences and the prejudice of doing so" (*id.* at 36-37); (10) failing to "assist" Petitioner during his narrative testimony (*id.* at 38, 45, 47-49); (11) failing to request a lesser charge (*id.* at 50); (12) failing to properly impeach Pagan (*id.* at 51); (13) refusing to present inculpatory evidence (*id.* at 53); and (14) destroying exculpatory evidence (*id.* at 53).

arguments, as follows:

> [W]e reject defendant's contention that he was denied the effective assistance of counsel.  A review of the record reveals that counsel engaged in vigorous and meaningful representation at every stage of the proceedings, defendant's claims to the contrary notwithstanding.  We have considered defendant's remaining contentions, including those asserted in his *pro se* brief, and find them to be equally without merit.

*Johnson*, 30 A.D.3d at 775.  This determination was not contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

The Sixth Amendment to the United States Constitution provides that: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  To establish a violation of this right to the effective assistance of counsel, a habeas petitioner must show both: (1) that counsel's representation fell below an objective standard of reasonableness, measured in the light of prevailing professional norms; and (2) resulting prejudice, that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different.  *Strickland v. Washington*, 446 U.S. 668, 688-90 (1984); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("the legal principles that govern claims of ineffective assistance of counsel" were established in *Strickland*.).  There is a strong presumption that counsel's conduct fell within the wide range of reasonable assistance and that counsel's actions constituted sound trial strategy under the circumstances.  *Cuevas v. Henderson*, 801 F.2d 586, 589-90 (2d Cir. 1986).

The record shows that trial counsel's performance was objectively reasonable.  Before trial, counsel successfully argued that Petitioner had not been given his full *Miranda* warnings before making a statement.  Dkt. No. 12-15 (Ex. O) at 63-64, 66-68.  The court suppressed the statement.

Dkt. No. 12-4 (Ex. D) at 38-39.[5]  Further, counsel was effective because he had negotiated a favorable plea bargain, namely an indeterminate, six years-to-life prison sentence, which Petitioner declined.  Dkt. No. 12-15 (Ex. O) at 5-6.  *See Whitehurst v. Senkowski*, 485 F. Supp. 2d 105, 120 (N.D.N.Y. 2007) (McCurn, S.J.) (finding that the fact that a defendant had received a favorable plea bargain "militate[d] against a finding that his attorney rendered ineffective assistance").

During trial, counsel argued a defense that the evidence was insufficient.  For instance, during his opening statement, counsel pointed out that on the day of the incident, Petitioner simply was returning to the home of a relative in North Troy, New York.  TT at 34.  Moreover, counsel stressed that Pagan would be testifying as a result of a plea bargain.  *Id.* at 36.  Counsel further noted that Pagan, who physically possessed the drugs, never saw Petitioner place the drugs in her bag.  *Id.*

Counsel cross-examined several witnesses at length, including Officer Duda, (TT at 93-109); Pagan (*id.* at 143-62); Christopher Mark McDonough (Forensic Scientist) (*id.* at 182-87); and Gina Cataldo (Albany Bus Terminal Employee) (*id.* at 196-98).  Significantly, during the cross examination of Pagan, counsel elicited testimony from Pagan in which *she admitted that she lied in a letter she wrote to the trial court*.  *Id.* at 160-62.  Counsel also elicited from Pagan that she was testifying as a result of her plea bargain.  *Id.* at 147-50.

Counsel also made several objections during the People's case.  For instance, counsel objected to Pagan testifying as to statements Petitioner made to her.  TT at 117.  Counsel also objected to the admission of certain letters Petitioner wrote to Pagan.  *Id.* at 139-40.

Counsel then presented Petitioner's testimony, allowing him to testify in a narrative form.  TT at 204-19.  Thereafter, counsel moved to dismiss pursuant to CPL § 290.10.  TT at 200-01.

_____

[5]  These specific page numbers are those assigned by the Court's electronic filing system.

Counsel also presented a comprehensive summation.  He argued that the People failed to carry their burden of proof beyond a reasonable doubt, pointing out that the behavior exhibited by Petitioner and Pagan at the bus terminal was innocent and inconsistent with that of drug transporting; that Petitioner's arrest was the product of racial profiling; that Pagan offered no reason for her use of an alias and admitted to receiving "leniency" in exchange for testifying against Petitioner; and that Petitioner made no admissions in his letters to Pagan.  TT at 264-85.

### 1.    Waiver of Suppression Hearing

Petitioner claims that counsel was ineffective for waiving his right to a hearing to suppress the drugs, and for failing to "adequately inform" Petitioner about the hearing or the "consequences" of waiving the hearing.  Dkt. No. 1 at 20-21, 26, 44-45.  Respondent argues that these claims are unavailing.  Dkt. No. 11-1, at 34-36.

Counsel filed a pre-trial omnibus motion regarding, *inter alia*, dismissal of the indictment and suppression of all property and statements taken from Petitioner.  Dkt. No. 12-3 (Ex. C), att. F, at 2-4.  Petitioner was granted a *Huntley/Mapp* suppression hearing,[6] but the court stated that it would only hold the *Mapp* hearing if the court determined that Petitioner had standing.  Dkt. No. 12-1 (Ex. A), at A6-7.  At the beginning of the hearing, counsel stated that after conferencing with Petitioner, "we'd like to withdraw my application for a *Mapp* hearing as my client does not wish to assert standing with respect to the contents of the items in issue."  Dkt. No. 12-15 (Ex. O), at 3-4.  The items at issue consisted of the backpack and the contents therein, namely the drugs.  *Id.* at 4.  Most likely counsel did not want to associate Petitioner with possession of the backpack, simply to assert standing to suppress it.  This decision was strategic in nature and is thus "virtually

---

[6] *People v. Huntley*, 15 N.Y.2d 72 (1965); *Mapp v. Ohio*, 367 U.S. 643 (1961).

unchallengable." *Strickland*, 466 U.S. at 690-91.[7]  Moreover, if Petitioner moved to suppress the drugs, he likely would have been unsuccessful given the fact that Pagan had consented to a search of the bag.  TT at 59.  Thus, counsel was not ineffective for waiving Petitioner's right to a *Mapp* hearing.  Accordingly, Petitioner has failed to meet either prong of the *Strickland* standard.  Accordingly, the petition on this ground is denied.[8]

### 2.     Alleged Failures to Object and Adequately Cross-Examine

Petitioner argues that counsel failed to object to the admission of evidence of his incarceration, and failed to object to the accomplice jury charge.  Petitioner also claims that counsel failed to adequately cross-examine Officer Duda, and the forensic scientist, Christopher McDonough.  Dkt. No. 1 at 14-17, 19, 31-33.  Respondent argues that these claims are meritless.  Dkt. No. 11-1, at 36-38.

#### a.     Alleged Failures to Object

##### i.     Evidence of Incarceration

Regarding Petitioner's argument that counsel was ineffective for failing to object to the

---

[7]  Similarly, in *Hediam v. Miller*, the defense counsel "felt a motion for a *Mapp* hearing would be antithetical to his client's consistent contention that defendant never had any possessory or proprietary interest in the drugs or paraphernalia recovered."  *Hediam v. Miller*, No. 02Civ.1419, 2002 WL 31867722, at *17 (S.D.N.Y. Dec. 23, 2002) (Heck, M.J.) (recommending dismissal of this claim).  The court found that counsel's "strategic decision not to seek a suppression hearing did not constitute ineffective assistance of counsel under the *Strickland* standard." *Id.* at *18.

[8]  To the extent that Petitioner argues that counsel was deficient for failing to adequately explain the concept of a suppression hearing, or the consequences of waiving the hearing, to Petitioner, Dkt. No. 1 at 20-21, Petitioner has failed to establish that even if this was true and that such failures constituted a deficient performance by counsel, that the outcome of the proceeding would have been different.

To the extent that Petitioner argues that the state court failed to address the issue of the waiver of the suppression hearing, Dkt. No. 1 at 21, the Appellate Division directly addressed Petitioner's contention that counsel was ineffective.  *Johnson*, 30 A.D.3d at 775.

admission of evidence of his incarceration, Dkt. No. 1 at 14, 17, *counsel did object* to the admission of this evidence, on the bases that a proper foundation was not laid and that the evidence was unduly prejudicial.  TT at 139-40.  Thus, Petitioner's claim that counsel failed to object to the introduction of this evidence is without merit and is denied.

To the extent that Petitioner argues that counsel was ineffective for failing to seek a curative instruction regarding the evidence of his incarceration, Dkt. No. 1 at 17, the trial court overruled counsel's objection to the evidence, which the Appellate Division stated was proper.  *Johnson*, 30 A.D. 3d at 775.  Therefore counsel had no reason to seek a curative instruction.[9]  Accordingly, Petitioner has failed to meet either prong of the *Strickland* standard, and the petition on this ground is denied.

### ii.       Accomplice Jury Charge

Regarding Petitioner's argument that counsel was ineffective for failing to object to the accomplice jury charge, Dkt. No. 1 at 19, this argument is unavailing.  The trial court properly gave the accomplice jury charge because Pagan had participated in the charged offense.  She testified that she agreed to transport drugs for Petitioner by allowing him to place the drugs in her backpack and by accompanying him on a bus to Albany.  TT at 118-28.  She further testified that she pled guilty to criminal possession of a controlled substance.  TT at 141-42.

The Appellate Division rejected Petitioner's claim that the trial court erred in instructing the jury as to accomplice testimony.  *Johnson*, 30 A.D.3d at 775.  The court reasoned that "by pleading

---

[9] *See Maxwell v. Greiner*, No. 04-CV-4477, 2008 WL 2039528, at *11 (E.D.N.Y. May 12, 2008) (noting that petitioner's argument that counsel did not seek a curative instruction after objecting to testimony "d[id] not make sense given that the objection was overruled" and that it was "illogical" for counsel to seek a curative instruction when another objection to testimony was overruled).

guilty to criminal possession of a controlled substance, Pagan conclusively established her complicity and County Court quite properly rendered an accomplice instruction to the jury." *Id.*

Therefore, counsel had no basis to object to the accomplice jury charge. Any such objection would have been overruled as baseless. Accordingly, counsel did not render ineffective assistance by failing to make a baseless objection. *See United States v. DiPaolo*, 804 F.2d 225, 234 (2d Cir. 1986) (holding that the failure to make a meritless objection does not constitute ineffective assistance).

Moreover, the charge was potentially helpful to Petitioner. The Court essentially instructed the jury that Petitioner could not be convicted solely on Pagan's testimony. TT at 322.

Therefore, Petitioner has failed to establish either prong of the *Strickland* standard. Accordingly, the petition on this ground is denied.

### b.    Alleged Failures to Adequately Cross Examine

### i.    Officer Duda

Petitioner argues that counsel was ineffective by failing to cross-examine Officer Duda regarding his failure to inventory Pagan's backpack. Dkt. No. 1 at 31-33. As Respondent pointed out, Dkt. No. 11-1 at 37, counsel specifically asked Duda about whether he performed an inventory of the contents of the backpack. TT at 65. Duda stated that he performed no inventory. *Id.* Thus, this claim is unavailing.

Petitioner also argues that counsel was ineffective by failing to cross-examine Officer Duda regarding an "old" bus ticket. Dkt. No. 1 at 24, 26, 29-34; Dkt. No. 16 at 2-5. Officer Duda testified that he recovered a bus ticket from the backpack. TT at 78-79. The ticket bore the name of Robert Ross, which was the alias used by Petitioner on the day of the incident. *Id.* at 53-54, 78, 206.

17

Petitioner claimed that this ticket was "planted" in the backpack and that the ticket was actually recovered from his pocket by Officer Frangella at the police station. *Id.* at 209. Petitioner claims that he insisted that counsel question Officer Duda as to this issue before Officer Duda testified about the ticket. Dkt. No. 1 at 31.

The transcript reveals that after counsel elicited testimony from Officer Duda that he performed no inventory of the backpack, counsel attempted to ask Officer Duda about the contents of the bag, but the court stopped counsel because the contents were not being offered into evidence at that point. TT at 65. When Officer Duda later testified about the contents, which included the bus ticket, counsel made no objection to the ticket being entered into evidence. TT at 67-80. Perhaps counsel did not want to call extra attention to the old bus ticket, and instead wanted the jury to focus on *the events that occurred on the day of the incident*. In any event, the decision to refrain from questioning Officer Duda at that point was strategic in nature, and will not support Petitioner's claim. Indeed, decisions about "whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (citing *U.S. v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) (quotation marks omitted)). Further, Petitioner's claim that the bus ticket was planted is purely speculative. Unsubstantiated conclusions, opinions, or speculation cannot serve as a basis for habeas relief. *See Wood*, 516 U.S. at 8. Thus, Petitioner failed to meet either prong of the *Strickland* standard. Accordingly, the petition on these grounds is denied.

### ii.        Christopher McDonough

Petitioner argues that counsel was unprepared to cross-examine the forensic scientist, Christopher McDonough. Dkt. No. 1 at 16, 17. Specifically, Petitioner argues that counsel

admitted that he lacked knowledge regarding drugs and drug testing procedures, and failed to question McDonough "about the foibles inherent in drug testing." *Id.* Respondent argues that counsel effectively cross-examined this witness. Dkt. No. 11-1 at 37-38.

At trial, counsel commenced his cross-examination of McDonough by stating, "I am going to apologize to you up front. I'm unfamiliar with a lot of these scientific terms." TT at 183. Counsel's statement was likely a strategic tactic used to gain the attention of the jury and perhaps a way to elicit clear, explanatory answers from this witness for the jury's benefit. Thereafter, counsel vigorously cross-examined McDonough, asking him numerous questions about the specific drug tests that he performed, his custody of the drugs, his work area, and his past experience with "false positive" test results, as well as a hypothetical question. TT at 182-87. Thus, Petitioner has failed to meet either prong of the *Strickland* standard. Accordingly, the petition on this ground is denied.

### 3. Alleged Failures to Investigate

Petitioner alleges that counsel was ineffective for failing to obtain videotapes of the bus terminal, and for failing to speak to the cab driver. Dkt. No. 1 at 15-16, 24, 26-27, 31-33, 38-39. Respondent claims that these omissions were sound trial strategy and did not constitute ineffective assistance. Dkt. No. 11-1, at 38-40.

#### i. Videotapes

Petitioner argues that counsel was ineffective for failing to obtain videotapes of the bus terminal because the videotapes "would have shown that [his] stop and arrest w[ere] unlawfully initiated." TT at 24. Petitioner thus argues that a videotape of the bus terminal would impeach Officer Duda's credibility. *Id.* at 31-32.

At the beginning of trial, counsel stated that he spoke to representatives from the bus

terminal, who informed counsel that while there were videotapes of the *inside* of the terminal, there were no videotapes of the *outside* of the terminal.  TT at 3.  Thus, counsel investigated the existence of the alleged videotapes, and discovered that there were no videotapes of the outside of the terminal, which is where the stop and arrest occurred.  *Id.* at 48, 49, 78, 128, 130, 205-07, 218. Petitioner himself admitted that the arrest occurred *outside of the bus terminal at the cab*.  *Id.* at 205-07.  Therefore, Petitioner's argument is unavailing.[10]  Thus, Petitioner has failed to meet either prong of the *Strickland* standard.  Accordingly, the petition on this ground is denied.[11]

ii.     **Cab Driver**

Petitioner claims that counsel "refused to send an investigator to speak to the cab driver concerning the arresting officers' claims about what transpired just prior to [Petitioner's] arrest." Dkt. No. 1 at 16.  Petitioner vaguely claims that the cab driver "would have contradicted what the officers said took place."  *Id.* at 24.

"The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."  *U.S. v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987), *cert. denied*, 484 U.S. 957 (1987).

Counsel made a tactical decision to refrain from calling the cab driver as a witness.

---

[10]  In his traverse, Petitioner argues that he incorrectly phrased his original request for videotapes, and states that he requested tapes of the *inside* of the bus terminal.  Dkt. No. 16 at 5 n.2. However, the stop and arrest occurred *outside* of the terminal at the cab.  TT at 48, 49, 78, 128, 130, 205-07, 218.  Therefore, there was no reason for counsel to obtain videotapes of the inside of the terminal because the stop and arrest did not occur there.

[11]  To the extent that Petitioner claims that counsel should have "place[d] proper blame" on the prosecutor because it was her obligation to provide the videotapes, Dkt. No. 1 at 27, this claim too is unavailing.  As noted there were no videotapes of the outside of the terminal, which is where the arrest occurred.  Therefore, counsel had no reason to "blame" the prosecutor for failing to provide a videotape that was nonexistent.

Moreover, it is unclear how testimony from the cab driver would have advanced the defense.

Further, Petitioner fails to explain how the cab driver "would have contradicted what the officers

said took place."

 Therefore, Petitioner has failed to meet either prong of the *Strickland* standard.

Accordingly, the petition on this ground is denied.

  **4.**  **Failure to Impeach Pagan with Letters**

 Petitioner argues that counsel was ineffective for failing to impeach Pagan using alleged

inculpatory letters that she wrote to him.  Dkt. No. 1 at 16, 40, 42-43.  Respondent fails to

specifically address this issue.

 "[S]trategic choices made after thorough investigation of law and facts relevant to plausible

options are virtually unchallengeable...."  *Strickland*, 466 U.S. at 690.  Moreover, "counsel is

strongly presumed to have rendered adequate assistance and made all significant decisions in the

exercise of reasonable professional judgment."  *Id.*

 At the close of the evidence, out of the presence of the jury, Petitioner brought the letters to

the court's attention, and apparently was holding the letters in question.  TT at 259.  Counsel stated

that he had "never seen" the letters Petitioner was holding.  *Id.* at 260.  However, he stated that

Petitioner gave him one letter that Pagan wrote Petitioner, and that he "strategically discussed" the

letter with Petitioner and that Petitioner "knew that we were not going to enter that letter into

evidence."  *Id.* at 260.  Petitioner claimed that he showed the other letters to counsel.  *Id.*  The trial

court denied Petitioner's request to admit the letters, noting that Petitioner "had an attorney that's

worked diligently and hard on your behalf," and that Petitioner's request was made after the proof

closed.  *Id.* at 262.

Plainly, counsel made a strategic decision not to use the letter he received from Petitioner.

Regarding the alleged other letters, which Petitioner claims he showed counsel, counsel denied that

Petitioner showed him other letters.  TT at 260.  Even assuming *arguendo* that Petitioner did show

counsel other letters, counsel attacked Pagan's credibility through other means.  Counsel vigorously

cross-examined Pagan and elicited testimony from Pagan in which *she admitted that she lied in a*

*letter she wrote to the trial court*.  *Id.* at 160-62.  He also elicited from Pagan that she was testifying

as a result of her plea bargain.  *Id.* at 147-50.  For example, counsel strenuously attacked Pagan's

credibility in the following exchange:

> Q:   It's your testimony that you have, you know, untruths in this case, correct?
>       You have lied about the facts in this case, correct?
> A:   No.  Never.
> Q:   Never lied to Judge Breslin in the letter?
> A:   In the letter I did.  That was before my indictment, yes.
> Q:   So it's - - I didn't ask about the indictment, ma'am.  Is it a fair statement to
>       make that you have lied and misrepresented the facts about this case?
> A:   At one point, yes.
> Q:   So you lied at one point.
> A:   At one point I did, yes.
> Q:   But now you want the jury to believe what you're saying.
> A:   I took the plea for my well-being.
> Q:   My question - -
> A:   I took the plea for my well-being which was possession.
> Q:   Ma'am, that's not my question.  My question is you lied at one point in time.
> A:   At one point I lied but - -
> Q:   Now you want - -
> A:   Once I got indicted and the truth needed to be told, you know, I knew I did
>       wrong and I took my well-being.
> Q:   Ma'am, once again my question and please answer my question, at one point
>       in time you lied to the Judge, correct?
> A:   Yes.
> Q:   And now you wish for the jury to believe that you are telling the truth.
> A:   Yes.
> Q:   And in light of the fact that you lied before, correct?
> A:   Yes.

TT at 161-62.

Similarly, in *Farrington v. Senkowski*, 19 F. Supp. 2d 176, 179-80 (S.D.N.Y. 1998), *aff'd*, 214 F.3d 237 (2d Cir. 2000), the court noted that the trial counsel's failure to introduce a witness's videotaped statement or to highlight a purported inconsistency between that statement and the witness's trial testimony did not constitute ineffective assistance of counsel. Counsel judged the videotape to be both inculpatory and exculpatory, and attacked the witness's credibility by other means. *Id.*

In light of the foregoing, Petitioner has failed to meet either prong of the *Strickland* standard. Accordingly the petition on this ground is denied.

**5.      Petitioner's Narrative Testimony**

Petitioner argues that counsel was ineffective by refraining from directly questioning Petitioner and by allowing him to testify in a narrative fashion, essentially "abandon[ing]" him. Dkt. No. 1 at 34. Petitioner also argues that counsel should have stopped his testimony to ask him questions about the videotapes, old bus ticket, and letters from Pagan. *Id.* at 37. Petitioner further argues that counsel "excessively" pressured him to continue testifying even after Petitioner stated that he was finished testifying. *Id.* at 28. Respondent failed to specifically address these issues.

At trial, counsel asked Petitioner three introductory questions, and then asked him to tell his version of the events in question. TT at 20-405. Petitioner testified, uninterrupted and at length, presenting his version of the events. *Id.* at 205-14. When Petitioner stopped talking, counsel asked him if there was anything else that he wanted to tell the jury, which prompted Petitioner to continue testifying in narrative fashion. *Id.* at 214-19. This sequence took place several times until Petitioner stated that he had told the jury his entire version of the events. *Id.*

First, the trial transcript indicates that Petitioner admitted to counsel that he committed the charged offenses. TT at 276-77.[12] "In the representation of a client, a lawyer shall not . . . [k]nowingly use perjured testimony or false evidence," or "assist the client in conduct that the lawyers knows to be illegal or fraudulent." N.Y. Code of Prof. Resp., DR 7-102. Counsel likely wished to avoid violating professional responsibility rules, and therefore chose not to directly question Petitioner. Accordingly, Petitioner's claim that counsel was ineffective by allowing him to testify in a narrative form is unavailing. *See DePallo v. Burge*, 296 F. Supp. 2d 282, 290-92 (E.D.N.Y. 2003) (finding that counsel's elicitation of the petitioner's testimony in narrative form did not constitute ineffective assistance of counsel, since this course enabled counsel to "fulfill[] his ethical obligations to the court and to his client"); *Benedict v. Henderson*, 721 F. Supp. 1560, 1563 (N.D.N.Y. 1989) (Foley, S.J.) (finding no Sixth Amendment violation where defense counsel doubted that defendant would testify truthfully and allowed defendant to testify in narrative form), *aff'd*, 904 F.2d 34 (2d Cir. 1990), *cert. denied*, 498 U.S. 867 (1990).

Moreover, the evidence against Petitioner was strong. Thus, even assuming *arguendo* that counsel's conduct fell below an objective standard of reasonableness, Petitioner cannot satisfy the prejudice prong of the *Strickland* standard in light of the strong evidence presented at trial against Petitioner, including the testimony of Officer Duda and Pagan. *See U.S. v. John Doe No. 1*, 272 F.3d 116, 126 (2d Cir. 2001) (holding similarly and noting that the petitioner had not demonstrated that counsel's "so-called abandonment," which resulted in the petitioner testifying in a narrative form, prejudiced the outcome).

---

[12] During a sidebar conference, the trial court reminded counsel that "you have already indicated to this Court that he has admitted it to you[.]" TT at 276-77.

24

Second, Petitioner's claim that counsel should have stopped his testimony to ask him questions about the videotapes, old bus ticket, and letters from Pagan, Dkt. No. 1 at 37-38, is unpersuasive. Counsel was not ineffective for refraining from directly asking Petitioner questions. Moreover, Petitioner cannot show that the outcome of his trial is unreliable because counsel failed to question him regarding the videotapes, the old bus ticket, or letters from Pagan. In any event, *Petitioner took it upon himself to talk about the videotapes and old bus ticket*, telling the jury that the old bus ticket was "planted" in the backpack, and that there are videotapes of the bus terminal that would show that he did not act suspiciously. TT at 217-18.

Third, Petitioner further claims that counsel "excessively" pressured him to continue testifying even after Petitioner stated that he was finished testifying. Dkt. No. 1 at 28. Petitioner is apparently referring to when counsel asked Petitioner if there was anything else that he wanted to tell the jury, which prompted Petitioner to continue testifying at length. TT at 214-19. As noted, this sequence occurred several times until Petitioner stated that he had told the jury his entire version of the events. *Id.* There is no indication that counsel "excessively pressured" Petitioner to continue testifying. If anything, counsel likely wanted to ensure that Petitioner presented his entire version of the events to the jury.

Therefore, Petitioner has failed to meet either prong of the *Strickland* standard. Accordingly, the petition on these grounds is denied.[13]

_____

[13] To the extent that Petitioner claims that counsel and the trial court failed to advise him of his Fifth Amendment rights and the consequences and prejudice of testifying, Dkt. No. 1 at 34-35, 39, this claim provides no basis for relief. Petitioner's claim assumes that both counsel and the trial court knew what the consequences, and possible prejudice, of his decision to testify would be. It thus appears that Petitioner is arguing that counsel and the trial court knew that Petitioner would be convicted if he testified. The Appellate Division rejected this claim as meritless, *Johnson*, 30 A.D.3d at 775, and Petitioner has failed to support his bald claim in this Court. Accordingly, the

**6.      Alleged Conflict of Interest Due to Alleged Romantic Relationship**

Petitioner argues that counsel labored under a conflict of interest because counsel was involved in a romantic relationship with the prosecutor.  Dkt. No. 1 at 25, 33.  Petitioner also argues that because of this conflict, counsel insisted that Petitioner plead guilty because counsel trained the prosecutor, this was her first "real case," she was inexperienced, and "she knew his tactics and he knew her tactics;" therefore counsel "could not win this case at trial."  *Id.* at 25.  Respondent argues that no actual or even potential conflict affected counsel's overall representation of Petitioner.  Dkt. No. 11-1 at 40-42.

A defendant's Sixth Amendment right to counsel further guarantees the right to conflict-free representation.  *See Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980).  When an ineffective assistance of counsel claim is predicated upon an alleged conflict of interest, the petitioner must demonstrate either (1) a per se conflict;[14] (2) an actual conflict that adversely affected a lawyer's performance; or (3) a potential conflict of interest that results in prejudice.  *See Cuyler*, 446 U.S. at 349-50 (1980); *see also Armienti v. United States*, 313 F.3d 807, 810 (2d Cir.

───────────────

petition on this ground is denied.

[14]  A *per se* conflict of interest exists in only two limited circumstances, and requires automatic reversal of a conviction without a showing of prejudice: (1) where trial counsel is not authorized to practice law or (2) where counsel is implicated in the crime for which his client is on trial.  *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000).  Neither of these circumstances is present in the instant case.

2002).[15]

In cases where an asserted conflict arises between the interests of the defendant and those of his attorney, the Second Circuit has promulgated a three-stage analysis. *United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000). The defendant must establish: (1) that an actual conflict of interest existed;[16] (2) the existence of an "actual lapse in representation," that resulted from the conflict;[17] and (3) causation-that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Id.* (citations and quotation marks omitted).

While the line between an actual and a potential conflict of interest is not always apparent, *see United States v. Cruz*, 982 F. Supp. 946, 948 n. 6 (S.D.N.Y. 1997), a potential conflict exists "if the interests of the defendant could place the attorney under inconsistent duties in the future," *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004) (emphasis in original) (citation omitted).

A defendant who proves that an actual conflict of interest affected the adequacy of his representation need not demonstrate prejudice. *Sullivan*, 446 U.S. at 349-50. On the other hand, a defendant who has established a potential conflict of interest is required to demonstrate prejudice in accordance with *Strickland* in order to prove that the conflict violated his right to effective assistance of counsel. *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993) (citing *Strickland*, 466 U.S.

---

[15] Whether a conflict of interest exists is a mixed question of law and fact. *See Cuyler*, 446 U.S. at 342; *see also United States v. Feyrer*, 333 F.3d 110, 115-16 (2d Cir. 2003).

[16] An actual conflict of interest arises during representation when the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action. *Moree*, 220 F.3d at 69 (citations and quotation marks omitted).

[17] An "actual lapse in representation" is demonstrated by the existence of some plausible alternative defense strategy not taken up by counsel. The defendant need not show that the alternative defense would necessarily have been successful only that it possessed sufficient substance to be a viable alternative. *Moree*, 220 F.3d at 69 (citations and quotation marks omitted).

27

at 688-90); *see also Sullivan*, 446 U.S. at 350 ("[T]he possibility of conflict is insufficient to impugn a criminal conviction.").

Initially, Petitioner's claim that counsel and the prosecutor were involved in a romantic relationship is completely unsubstantiated.  As noted, unsubstantiated conclusions, opinions, or speculation cannot serve as a basis for habeas relief.  *See Wood*, 516 U.S. at 8.

Moreover, Petitioner has failed to establish that an actual conflict of interest existed, that an actual lapse in representation occurred, and causation.  Petitioner also cannot demonstrate that counsel labored under a potential conflict of interest.  As discussed above, counsel's representation was objectively reasonable.

Regarding Petitioner's claim that counsel insisted that Petitioner plead guilty because of the alleged romantic relationship, this is completely speculative and unsubstantiated.  Moreover, even assuming that counsel insisted that Petitioner plead guilty, the alleged insistence was obviously futile as *Petitioner did not plead guilty*.  Further, even if counsel did advise Petitioner to plead guilty, Petitioner has failed to prove that counsel did anything other than provide professional advice.

For the foregoing reasons, Petitioner has failed to show that counsel was deficient. Accordingly, these claims are unavailing and are denied.

**7.      Alleged Conflict of Interest Due to Allegations of Coercion**

Petitioner argues that counsel was ineffective because he was laboring under a conflict of interest at trial when defense counsel was placed in the position of "having to contradict his client in order to protect himself from allegations of malpractice and potential liability."  Dkt. No. 1 at 28. Respondent failed to specifically address this issue.

28

Petitioner cites *United States v. Davis*, 239 F.3d 283 (2d Cir. 2001)[18] for support.  Dkt. No. 1 at 28.  In that case, the Second Circuit addressed the issue of whether a defendant was denied effective assistance of counsel *at his plea withdrawal hearing*.  *Davis*, 239 F.3d at 286.  The Court held that defense counsel suffered from an actual conflict of interest at the hearing.  *Id.* at 285.  The Court noted as follows:

> *Many of Davis's allegations of coercion do not suffice to create an actual conflict. For example, defense counsel's perhaps honest assessment that Davis would be found guilty if he went to trial, and that failing to take the plea would result in Davis "losing everything," might constitute nothing more than competent advice.* However, Davis also makes particularized allegations that counsel had threatened not to investigate his case and not to file pre-trial motions if Davis did not accept the plea. These allegations are sufficient to create an actual conflict of interest.

*Id.* at 287 (emphasis added).

Here, Petitioner made no such particularized allegations of coercion.  Petitioner's allegations describe only competent counsel's candid advice about the risks of going to trial.  For instance, at the beginning of trial, Petitioner stated that counsel was ineffective for the following relevant reasons:

> [H]e is continuously telling me to cop out; that he told me I wasn't going to be - - I wasn't going to -- you weren't going to grant a suppression hearing.  I'm telling you right now Mr. Breslin is not going to, your Honor, the Judge is not going to grant you hearings.  He just getting me to cop out.  I'm thinking he is not in the best interests of my defense.
>
> . . . .
> He keeps telling me there is no - - they are going to - - you are going to lose this case. I don't know why you are going to trial.  He is not telling me - - he is not defending me.  That's telling me to cop out.

TT at 4-5.

─────────────────────

[18]  Petitioner failed to provide a citation to this case.  Therefore, the Court assumes that *United States v. Davis*, 239 F.3d 283 (2d Cir. 2001), is the case to which Petitioner refers.

Petitioner's allegations simply describe candid advice from counsel.  Where "a defendant's allegations describe only competent counsel's candid advice about the risks of going to trial, counsel will not be placed in an actual conflict between advocating for his client's interests and his own." *Davis*, 239 F.3d at 286-87.  Petitioner cannot establish that counsel was laboring under a conflict of interest at trial due to allegations of coercion, and therefore cannot establish that counsel was deficient.  Accordingly, the petition on this ground is denied.

**F.    Trial Court Inquiries**

Petitioner claims that the trial court erred by failing to inquire into the alleged romantic relationship between counsel and the prosecutor, as well as the alleged insistence by counsel that Petitioner plead guilty.  Dkt. No. 1 at 25, 29, 46.  He claims that separate counsel should have been appointed to assist him in establishing these allegations.  *Id.*  Respondent failed to specifically address these issues.

When a trial court is "sufficiently apprised of even the possibility of a conflict of interest," the court has an inquiry obligation.  *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994) (citation omitted).  "The court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all."  *Id.* (citation omitted).

At the beginning of trial, Petitioner informed the court that he wanted to relieve counsel for various reasons, TT at 2-5, including the following:

Petitioner:[19]    I just don't feel that - - he also had a relationship, some sort of friendly relationship with the prosecution.  He has told me about he has worked with her, the district attorney.  He used to be a DA.  I

_____

[19]  In the original transcript, Petitioner is referred to as "The Defendant."  Dkt. No. 12-16.

30

don't feel comfortable with him representing me.

The Court:     Because he was a former Assistant District Attorney?

Petitioner:    No.  He keeps telling me there is no - - they are going to - - you are
               going to lose this case.  I don't know why you are going to trial.  He is
               not telling me - - he is not defending me.  That's telling me to cop out.

The Court:     Well, no sir.  An attorney has an obligation to give you their opinion
               as to what they believe the outcome of the trial might be.

               They're not supposed to give you some pie in the sky answer and say
               hey, that's the greatest case in the world.  They are supposed to give
               you the best opinion.

Petitioner:    He is not supposed to - -

The Court:     Excuse me.

Petitioner:    Pardon me.

The Court:     But it's always for the client to decide whether they want to plead or
               go to trial.  We're here at trial because you decided that's the case.  So
               have a seat.  We are going to proceed.

TT at 4-5.

Thus, the transcript reveals that Petitioner made no mention of the alleged romantic

relationship.  He simply stated that the attorneys had a "friendly" relationship, that the attorneys had

worked together, and that counsel used to be a prosecutor.  TT at 4-5.  Upon the trial court's

questioning, Petitioner clarified that he was uncomfortable with counsel representing him because

of the alleged insistence that Petitioner plead guilty.  Further, Petitioner himself stated in the petition

that it was "hard" for him to "explain" the relationship to the trial court albeit because Petitioner

claims that he knew that "counsel was a married man."  Dkt. No. 1 at 25.  Therefore, I find that the

trial court was not "sufficiently apprised" of the alleged romantic relationship.  Accordingly, the

31

trial court had no obligation to inquire into the alleged romantic relationship because it was never made aware of its existence.[20]   Moreover, the trial court had no reason to appoint separate counsel to assist Petitioner with regard to these allegations.

As to the allegation that the trial court failed to inquire into counsel's alleged insistence that Petitioner plead guilty, Dkt. No. 1 at 29, 46, this claim is unavailing.  The trial court patiently listened to the numerous reasons why Petitioner wanted to relieve counsel, and even asked Petitioner to elaborate on these claims.  TT at 2-5.  The trial court explained that counsel had an obligation to give him his best opinion as to the outcome of the case.  *Id.* at 5.  The trial court also explained to Petitioner that ultimately it was his choice to proceed to trial.  *Id.*

"[C]ounsel has a professional obligation to adequately inform her client about the considerations that are relevant to her client's decision to accept or deny a plea bargain."  *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005).  Moreover, an attorney who advises a client to take an offer and warns him that his failure to do so would result in a lengthy prison sentence "merely asserts that the lawyer gave professional advice as to what the consequences of his choice might be."  *Moree*, 220 F.3d at 72.

Therefore, the trial court inquired into the reasons why Petitioner wanted to relieve counsel, including the allegation that counsel had informed Petitioner that he should accept the plea bargain and that he had a low or no chance of success at trial.  There was no reason to appoint separate

---

[20]  In his traverse, Petitioner cites *Summerlin v. Stewart*, 267 F.3d 926 (9th Cir. 2001), for support.  Dkt. No. 16 at 9.  This opinion is uncontrolling and furthermore was withdrawn. *Summerlin v. Stewart*, 281 F.3d 836 (9th Cir. 2002).

counsel to assist Petitioner.  Accordingly, the petition on this ground is denied.[21]

**G.      Resentencing Claim**

Petitioner argues that he was improperly resentenced under § 70.71 of the Rockefeller Drug

Law Reform Act ("Reform Act") because the statute requires a positive testing of at least eight

ounces to qualify as a class A-I felony, but that the prosecution tested only seven ounces.  Dkt. No. 1

at 46-52.

Respondent argues that Petitioner was properly resentenced within the limits set by the

legislature under § 70.71, and his challenge to the length of his sentence, thus, is not cognizable.

Dkt. No. 11-1, at 42-43.  Respondent further argues that Petitioner's claim is meritless because,

*inter alia*, the state court found that the re-sentencing provisions permit a new determinate sentence

to be imposed but do not change the underlying conviction.  *Id.* at 43, at n.12.

A petitioner's assertion that a sentencing judge abused his discretion in sentencing is

generally not a federal claim subject to review by a habeas court.  *See Fielding v. LeFevre*, 548 F.2d

1102, 1109 (2d Cir. 1977) (petitioner raised no cognizable federal claim by seeking to prove that

state judge abused his sentencing discretion by disregarding psychiatric reports) (citing *Townsend v.*

*Burke*, 334 U.S. 736, 741(1948)) ("The [petitioner's] sentence being within the limits set by the

statute, its severity would not be grounds for relief here even on direct review of the conviction,

---

[21]  To the extent that Petitioner is claiming that the trial court should have conducted an inquiry into counsel's "refusal to represent" Petitioner, Dkt. No. 1 at 41, this claim is unavailing. Petitioner refers to a portion of the trial transcript in which counsel stated that "from the very beginning of this trial I have been systematically harassed by my client."  TT at 259.  The trial court stopped counsel, stating "We're not going to get into that."  *Id.* at 260.  Counsel responded, "That's fine, Judge."  *Id.*  Nothing from this portion of the transcript indicates that counsel refused to represent Petitioner.  Petitioner points to no other evidence indicating that counsel refused to represent Petitioner, and the Court is unaware of any such evidence.  Thus this claim is unavailing.

much less on review of the state court's denial of habeas corpus.").  Clearly established federal law

holds that "[n]o federal constitutional issue is presented where, as here, the sentence is within the

range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)(holding that a

state prisoner who was sentenced within the limits of the state law does not present a federal

constitutional issue for habeas purposes) (citing *Underwood v. Kelly*, 692 F. Supp. 146

(E.D.N.Y.1988), *aff'd mem.*, 875 F.2d 857 (2d Cir. 1989)); *see also Jackson v. Lacy*, 74 F. Supp. 2d

173, 181 (N.D.N.Y. 1999) (McAvoy, C.J.) ("[i]t is well-settled ... that a prisoner may not challenge

the length of a sentence that does not exceed the maximum set by state law").

       After the Reform Act became effective in January of 2005, Petitioner, as a second felony

offender, could have been resentenced to a minimum determinate term of twelve years and a

maximum determinate term of twenty-four years in prison, plus five years' post-release supervision.

N.Y. Penal Law §§ 60.04(2), 70.71(3)(b)(I).  Petitioner was resentenced to a determinate fourteen-

year prison term, to run concurrent to his ten-to-twenty years' prison term.  Dkt. No. 12 (Ex. K) at 2.

While Petitioner's fourteen-year determinate prison term was greater than the possible minimum

term, it was still within the range.  Dkt. No. 12-11 (Ex. K) at 2-3.  Accordingly, no federal

constitutional issue is presented here, since the sentence was within the applicable statutory range.

       However, Petitioner argues that he was improperly resentenced under § 70.71 because the

statute requires a positive testing of at least eight ounces to qualify as a class A-I felony, but that the

prosecution's witness testified that he analyzed only seven ounces.  Dkt. No. 1 at 46-52.  At the time

of Petitioner's trial, the weight requirement for criminal possession of a controlled substance in the

first degree was four ounces.  *See* N.Y. Penal Law § 220.21 (2004); TT at 314.  Under the Reform

Act, the applicable weight requirement was raised to eight ounces.  N.Y. Legis. 2004, ch. 738, §

34

220.21.

The state court rejected this claim as meritless.  Dkt. No. 12-12, at 3.  The court noted, "the re-sentencing provisions permit a new determinate sentence to be imposed but do not change the underlying conviction."  *Id.*  This Court agrees.  Petitioner was convicted upon a jury finding that he possessed four ounces of a controlled substance, which is all that the law required at the time of his trial.[22]  Moreover, the State's forensic scientist testified that he analyzed only the contents of two of the five bags containing the drugs because it was "New York State Police policy to analyze only enough evidence to reach the highest legal weight cut off," which was four ounces.  TT at 172.  Accordingly, Petitioner's claim is denied.

**WHEREFORE**, based upon the foregoing, it is hereby

**ORDERED**, that the petition for a writ of habeas corpus (Dkt. No. 1) is **DENIED** and **DISMISSED**;

**ORDERED**, that a certificate of appealability not issue with respect to any of the claims set forth in the petition as Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2); and it is further

---

[22]  *See People v. Quinones*, 22 A.D.3d 218, 219 (N.Y. App. Div. 2005) (holding that upon raising weight requirement for first-degree drug possession conviction from four to eight ounces, defendant was not entitled to reduction of first-degree possession conviction to second-degree possession, since a jury finding that defendant possessed four ounces of cocaine was all that the law required to convict him at the time of trial), *leave to appeal denied*, 6 N.Y.3d 817 (N.Y. 2006).

**ORDERED**, that the Clerk serve copies of the electronically-available-only opinions cited herein on Petitioner.[23]


Dated: March 24, 2010




Thomas J. McAvoy
Senior, U.S. District Judge

---

[23] Those decisions include *Welch v. Artus*, No. 04-cv-205S, 2007 WL 949652 (W.D.N.Y. Mar. 29, 2007); *Hediam v. Miller*, No. 02Civ.1419, 2002 WL 31867722 (S.D.N.Y. Dec. 23, 2002); and *Maxwell v. Greiner*, No. 04-CV-4477, 2008 WL 2039528 (E.D.N.Y. May 12, 2008).

36



Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Oliver HEDIAM, Petitioner,
v.
David MILLER Superintendent, Respondent.
No. 02Civ.1419AGSAJP.

Dec. 23, 2002.

State prisoner petitioned for habeas corpus. The District Court, Peck, Magistrate Judge, filed a report and recommendation to the effect that: (1) claim that conviction on three counts was inconsistent with acquittal on another was not cognizable on habeas corpus; (2) evidence was legally sufficient; and (3) trial counsel was not ineffective in not filing a suppression motion.

Report and recommendation filed.

West Headnotes

**[1] Habeas Corpus 197** ⌐⌐⌐   461

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
            197k461 k. Grounds in General. Most Cited Cases
Petitioner's claim that jury's acquittal on charge of criminal possession with intent to sell was inconsistent with and repugnant to its convicting petitioner of criminal possession in the first degree, and was a "compromise verdict," in violation of due process, was not cognizable on habeas corpus. U.S.C.A. Const.Amend. 14; 28 U.S.C.A. § 2254.

**[2] Controlled Substances 96H** ⌐⌐⌐   80

96H Controlled Substances
    96HIII Prosecutions
        96Hk70 Weight and Sufficiency of Evidence
            96Hk80 k. Possessory Offenses. Most Cited Cases

**Controlled Substances 96H** ⌐⌐⌐   89

96H Controlled Substances
    96HIII Prosecutions
        96Hk70 Weight and Sufficiency of Evidence
            96Hk89 k. Paraphernalia and Instrumentalities. Most Cited Cases
Evidence was legally sufficient to convict defendant of first degree criminal possession of a controlled substance and second degree criminally using drug paraphernalia, under New York law, though contraband was found in bedroom allegedly rented to another person, in light of evidence that defendant exercised control over the apartment in which the contraband was found in plain sight in an open bedroom. McKinney's N.Y. Penal Law §§ 10.00(8), 220.21(1), 220.25(2), 220.50.

**[3] Criminal Law 110** ⌐⌐⌐   1926

110 Criminal Law
    110XXXI Counsel
        110XXXI(C) Adequacy of Representation
            110XXXI(C)2 Particular Cases and Issues
                110k1921 Introduction of and Objections to Evidence at Trial
                    110k1926 k. Suppression of Evidence. Most Cited Cases
        (Formerly 110k641.13(6))
Trial counsel was not ineffective in not filing a motion to suppress the drugs and drug paraphernalia found in bedroom, and state court's ruling to that effect was not an unreasonable application of *Strickland*, so as to warrant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

habeas relief, where petitioner maintained as an integral part of his defense that the police seized the drugs and paraphernalia from a locked bedroom that belonged to boarder and, if this was the case, petitioner would not have had a legitimate expectation of privacy in the bedroom. 28 U.S.C.A. § 2254(d); U.S.C.A. Const.Amend. 6.

*REPORT AND RECOMMENDATION*

PECK, Magistrate J.

**\*1** Pro se petitioner Oliver Hediam seeks a writ of habeas corpus from his 1996 conviction in Supreme Court, New York County, of first degree criminal possession of a controlled substance and second degree criminally using drug paraphernalia, and sentence of fifteen years to life imprisonment and two concurrent one-year sentences. (Dkt. No. 1: Pet. ¶¶ 1-4.) Hediam's habeas corpus petition alleges that: (1) his conviction for criminal possession of a controlled substance and criminally using drug paraphernalia is repugnant to his acquittal for criminal possession of a controlled substance with intent to sell (Pet.¶ 12(A) & Attachment); (2) the State failed to prove beyond a reasonable doubt that he exercised control over the bedroom from which the drugs and drug paraphernalia were seized (Pet.¶ 12(B) & Attachment); and (3) his trial counsel was ineffective for failing to move under the Fourth Amendment to suppress the evidence seized from the apartment (Pet.¶ 12(C) & Attachment).

For the reasons set forth below, Hediam's petition should be DENIED.

*FACTS*

On March 25, 1994, Hediam [FN1] was indicted for first and third degree criminal possession of a controlled substance, second degree criminally using drug paraphernalia (two counts), and fourth degree criminal possession of a weapon (two counts). (Ex. A: Record on Appeal to 1st Dep't at 14-17: 3/25/94 Indictment.) [FN2]

FN1. At times, the transcript and other court documents refer to Oliver Hediam as Oliver "Hediam." For consistency, the Court will use "Hediam" throughout this Report & Recommendation.

FN2. References to exhibits are to those attached to the October 7, 2002 affidavit of Assistant Attorney General Darian B. Taylor. (Dkt. No. 16.)

*The Prosecution Case at Trial*

On the evening of March 18, 1994, Police Officers Richard Wells and Brian Ranaghan were conducting building "vertical patrols," in which, to eliminate trespassing, they walked through building stairwells, hallways and roof areas pursuant to criminal trespass consent affidavits from each building's owner or managing agent. (Wells: Trial Transcript ["Tr."] 264-67; Ranaghan: Tr. 410-11.) [FN3]

FN3. The trial transcript, in six volumes, is Docket Nos. 18-23.

At approximately 8:35 p.m., Officers Wells and Ranaghan entered 548 West 164th Street through the roof entrance as part of a building vertical patrol. (Wells: Tr. 267-68; Ranaghan: Tr. 411-12.) When the officers descended to the well-lit third floor hallway, Officer Wells "heard locks that appeared to be unlocking" from the direction of apartment 3H. (Wells: Tr. 269-70.) Officer Wells was "basically on the opposite side of the hallway, approximately ten to fifteen feet away from the door ..., just off of the stairwell landing," with nothing obstructing his view of the front door to apartment 3H. (Wells: Tr. 269-70, 273.) Officer Ranaghan was behind Officer Wells, standing on the landing near the stairwell. (Wells: Tr. 273, 326-27 Ranaghan: Tr. 415, 432, 434.) No other apartment doors on the third floor were open and no one else was in the hallway. (Wells: Tr. 270, 352-53; Ranaghan: Tr. 419-20.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

The door to apartment 3H opened, and Officer Wells "observed a male Hispanic attempt to exit the location, at which time [Officer Wells] observed the silver top strap portion and also the white butt handle of a firearm tucked into this male's waist." (Wells: Tr. 269; *see alsoid.* at 298, 315, 333-34, 337-39.) The man, later identified as Oliver Hediam, took a step out of the apartment; he did not walk more than a foot or two away from the door. (Wells: Tr. 271, 334-38; Ranaghan: Tr. 413-14, 444-46.) Officer Wells testified that, "[u]pon exiting the apartment [Hediam] appeared startled. He basically stopped in his tracks, momentarily froze, eyes widened a bit, and he turned and fled back into the apartment." (Wells: Tr. 271; *see alsoid.* at 272-73; Ranaghan: Tr. 414, 416, 435, 445-46.) Hediam attempted to slam the apartment door behind him, but Officer Wells stopped the door with his body before it closed fully. (Wells: Tr. 273-74, 342-43; Ranaghan: Tr. 417, 436-37, 446, 457.) Hediam ran down a long hallway within the apartment, with the officers close behind. (Wells: Tr. 274-75; Ranaghan: 417-18, 456-57.) Simultaneously, Officer Wells radioed for assistance, mentioning the gun. (Wells: Tr. 274-76, 362; Ranaghan: Tr. 418, 453-54.)

**\*2** Officer Wells testified that as Hediam passed an open door approximately halfway down the apartment's well-lit hallway, Hediam made "a sweeping motion with [his] left arm, as if something was being thrown" to the left. (Wells: Tr. 276-77, 285, 345-50.) Officer Wells was approximately ten feet behind Hediam at this time. (Wells: Tr. 277.)

Officer Wells caught up with Hediam in the living room, where another male, Juan Cordero, was sitting on a sofa. (Wells: Tr. 276-79, 287, 349, 353; Ranaghan: Tr. 420-22.) Hediam and Cordero were ordered to the ground and checked for weapons, but none were found. (Wells: Tr. 279, 287, 350; Ranaghan: Tr. 421-22, 459.) For the officers' safety, Officer Wells did a quick check of the rest of the apartment for other occupants, while Officer Ranaghan watched over Hediam and Cordero in the living room. (Wells: Tr. 280, 288-89, 295-96, 299; Ranaghan: Tr. 422, 424-25.)

After the initial quick search, Officer Wells entered the open door of the second bedroom down the hallway from

the front door. (Wells: Tr. 290, 299-300, 370.) At the foot of the bed, Officer Wells saw a handgun-silver with a white handle-resembling the handgun he had seen earlier on Hediam's waistband. (Wells: Tr. 290-91, 315.) Officer Wells also recovered a .32 caliber firearm from a slightly-opened top dresser drawer. (Wells: Tr. 292, 317, 365-66.) Officer Wells also observed a scale, two sifters, a pestle, a calculator, a box of aluminum foil, and a box of clear plastic baggies on the dresser. (Wells: Tr. 291-92, 371-72.) In addition, he saw two large bags, one small white bag and one small jar, all containing white powder that looked like cocaine, as well as a small clear plastic bag housing a yellow rock-like substance resembling crack-cocaine. (Wells: Tr. 291.) Officer Wells did not find any money inside this second bedroom. (Wells: Tr. 299.) Throughout Officer Wells' search of the apartment, Officer Ranaghan remained in the living room with Hediam and Cordero. (Wells: Tr. 297; Ranaghan: Tr. 427.) Officer Ranaghan did not hear doors being broken down or kicked in. (Ranaghan: Tr. 426-27.)

Back-up officers arrived at the apartment approximately one or two minutes after Officer Wells' radio call for assistance. (Wells: Tr. 299, 362-63; Ranaghan: Tr. 427.) As soon as the first two back-up officers arrived, Officer Wells began collecting evidence while Officer Ranaghan remained in the living room. (Wells: Tr. 300-01.)

When Sergeant Robert Yackel (the 34th Precinct anti-crime supervisor) arrived, the door to the second bedroom (where Officer Wells was working) was unbroken. (Yackel: Tr. 234-39). Officer Wells gave Sergeant Yackel a dresser drawer containing two guns, drugs and drug paraphernalia for transport to the precinct. (Yackel: Tr. 237-38, 240; Wells: Tr. 293, 296, 301.) Officers Wells and Ranaghan took Hediam and Cordero to the 34th Precinct, where they recovered a beeper from Hediam and a small amount of money and a beeper from Cordero. (Wells: Tr. 301-03; Ranaghan: Tr. 428.) Officer Wells vouchered into evidence the drawer-full of items taken from the apartment (Wells: Tr. 304-06, 310-22), and the bags and jar were taken to the police laboratory for analysis (Wells: Tr. 308). Police chemists testified that some of the bags contained cocaine. (Getkhman: Tr. 386, 392; Griffel: Tr. 395, 400.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

**\*3** Senior Investigator Brendan Leddy of the Office of Special Narcotics testified as an expert witness that the cocaine seized at the apartment was worth approximately $9,000. (Leddy: Tr. 246, 248-50.) Investigator Leddy also testified that the usual layout of a drug apartment includes "a table, the triple beam scale, pre-cut aluminum foil, calculator and perhaps a notebook of running accounts of the day's work." (Leddy: Tr. 253.)

On cross examination of Officer Wells, defense counsel established that the retrieved gun was unloaded, and that Officer Wells did not find any bullets, drugs or even keys to the apartment on Hediam. (Wells: Tr. 357, 374.) Defense counsel also established that at the time he was arrested, Hediam told the police that it was his mother's apartment. (Wells: Tr. 363-64, 380.) Defense counsel also accused Officer Wells of breaking down the locked door to the bedroom from which the drugs and gun were recovered, which Officer Wells denied. (Wells: Tr. 369.)

The prosecution rested (Tr. 460), and the defense moved to dismiss on the ground that Hediam was not in the bedroom in which the drugs and gun were found. (Tr. 461-62.) The People argued that Hediam had "dominion and control over this apartment." (Tr. 462-63 .) The trial court denied the defense's motion, finding it an issue for the jury. (Tr. 463.)

*The Defense Case at Trial*

*The Occupants and Condition of Apartment 3H*

Hediam's wife Ruth and mother Isabel lived in apartment 3H along with two "tenants" who subleased rooms in the apartment. (Pena: Tr. 481, 484-85, 506-07, 523-24; Zapata: Tr. 540, 544; I. Hediam: Tr. 558-60, 562-63, 570-71; Hediam: Tr. 660-61, 682-83, 728.) Isabel and Ruth lived in the first bedroom closest to the front door, a boarder named Pedro Tavaris lived next to them in the second bedroom from the front door, and a boarder named Juan rented the third bedroom. (Hediam: Tr. 661-62, 682-83, 728, 747; I. Hediam: Tr. 560-61, 571; Cordero: Tr. 592, 595.) Hediam lived in apartment 1G. (Pena: Tr. 480; Zapata: Tr. 540; Hediam: Tr. 654.) [FN4] Pedro Tavaris

never came back to apartment 3H after Hediam was arrested. (I. Hediam: Tr. 576.) Cordero testified that the boarders' bedroom doors in apartment 3H were generally kept locked and that he "never" saw the bedroom doors "open." (Cordero: Tr. 594-95.) In the week he worked in the apartment, Cordero never saw anyone come in or out of those rooms, but did hear doors slam. (Cordero: Tr. 631-32.)

FN4. By the time of trial, Isabel lived in apartment 1G with Hediam and his wife. (I. Hediam: Tr. 557-58.)

In March 1994, Hediam and Cordero were renovating the kitchen and the bathroom of apartment 3H. (I. Hediam: Tr. 563-64, 569-70; Hediam: Tr. 657, 664; Cordero: Tr. 590, 614.) Hediam was "in charge" of the renovations for Isabel. (I. Hediam: Tr. 563-64, 570.) According to Isabel, Hediam had a key to apartment 3H (I. Hediam: Tr. 564-65), but Cordero said Ruth always opened the 3H apartment door for them (Cordero: Tr. 598). In contrast to his mother's testimony, Hediam testified that he did not have the key to apartment 3H but that there was one in his apartment, Apt. 1G. (Hediam: Tr. 662-63.)

**\*4** Luis Pena, the superintendent of 548 West 164th Street, testified that on the morning of March 18, he briefly went to apartment 3H to show the building manager the repairs being made in the bathroom and kitchen. (Pena: Tr. 478, 480, 492, 495.) Hediam, who let him into the apartment, and Cordero were present. (Pena: Tr. 521.) Pena noticed that none of the door locks were broken and that the second bedroom door was closed and locked. (Pena: Tr. 487-88, 525.) Two days after Hediam's arrest, Pena was called to apartment 3H to fix two broken locks that seemed to have been forced open. (Pena: Tr. 485-86, 512-14, 525-26.) On cross examination, Pena admitted that he did not know the condition of the doors or locks from the day of Hediam's arrest until two days later. (Pena: Tr. 515.) He also became "not sure" whether the doors were broken or not on the morning before Hediam's arrest. (Pena: Tr. 525-26.)

*Neighbor Zapata's Testimony: The Police Knocked on the Door*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

Lorenza Zapata, who lived next door in apartment 3G, testified that after 7:00 p.m. on March 18, 1994, as she walked a friend out her apartment door, she saw two police officers knocking hard on the closed front door of apartment 3H. (Zapata: Tr. 533-34, 538, 545-46.) According to Zapata, one of the officers saw her and put his finger to his lip, which she understood to mean "not to say anything or shut up." (Zapata: Tr. 534-35, 549.) Shortly thereafter, Zapata heard a lot of breaking and shattering noises coming from apartment 3H. (Zapata: Tr. 535-36.) On cross-examination, however, Zapata admitted that she told police investigators and an Assistant District Attorney that no unusual sounds had come from apartment 3H and that she heard only "repair sounds." (Zapata: Tr. 548-50.)

*Cordero's Testimony*

Cordero recounted the circumstances leading to his arrest:

> We were in the apartment. I came early in the morning, like 11:00, something like that, to work. I was doing kitchen fixing together with my friend [Hediam] here, and in that apartment I was doing like two weeks work.

> I was fixing the kitchen together with him, Oliver Hedia[m], and about in the afternoon late, like 6:00, 7:00, 8:00, something like that, some police came, knock the door. My friend open the door after while, and you know, [the police] just dump him on the floor. He came inside.

> A lot of screaming. [The police] bring him [Hediam] to the place I was, in the living room sitting down watching TV. I was eating sandwich, some food, and he dump us in the place, I mean in the-I mean in the living room, and we were arrested in the place.

(Cordero: Tr. 585-86; *see also id.* at 587, 596.) Cordero testified that Hediam did not have a gun in his waistband (Cordero: Tr. 589.) According to Cordero, the police

grabbed Hediam, "dump him in the hallway, then bring him to the place of the living room, they put us both in the, in the floor.... Took me, dump me in the floor, put a foot on top of my back over here." (Cordero: Tr. 599.) The police told Cordero, " 'Don't look nowhere, stay still, nothing is going to happen to you, but if you move, if you look up I will blow up your head." ' (Cordero: Tr. 600-02.) Both police officers then went around to every room in the apartment, "banging doors and things," while Hediam and Cordero were left alone in the living room. (Cordero: Tr. 601, 637; Hediam: Tr. 670.) Cordero and Hediam were arrested but Cordero's case was dismissed when he told the judge that he was just working in the apartment. (Cordero: Tr. 603-04.)

**\*5** The prosecution attacked Cordero's credibility. For example, although Cordero testified at trial that the police knocked at the door of the apartment and that Hediam opened the door to let them in (Cordero: Tr. 585-86), Cordero earlier told the Grand Jury that he did not hear anyone knocking and that he did not actually observe Hediam open the front door (Cordero: Tr. 621-23). Cordero conceded on cross-examination that he "never heard a knock on the door." (Cordero: Tr. 623.) Cordero also had told a detective that after Hediam opened the door, " 'with no warning [he] heard the noise of running in the apartment." ' (Cordero: Tr. 618-19.) Cordero never told the Grand Jury that the police kicked in or knocked down any doors in the apartment (Cordero: Tr. 634-35, 646-47), and while he took pictures of the apartment for evidence after his arrest, he did not take any pictures of damaged doors (Cordero: Tr. 632-35).

*Hediam's Own Testimony*

Hediam testified that on March 18, 1994, he arrived at apartment 3H at around 5 p.m. to help Cordero with the renovation work. (Hediam: Tr. 663-64, 666.) Hediam's wife brought them sandwiches, which Hediam and Cordero ate in the living room while watching television. (Hediam: Tr. 667.) "[S]omeone knocked on the [apartment] door," Cordero went to the door to look (contrary to Cordero's testimony), but did not see anyone. (Hediam: Tr. 667.) A few minutes later, "they started knocking a little stronger again," Hediam went to the door, saw police and opened the door to see what they wanted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

(Hediam: Tr. 667-68.) Hediam did not step out of the apartment. (Hediam: Tr. 684.)

Hediam did not have a gun-not then, not ever. (Hediam: Tr. 668, 700.) Hediam also testified that he "never sold drugs to anyone." (Hediam: Tr. 769.)

Hediam "hadn't even open the door completely when [the officer] knocked [him] down on the floor" and dragged him to the living room. (Hediam: Tr. 668-69, 685-86.) The officers threw both Hediam and Cordero to the ground, and told them (with expletives) to " 'shut up .' " (Hediam: Tr. 669-70.) The two officers left Hediam and Cordero alone in the living room and went to the bedroom. (Hediam: Tr. 670.) Hediam saw Officer Wells go to the second bedroom and "started kicking that door," the lock broke and Office Wells went into the bedroom. (Hediam: Tr. 670-71.) Officer Wells "screamed 'Bingo!' [a]nd came out of the room," shoving money into his vest area. (Hediam: Tr. 672-73.) Before the police entered the apartment, Hediam never saw the drugs found in the second bedroom. (Hediam: Tr. 702.) Officer Wells saw Hediam looking his way and told Hediam that if he lifted his head again "he would blow [Hediam's] brains out." (Hediam: Tr. 673.) At that time, the officers radioed for back-up. (Hediam: Tr. 673.) Hediam told Officer Wells that he did not know anything about the things found in the bedroom, he and Cordero were renovating Hediam's mother's kitchen. (Hediam: Tr. 675.) When the other officers arrived, Hediam and Cordero were arrested and taken to the 34th Precinct, where Hediam told a detetive that he was working in his mother's apartment. (Hediam: Tr. 677.) He was afraid, however, to tell the detective that he saw the officers take money in the apartment. (Hediam: Tr. 678.)

**\*6** The prosecutor's cross-examination pointed out inconsistencies between Hediam's trial testimony and his prior statements. For example, Hediam admitted that he was interviewed by a detective at the precinct on the night of his arrest, and that he signed a statement that made no mention of police officers knocking his head into a wall, stealing money, or kicking down doors. (Hediam: Tr. 706-09.) <u>FN5</u> As another example, contrary to his direct testimony about hearing a knock at the door, on cross examination Hediam admitted that he told a detective

shortly after his arrest and later told a district attorney that he heard a doorbell ring in his apartment on the evening of March 18, and he signed a statement to that effect. (Hediam: Tr. 713-17.) Moreover, when asked in his civil case against the police if they ever hit Hediam, he had testified that they did not hit him. (Hediam: Tr. 726-28.) Hediam admitted on cross that contrary to his direct testimony, he did not see the police break down the bedroom door, but rather that he "heard the kicking sounds." (Hediam: Tr. 747-48.) <u>FN6</u>

> <u>FN5.</u> Hediam explained that he did not tell anyone at the precinct that Officer Wells had taken money because Hediam "was afraid that this policeman, if he was able to take that money and I saw him, maybe he will hurt my children or my family." (Hediam: Tr. 677-78.) In October 1994, while at Riker's Island, Hediam informed two Internal Affairs officers (and, later, an Assistant District Attorney) that Wells had taken money. (Hediam: Tr. 678-79.)

> <u>FN6.</u> At sentencing, the trial judge noted that while determining credibility was the jury's job, "frankly, I must say personally there were certain things [Hediam] testified to and certain aspects of his demeanor that I, personally, did not or did not appear to me to be that credible; but, again, I am not the finder of the facts." (Sentencing: S. 36-37.)

*The Prosecution's Rebuttal Case at Trial*

In rebuttal, Rubin Valentin, a senior investigator in the Manhattan District Attorney's Office Official Corruption Unit, testified that he investigated Hediam's allegations of police corruption. (Valentin: Tr. 775-76.) He interviewed Lorenza Zapata, who told Valentin that she became scared when she saw police officers banging on the door of 3H, so she went back into her apartment and closed the door. (Valentin: Tr. 777.) Shortly thereafter, "she heard footsteps running down the hallway." (Valentin: Tr. 777-78.) Although Valentin specifically asked her to describe what she heard that night, she did not tell Valentin that she heard any other unusual noises, such as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

"breaking or shattering" coming from apartment 3H. (Valentin: Tr. 778.)

Valentin also interviewed Hediam two or three times. (Valentin: Tr. 779-80, 782-83.) During those interviews, Hediam never mentioned that any police officers hit, beat or kicked him, threatened to hurt him, or broke down doors in the apartment. (Valentin: Tr. 780-82.)

*Verdict and Sentencing*

On March 26, 1996, the jury found Hediam guilty of one count of first degree criminal possession of a controlled substance and two counts of second degree criminally using drug paraphernalia. (Verdict: Tr. 964-66, 976-78.) The jury found Hediam not guilty of third degree criminal possession of a controlled substance and two counts of fourth degree criminal possession of a weapon. (Verdict: Tr. 964-66, 976-78.)

Hediam's counsel requested that the verdict be set aside as inconsistent or repugnant. (Tr. 966-67.) The trial judge refused because "[t]o the extent that it may appear to be somewhat illogical, jurors frankly are given the power to grant that kind of leniency, giving the defendant the benefit of the doubt"; although the judge is not required to find the particular explanation for the verdict, he said that there are "logical explanation[s]," such as the jury finding Hediam not guilty on drug sales because the prosecution had "no real evidence of intent to sell, other than sheer weight." (Verdict: Tr. 968-75.)

**\*7** At the April 18, 1996 sentencing, the court denied Hediam's motion "to set aside the verdict on the grounds that the People have failed to prove their case beyond a reasonable doubt." (Sentence: S. 15.) The trial judge sentenced Hediam to the mandatory minimum of fifteen years to life imprisonment for first degree criminal possession of a controlled substance, and one year for each of the two drug paraphernalia counts, all of the sentences to run concurrently. (Sentence: S. 38.)

*Hediam's Direct State Appeal*

Represented by different counsel, Hediam appealed to the First Department in December 1997, claiming, *interalia,* that the evidence was insufficient to meet the prosecution's burden of proof or "insufficient causing a repugnant verdict." (Ex. B: Hediam 1st Dep't Br.) In July 1998, Hediam filed a pro se supplemental brief with the First Department adding the following Fourteenth Amendment claims:

• [Hediam's] convictions of criminal possession of a controlled substance in the first degree and two counts of criminally using drug paraphernalia in the second degree were repugnant to his acquittals of criminal possession of a controlled substance in the third degree with intent to sell and two counts criminal possession of a weapon in the second degree, requiring the court below to set aside the verdict....

• The People failed to prove beyond [a] reasonable doubt that [Hediam] exercised dominion and control over his mother's-Isabel Hediam's-apartment and the drugs and drug paraphernalia found in the second bedroom that was being rented out....

(Ex. C: Hediam Pro Se Supp. 1st Dep't Br.; *see also* Ex. E: Hediam Pro Se 1st Dep't Reply Br.)

On February 18, 1999, the First Department affirmed Hediam's conviction, holding:

The verdict was based on legally sufficient evidence and was not against the weight of the evidence. There was ample evidence of constructive possession, as well as possession under the "room presumption" theory (Penal Law § 220.25 [2] ). We see no reason to disturb the jury's credibility determinations. In light of the court's charge, the jury's acquittal of defendant on the possession with intent to sell count and weapon possession counts was not repugnant to the convictions on the other counts.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

*People v. Hediam,* 258 A.D.2d 363, 363, 683 N.Y.S.2d 848, 848-49 (1st Dep't 1999) (citations omitted).

The New York Court of Appeals denied leave to appeal on November 30, 1999.  *People v. Hediam,* 94 N.Y.2d 824, 702 N.Y.S.2d 594, 724 N.E.2d 386 (1999).

*Hediam's C.P.L. § 440.10 Motion*

On September 6, 2000, Hediam moved under C.P.L. § 440.10 to vacate his conviction, alleging ineffective trial counsel because his attorney failed to move to suppress the drugs and paraphernalia seized from the apartment. (Ex. L: Hediam § 440 Br. at 1.) In opposition, the State asserted that Hediam's defense counsel had told an Assistant District Attorney that "he felt a motion for a Mapp hearing would be antithetical to his client's consistent contention that defendant never had any possessory or proprietary interest in the drugs or paraphernalia recovered. Defense Counsel Velez further stated that this was a strategic decision on his part prior to trial." (Ex. M: State § 440 Br., fourth page.)

**8** On June 23, 2001, the trial court denied Hediam's motion:

In order for the defendant to have moved for a *Mapp* hearing, it was necessary for him to allege sufficient facts to warrant a hearing. Critically, the defendant needed to show that he himself had a personal legitimate expectation of privacy in the premises or object searched. The defendant's position throughout the proceedings, however, was that the drugs the police recovered were not his but were seized from a locked bedroom that his mother had sublet to a boarder. While the defendant's connection to his mother's home may have been sufficient to afford him standing to a general search of her home, under the defendant's version of the facts, he had no standing to contest the police search of the tenant's room.

Moreover, although a defendant is permitted to take inconsistent positions at the suppression hearing and

trial, the prosecution would have been allowed to impeach him with the inconsistency if he elected to testify at trial. Here, the defendant testified at the trial and put on additional witnesses to try and convince the jury that his story was credible. In light of this, counsel's election to forego a *Mapp* hearing was not only a legitimate strategy, but practically the only one open to him under the circumstances. There is, therefore, no basis to believe the defendant was denied the effective assistance of counsel. The motion is therefore denied.

(Ex. O: 6/23/01 C.P.L. § 440 Decision at 3-4 (citations omitted).) The First Department denied leave to appeal. (Ex. R.) *SeePeople v. Hediam,* No. M-4751, 2001 N.Y.App. Div. LEXIS 10297 at *1 (1st Dep't Oct. 30, 2001).

*Hediam's Federal Habeas Corpus Petition*

Hediam's habeas corpus petition raises three grounds for relief:

1. [Hediam's] Conviction of Criminal Possession of a Controlled Substance and two counts of Criminally Using Drug Paraphernalia is repugnant to his acquittal of Criminal Possession of Controlled Substance with intent to sell.

2. The People failed to prove beyond a reasonable doubt that [Hediam] exercised dominion and control over both his mother's apartment and the drugs and drug paraphernalia seized from the apartment....

3. [Hediam] was denied ... effective assistance of counsel ... where trial counsel failed to file a motion to suppress the evidence which was obtained in violation of his fourth amendment right to privacy.

(Dkt. No. 1: Pet. ¶ 12(A)-(C) & Attachments.) The State concedes that the Petition is timely and that all three claims are exhausted. (Dkt. No. 15: State Br. at 16-19.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

*ANALYSIS*

I. *THE AEDPA REVIEW STANDARD*[FN7]

> [FN7.](#) For additional decisions authored by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, *see* *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at \*6-8 (S.D.N.Y. Nov.6, 2002) (Peck, M.J.); *Figueroa v. Greiner,* 02 Civ. 2126, 2002 WL 31356512 at \*5-6 (S.D.N.Y. Oct.18, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at \*6-8 (S.D.N.Y. Oct.15, 2002) (Peck, M.J.); *Velazquez v. Murray,* 02 Civ. 2564, 2002 WL 1788022 at \*12-14 (S.D.N.Y. Aug.2, 2002) (Peck, M.J.); *Soto v. Greiner,* 02 Civ. 2129, 2002 WL 1678641 at \*6-7 (S.D.N.Y. July 24, 2002) (Peck, M.J.); *Green v. Herbert,* 01 Civ. 11881, 2002 WL 1587133 at \*9-11 (S.D.N.Y. July 18, 2002) (Peck, M.J.); *Bueno v. Walsh,* 01 Civ. 8738, 2002 WL 1498004 at \*10-11 (S.D.N.Y. July 12, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at \*14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug.6, 2000) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at \*8-9 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at \*12-13 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Jamison v. Grier,* 01 Civ. 6678, 2002 WL 100642 at 8-9 (S.D.N.Y. Jan.25, 2002) (Peck, M.J.); *Thomas v. Breslin,* 01 Civ. 6657, 2002 WL 22015 at \*4-5 (S.D.N.Y. Jan.9, 2002) (Peck, M.J.); *Thomas v. Duncan,* 01 Civ. 6792, 2001 WL 1636974 at \*7 (S.D.N.Y. Dec.21, 2001) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at \*6 (S.D.N.Y. Dec.11, 2001) (Peck, M.J.); *Rodriguez v. Lord,* 00 Civ. 0402, 2001 WL 1223864 at \*16 (S.D.N.Y. Oct.15, 2001) (Peck, M.J.); *James v. People of the State of New York,* 99 Civ. 8796, 2001 WL 706044 at \*11 (S.D.N.Y. June 8, 2001) (Peck, M.J.), *report & rec. adopted,* 2002 WL 31426266 (S.D.N.Y. Oct.25, 2002) (Berman, D.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at \*5 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at \*22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug.14, 2000) (McKenna, D.J.), *aff'd,*303 F.3d 411, 417 (2d Cir.2002); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at \*10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,*No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002).

Before the Court can determine whether Hediam is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." *Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000). The AEDPA imposed a more stringent review standard, as follows:

> **\*9** (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." *Williams v. Taylor,* 529 U.S. at 404-05, 120 S.Ct. at 1519.[FN8] Both, however, "restrict[ ] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523.[FN9] "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller,* 289 F.3d at 42. "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 296 F.3d at 135; *accord,e.g.,DelValle v. Armstrong,* 306 F.3d at 1200.

> FN8.*Accord,e.g.,Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000); *Lurie v. Wittner,* 228 F.3d 113, 125 (2d Cir.2000), *cert. denied,*532 U.S. 943, 121 S.Ct. 1404, 149 L.Ed.2d 347 (2001); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000), *cert. denied,*531 U.S. 1116, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001).

> FN9.*Accord,e.g.,DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002); *Yung v. Walker,* 296 F.3d 129, 135 (2d Cir.2002); *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,*537 U.S. 909, 123 S.Ct. 251, 154 L.Ed.2d 187 (2002); *Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.... A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

*Williams v. Taylor,* 529 U.S. at 405-06, 120 S.Ct. at 1519-20.[FN10]

> FN10.*Accord,e.g.,DelValle v. Armstrong,* 306 F.3d at 1200; *Yung v. Walker,* 296 F.3d at 135; *Kennaugh v. Miller,* 289 F.3d at 42; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v. Wittner,* 228 F.3d at 127-28.

In *Williams,* the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413, 120 S.Ct. at 1523. However, "[t]he term 'unreasonable' is ... difficult to define." *Id.* at 410, 120 S.Ct. at 1522. The Supreme Court made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.*[FN11] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. at 1521.[FN12] The Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Jones v. Stinson,* 229 F.3d at 119 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)); *accord,e.g.,Ryan v. Miller,* 303 F.3d at 245; *Yung v. Walker,* 296 F.3d at 135;*Loliscio v. Goord,* 263 F.3d at 184. Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Kennaugh v. Miller,* 289 F.3d at 45;*accordYung v. Walker,* 296 F.3d at 135. Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." *Yung v. Walker,* 296 F.3d at 134.

> FN11.*See also,e.g.,DelValle v. Armstrong,* 306 F.3d at 1200 ("With regard to issues of law,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

FN12. *Accord,e.g.,Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002); *Yung v. Walker,* 296 F.3d at 135;*Loliscio v. Goord,* 263 F.3d at 184;*Lurie v. Wittner,* 228 F.3d at 128-29.

**\*10** Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

*Sellan v. Kuhlman,* 261 F.3d at 312;*accord,e.g.,Ryan v. Miller,* 303 F.3d at 245;*Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir.), *cert. denied,*No. 02-7208, 2002 WL 31520415 (2d Cir. Dec. 16, 2002); *Jenkins v. Artuz,* 294 F.3d 284, 291 (2d Cir.2002) ("In *Sellan,* we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference."); *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002); *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001).FN13 On the other hand, "[i]f it cannot be determined from the state-court opinion whether the denial of a given claim was based on a procedural ground rather than on the merits, no AEDPA deference is due the state-court decision on that claim." *Rudenko v. Costello,* 286 F.3d 51, 69 (2d Cir.2002).

FN13. The Second Circuit "recognize[d] that a state court's explanation of the reasoning

underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests." *Sellan v. Kuhlman,* 261 F.3d at 312. Where the state court does not explain its reasoning, the Second Circuit articulated the analytic steps to be followed by a federal habeas court:

We adopt the Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated "on the merits" by a state court. As the Fifth Circuit has explained, "[W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999).

*Sellan v. Kuhlman,* 261 F.3d at 314;*accord,e.g.,Norde v. Keane,* 294 F.3d at 410;*Aparicio v. Artuz,* 269 F.3d at 93.

Here, the First Department decided the repugnant verdict and sufficiency of the evidence of dominion and control issues on the merits, see*People v. Hedian,* 258 A.D.2d 363, 363, 683 N.Y.S.2d 848, 848-99 (1st Dep't 1999), and the § 440 court also decided Hediam's ineffective assistance claim on the merits (Ex. O, quoted at page 15 above), so the deferential AEDPA standard applies to all of Hediam's habeas claims.

II. *HEDIAM'S REPUGNANT VERDICT CLAIM IS NOT COGNIZABLE ON FEDERAL HABEAS REVIEW*

[1] Hediam claims that "the jury's acquital [sic] of the criminal possession with intent to sell [count] was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

repugnant to its convicting [Hediam] of the criminal possession in the first degree count." (Pet.¶ 12(A) Attachment.) According to Hediam: "the verdict rendered was repugnant because the jury had acquitted [Hediam] of, *interalia,* the weapon the police testified to seeing on [Hediam's] person as he attempted to exit his mother's apartment. Given the trial court's specific instruction that if the jury did not believe that the police saw a weapon on [Hediam's] person [the police] were not permitted to enter the apartment, the verdict must be deemed repugnant," and a "compromise verdict" was not permitted. (*Id.*)

Hediam's claim is meritless. It is well settled that "inconsistent jury verdicts are not a ground for habeas relief." *Estrada v. Senkowski,* 98 Civ. 7796, 1999 WL 1051107 at \*13-14 (S.D.N.Y. Nov.19, 1999) (Pauley, D.J. & Peck, M.J.) (citing cases); *see,e.g., United States v. Powell,* 469 U.S. 57, 58, 105 S.Ct. 471, 473, 83 L.Ed.2d 461 (1984); *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) ("[i]nconsistency in a verdict is not a sufficient reason for setting it aside"); *Dunn v. United States,* 284 U.S. 390, 393-94, 52 S.Ct. 189, 190-91, 76 L.Ed. 356 (1932); *United States v. Acosta,* 17 F.3d 538, 545 (2d Cir.1994) ("it has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty"); *United States v. Alvarado,* 882 F.2d 645, 653 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990); *United States v. Romano,* 879 F.2d 1056, 1060 (2d Cir.1989); *United States v. Chang An-Lo,* 851 F.2d 547, 559-60 (2d Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *Williams v. Artuz,* 98 Civ. 7964, 2002 WL 989529 at \*8 (S.D.N.Y. May 15, 2002) ("A claim of inconsistent or repugnant verdicts presents no issue upon which federal habeas corpus relief could be granted."); *Torres v. Costello,* No. 97-CV-5480, 2001 WL 811924 at \*11 (E.D.N.Y. June 1, 2001) (Raggi, D.J .) ("The Supreme Court ... has long held that a prisoner found guilty on one count of an indictment cannot attack his conviction simply because it appears inconsistent with a finding of not guilty on another count.... Indeed, courts recognize that inconsistent verdicts are often a product of jury lenity, which courts will not review."); *Bowden v. Keane,* 85 F.Supp.2d 246, 251 n. 6 (S.D.N.Y.2000) (" 'a jury is free to render inconsistent verdicts or to employ relevant evidence in convicting on one count that it may seem to have rejected in acquitting

on other counts' "), *aff'd* 237 F.3d 125 (2d Cir.2001); *Rust v. Eisenschmidt,* No. 97CV615, 2000 WL 33767757 at \*3 (N.D.N.Y. June 8, 2000); *Dukes v. McGinnis,* 99 Civ. 9731, 2000 WL 382059 at \* 12-13 (S.D.N.Y. Apr.17, 2000) (Peck, M.J.).[FN14]

FN14. *See also,e.g., Erdheim v. Greiner,* 22 F.Supp.2d 291, 298 (S.D.N.Y.1998); *Carr v. New York,* No. 97 CV 117, 97 CV 490, 1998 WL 178844 at \*2 (E.D.N.Y. Feb.13, 1998); *United States v. Anzellotto,* No. 93 CR 1316, 1995 WL 313641 at \*3 (E.D.N.Y. May 9, 1995); *Billups v. Costello,* 91 Civ. 6296, 1992 WL 170650 at \*4 (S.D.N.Y. July 6, 1992) ("As long as a conviction is the result of a fair trial at which legally sufficient evidence has been adduced, its inconsistency with another verdict does not create a constitutional defect."); *Savage v. Berbary,* No. CIV-90-290E, 1991 WL 147371 at \*2 (W.D.N.Y. July 22, 1991) ("Alleged inconsistencies in state court verdicts are not a proper ground for federal habeas corpus intervention...."); *United States v. Marcus Schloss & Co.,* No. 88 CR. 796, 1989 WL 153353 at \*2 (S.D.N.Y. Dec.11, 1989); *United States v. Stagnitta,* No. 87-CR-182, 1988 WL 46617 at \*6-7 (N.D.N.Y. May 6, 1988); *United States v. Obayagbona,* 627 F.Supp. 329, 345 (E.D.N.Y.1985).

**\*11** In *United States v. Powell,* the Supreme Court explained that "where truly inconsistent verdicts have been reached, '[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.' ... It is equally possible that the jury, convinced of guilt, properly reached its conclusion ... then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [other] offense." 469 U.S. at 64-65, 108 S.Ct. at 476 (quoting *Dunn,* 284 U.S. at 393, 52 S.Ct. at 190).[FN15] The Supreme Court in *Powell* rejected, as "imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *United States v. Powell,* 469 U.S. at 66, 105 S.Ct. at 477;*accord,e.g.,United States v. Acosta,* 17 F.3d at 546 ("A court knows only what the jury's verdicts were, not what the jury found, and it is not within the province of the court to attempt to determine the reason or reasons for verdicts that are inconsistent."); *United States v. Chang An-Lo,* 851 F.2d at 559-60;*Dukes v. McGinnis,* 2000 WL 382059 at *14;*Estrada v. Senkowski,* 1999 WL 1051107 at *14.

FN15.*Accord,e.g.,Dukes v. McGinnis,* 2000 WL 382059 at *14;*Estrada v. Senkowski,* 1999 WL 1051107 at *14;*see also,e.g.,Torres v. Costello,* 2001 WL 811924 at *11.

Thus, Hediam's repugnant verdict due process claim is not cognizable on federal habeas corpus review.

III. *HEDIAM'S SUFFICIENCY OF THE EVIDENCE CLAIM SHOULD BE DENIED*

Hediam's second habeas claim alleges that the prosecution "failed to prove beyond a reasonable doubt that [Hediam] exercised dominion and control over both his mother's apartment and the drugs and drug paraphernalia seized from the apartment at the time of [Hediam's] arrest." (Dkt. No. 1: Pet. ¶ 12(B) Attachment.) Hediam claims that the prosecution was "unable to contest [Hediam's] claim that the drugs and paraphernalia belonged to the male boarder [Pedro Tavaris] who occupied the room in question." (*Id.*)

A. *Legal Principles Governing Sufficiency of the Evidence Habeas Claims*[FN16]

FN16. For additional decisions authored by this Judge discussing the sufficiency of the evidence standard in habeas cases in language substantially similar to this section of this Report & Recommendation, *seeGutierrez v. Ricks,* 02 Civ. 3780, 2002 WL 31360417 at *7-10

(S.D.N.Y. Oct.21, 2002) (Peck, M.J.); *Ibarra v. Burge,* 02 Civ. 0825, 2002 WL 1467756 at *4-5 (S.D.N.Y. July 9, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *13-14 & n. 17 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Jamison v. Grier,* 01 Civ. 6678, 2002 WL 100642 at *9-10 (S.D.N.Y. Jan.25, 2002) (Peck, M.J.); *Ferguson v. Walker,* 00 Civ. 1356, 2001 WL 869615 at *4 (S.D.N.Y. Aug.2, 2001) (Peck, M.J.), *report & rec. adopted,* 2002 WL 31246533 (S.D.N.Y. Oct.7, 2002); *Simpson v. Portuondo,* 01 Civ. 1379, 2001 WL 830946 at *7 (S.D.N.Y. July 12, 2001) (Peck, M.J.); *Simmons v. Mazzuca,* 00 Civ. 8174, 2001 WL 537086 at *6 (S.D.N.Y. May 21, 2001) (Peck, M.J.); *Jones v. Duncan,* 162 F.Supp.2d 204, 214-15 (S.D.N.Y.2001) (Peck, M.J.); *Cassells v. Ricks,* 99 Civ. 11616, 2000 WL 1010977 at *5 (S.D.N.Y. July 21, 2000) (Peck, M.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at *7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Roldan v. Artuz,* 78 F.Supp.2d 260, 266-67 (S.D.N.Y.2000) (Batts, D.J. & Peck, M.J.); *Estrada v. Senkowski,* 98 Civ. 7796, 1999 WL 1051107 at *14 (S.D.N.Y. Nov.19, 1999) (Pauley, D.J. & Peck, M.J.); *Cruz v. Greiner,* 98 Civ. 7939, 1999 WL 1043961 at *25 (S.D.N.Y. Nov.17, 1999) (Peck, M.J.); *Jones v. Strack,* 99 Civ. 1270, 1999 WL 983871 at *12 (S.D.N.Y. Oct.26, 1999) (Peck, M.J.); *Franza v. Stinson,* 58 F.Supp.2d 124, 137 (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); *Carromero v. Strack,* 98 Civ. 3519, 1998 WL 849321 at *4 (S.D.N.Y. Nov.19, 1998) (Preska, D.J. & Peck, M.J.); *Fernandez v. Dufrain,* 11 F.Supp.2d 407, 416 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Williams v. Bennet,* 97 Civ. 1628, 1998 WL 236222 at *4 (S.D.N.Y. Apr.20, 1998) (Baer, D.J. & Peck, M.J.); *Robinson v. Warden of James A. Thomas Ctr.,* 984 F.Supp. 801, 805 (S.D.N.Y.1997) (Sprizzo, D.J. & Peck, M.J.); *Ehinger v. Miller,* 942 F.Supp. 925, 935 (S.D.N.Y.1996) (Mukasey, D.J. & Peck, M.J.); *Vera v. Hanslmaier,* 928 F.Supp. 278, 284 (S.D.N.Y.1996) (Jones, D.J. & Peck, M.J.).

" '[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." ' *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) (quoting *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970)). However, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 317, 99 S.Ct. at 2788. Accordingly, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254-if the settled procedural prerequisites for such a claim have otherwise been satisfied-the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 324, 99 S.Ct. at 2791-92.[FN17]

> FN17.*Accord,e.g.,Fama v. Commissioner of Corr. Servs.,* 235 F.3d 804, 811 (2d Cir.2000); *Einaugler v. Supreme Court,* 109 F.3d 836, 839 (2d Cir.1997).

*12 Petitioner Hediam bears a very heavy burden:

> [T]he standard for appellate review of an insufficiency claim placed a "very heavy burden" on the appellant. Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt. In making this determination, we must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor.

*United States v. Carson,* 702 F.2d 351, 361 (2d Cir.) (citations omitted), *cert. denied,*462 U.S. 1108, 103 S.Ct. 2456, 2457 (1983).[FN18]

> FN18.*Accord,e.g.,Fama v. Commissioner of Corr. Servs.,* 235 F.3d at 811 ("petitioner bears a very heavy burden in convincing a federal *habeas* court to grant a petition on the grounds of insufficiency of the evidence"); *United States v.*

*Middlemiss,* 217 F.3d 112, 117 (2d Cir.2000); *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000) ("a defendant shoulders a 'heavy burden' in challenging the sufficiency of evidence supporting a conviction"); *United States v. Kinney,* 211 F.3d 13, 16 (2d Cir.2000), *cert. denied,*531 U.S. 1079, 121 S.Ct. 778 (2001); *United States v. Bicaksiz,* 194 F.3d 390, 398 (2d Cir.1999) (The defendant "bears a 'very heavy burden' in challenging the sufficiency of the evidence that led to his conviction. In considering any such challenge, we view all proof in the light most favorable to the government and draw all reasonable inferences in the government's favor.") (citations omitted), *cert. denied,*528 U.S. 1161, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000); *United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.), *cert. denied,*519 U.S. 927, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996); *United States v. Rosa,* 11 F.3d 315, 337 (2d Cir.1993) ("[T]he defendant who makes a sufficiency challenge bears a heavy burden."), *cert. denied,*511 U.S. 1042, 1096, 114 S.Ct. 1565, 1864 (1994); *United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993) (burden on defendant claiming insufficiency is "very heavy" and all inferences must be drawn in the government's favor).

The habeas court's review of the jury's findings is limited:

> [T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia,* 443 U.S. at 318-19, 99 S.Ct. at 2789 (citations omitted).[FN19]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

FN19.Accord,e.g.,United States v. Middlemiss, 217 F.3d at 117;United States v. Kinney, 211 F.3d at 16;United States v. Russo, 74 F.3d at 1395 (quoting United States v. Martinez, 54 F.3d 1040, 1042-43 (2d Cir.), cert. denied,516 U.S. 1001, 116 S.Ct. 545, 133 L.Ed.2d 448 (1995)); Mallette v. Scully, 752 F.2d 26, 31 (2d Cir.1984).

The Jackson v. Virginia "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson v. Virginia, 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16;accord,e.g.,Green v.. Abrams, 984 F.2d 41, 44-45 (2d Cir.1993) ("In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime.").

B. The Evidence Was Legally Sufficient to Support Hediam's Conviction

[2] Hediam was convicted of first degree criminal possession of a controlled substance and two counts of second degree criminally using drug paraphernalia. (See page 13 above.)

"A person is guilty of criminal possession of a controlled substance in the first degree when he knowingly and unlawfully possesses: (1) one or more preparations, compounds, mixtures or substances containing a narcotic drug and said preparations, compounds, mixtures or substances are of an aggregate weight of four ounces or more...." Penal Law § 220.21(1). "A person is guilty of criminally using drug paraphernalia in the second degree when he knowingly possesses or sells [drug paraphernalia]." Penal Law § 220 .50. Hediam claims that because of testimony that the bedroom door was locked and the bedroom was rented to Pedro Tavaris, the drugs and paraphernalia were not owned or controlled by Hediam. (See Pet. Ex. 12(B) & Attachment); Ex. B: Hediam 1st Dep't Br., Point I; Ex. C: Hediam Pro Se Supp. 1st Dep't Br. at 31-39.) FN20

FN20. Hediam does not dispute that the drugs found in the bedroom-cocaine-are included in the statutory definition of "controlled substance," nor does he dispute that the white powder appearing to be a dilutant, the scale, sifters, aluminum foil, and the box of clear plastic bags apparently for individual packaging of the cocaine, are all included in the statutory definition of "drug paraphernalia." (See Ex. B: Hediam 1st Dep't Br., Point I; Ex. C: Hediam Pro Se Supp. 1st Dep't Br. at 31-39.)

*13 Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found Hediam guilty beyond a reasonable doubt for both of these offenses. Under the Penal Law, " '[p]ossess' means to have physical possession or otherwise to exercise dominion or control over tangible property." Penal Law § 10.00(8). "In New York, the rule has long been that to support a charge that a defendant was in constructive possession of tangible property, the People must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found...." People v. Manini, 79 N.Y.2d 561, 573, 584 N.Y.S.2d 282, 288, 594 N.E.2d 563 (1992); accord,e.g.,People v. Bailey, 295 A.D.2d 632, 633, 743 N.Y.S.2d 610, 613 (3d Dep't 2002) ("As ... the trial evidence does not establish that [defendant] physically possessed the drugs, the People must establish constructive possession beyond a reasonable doubt. To do so, the evidence in chief must establish that defendant exercised dominion and control over the property...."); People v. Skyles, 266 A.D.2d 321, 322, 698 N.Y.S.2d 286, 287 (2d Dep't) ("A sufficient level of control over the area in which the contraband is found establishes constructive possession."), appeal denied,94 N.Y.2d 867, 704 N.Y.S.2d 543, 725 N.E.2d 1105 (1999); People v. Diaz, 220 A.D.2d 260, 260, 632 N.Y.S.2d 82, 83 (1st Dep't 1995) ("Where, as here, the evidence demonstrates that defendant owned, rented or had control over or a possessory interest in, the apartment where drugs were found, the evidence is legally sufficient to establish his constructive possession of such drugs."). FN21

FN21.See also,e.g.,People v. Hamilton, 291 A.D.2d 411, 411-12, 736 N.Y.S.2d 901, 902 (2d Dep't), appeal denied,98 N.Y.2d 651, 745

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

N.Y.S.2d 510, 772 N.E.2d 613 (2002); *People v. Hojas,* 271 A.D.2d 547, 547, 706 N.Y.S.2d 349, 350 (2d Dep't) ("The evidence established that the defendant exercised a sufficient level of control over the back room of his store to support the jury's finding that he had constructive possession of the eight packets of cocaine that were found inside a flowerpot in that room."), *appeal denied,* 95 N.Y.2d 866, 715 N.Y.S.2d 221, 738 N.E.2d 369 (2000); *People v. Humphrey,* 221 A.D.2d 657, 657-58, 634 N.Y.S.2d 212, 213 (2d Dep't 1995), *appeal denied,* 87 N.Y.2d 1020, 644 N.Y.S.2d 154, 666 N.E.2d 1068 (1996); *People v. Fetter,* 201 A.D.2d 500, 500-01, 607 N.Y.S.2d 381, 382 (2d Dep't) (Defendant's guilt via constructive possession proved: "A rational juror could infer from the evidence that the defendant was the manager of the grocery store where the stolen goods were found. Therefore, the evidence was sufficient to establish that the defendant exercised 'dominion and control' over the store."), *appeal denied,* 83 N.Y.2d 967, 616 N.Y.S.2d 19, 639 N.E.2d 759 (1994).

The prosecution relied on the theory that Hediam had constructive possession of the drugs and paraphernalia, since he exercised control over the apartment in which the contraband was found in plain sight in an open bedroom. Officer Wells testified that he observed Hediam step out of the apartment, appear startled, and run back into the apartment, attempting to shut the door behind him. (*See* page 3 above.) Hediam also had keys to the apartment (*see* page 7 above), pointing to his dominion over the apartment. *See,e.g.,United States v. Grant,* 545 F.2d 1309, 1313 (2d Cir.1976) (having keys to the area in which contraband was found contributed to the finding of constructive possession), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977); *People v. Robertson,* 48 N.Y.2d 993, 994, 425 N.Y.S.2d 545, 401 N.E.2d 903 (1980) (same). The police testified that the door to the second bedroom was wide open and the drugs and drug paraphernalia were on top of the dresser, in plain view. (*See* page 4 above.) Although Hediam and other defense witnesses testified that the second bedroom door was closed and locked (*see* pages 6-7, 10 above), a reasonable jury could have believed the officers' testimony and concluded that since the contraband was situated in an

open room in close proximity to Hediam, Hediam had constructive possession of the items. Under the "room presumption" theory, which the trial court included in its jury instruction, "[t]he presence of a narcotic drug ... in open view in a room, other than a public place, under circumstances evincing an intent to unlawfully mix, compound, package or otherwise prepare for sale such controlled substance is presumptive evidence of knowing possession thereof by each and every person in close proximity to such controlled substance at the time such controlled substance was found...." Penal Law § 220.25(2). Intent to prepare the drugs for sale in this case is evident from the sheer quantity of drugs found, as well as from the discovery of a dilutant powder, aluminum foil, plastic bags, a scale, a calculator, and other accessories related to the packaging and sale of drugs. Under these circumstances, if the jury believed that the door to the second bedroom was open, they could have reasonably presumed that Hediam, who was close to the second bedroom by virtue of being in the apartment, possessed the drugs and paraphernalia. *See,e.g.,People v. Jiminez,* 292 A.D.2d 196, 197, 738 N.Y.S.2d 344, 344 (1st Dep't) ("The police testimony and physical evidence established that crack cocaine was being packaged for sale in open view, in one of the bedrooms of the apartment in question. While defendant was not found in that bedroom, he was observed by the police walking around the end of the solid wall on the same side of the apartment, behind which was a hallway leading to that bedroom and two others, placing him in close proximity thereto. Thus, the drug factory presumption of Penal Law § 220.25(2) was clearly applicable. The evidence warranted the conclusion that defendant was inside the apartment where the drugs were found in open view and was in close proximity thereto."), *appeal denied,* 98 N.Y.2d 698, 747 N.Y.S.2d 416, 776 N.E.2d 5 (2002); *People v. Collado,* 267 A.D.2d 122, 122-23, 700 N.Y.S.2d 148, 148 (1st Dep't 1999) ("The evidence likewise supported defendant's guilt under the 'room presumption' theory. The court properly submitted that presumption to the jury since the drugs and paraphernalia were in 'open view,' and since defendant was in 'close proximity' to them, especially given the small size of the apartment."), *appeal denied,* 94 N.Y.2d 917, 708 N.Y.S.2d 357, 729 N.E.2d 1156 (2000); *People v. Miranda,* 220 A.D.2d 218, 218, 631 N.Y.S.2d 840, 840-41 (1st Dep't) ("[T]he People's evidence established, beyond a reasonable doubt, that defendant knowingly exercised dominion and control over the cocaine recovered from the small, one-bedroom apartment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

defendant fled as the police were about to execute a search warrant. Based upon the People's proof that the cocaine was found in open view in a bedroom with an open door that was visible from other areas of the apartment, and that cocaine was next to a table containing an Ohaus scale, wrapping materials and a calculator-equipment used in preparing narcotics for sale-the trier of fact properly applied the 'drug factory' presumption (Penal Law 220.25[2] ) in concluding that defendant constructively possessed the illegal narcotics in the apartment. Defendant was in 'close proximity' to the narcotics, as required by the statute."), *appeal denied*, 87 N.Y.2d 849, 638 N.Y.S.2d 607, 661 N.E.2d 1389 (1995); *People v. Rodriguez*, 194 A.D.2d 634, 635, 599 N.Y.S.2d 46, 47 (2d Dep't) ("the trial court was correct in applying the statutory presumption of possession pursuant to Penal Law § 220.25(2) as the jury could reasonably conclude that the defendant, who was apprehended in the living room, was in close proximity to the narcotics found in open view in the bedroom and that the narcotics were being packaged for future distribution"), *appeal denied*, 82 N.Y.2d 758, 603 N.Y.S.2d 1001, 624 N.E.2d 187 (1993).

**\*14** Here, as in prior cases, "the jury's 'decision was largely a matter of choosing whether to believe [the defense's] version of the events or to believe the version offered by the State. The jury chose to believe the State's witnesses.... We cannot say that no rational [factfinder] could have found guilt beyond a reasonable doubt on all the evidence." ' *Jamison v. Grier*, 01 Civ. 6678, 2002 WL 100642 at *12 (S.D.N.Y. Jan.25, 2002) (Peck, M.J.) (quoting *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir.1981)); *see* cases cited at pages 25-27 & nn. 16-19 above.[FN22]

> FN22. *See also*, *e.g.*, *Garcia v. Warden, Dannemore Corr. Facility*, 795 F.2d 5, 6 (2d Cir.1986) ("When the evidence, which we have merely highlighted, is viewed in the light most favorable to the State, it cannot be said that no rational trier of the fact could have found petitioner guilty beyond a reasonable doubt."); *Ruiz v. Artuz*, 99 Civ. 4476, 2002 WL 31045856 at *6 (S.D.N.Y. Jun.13, 2002) ("Although there certainly was other evidence from which the jury could have concluded that [petitioner] was not guilty, the prosecution's case was unquestionably

sufficient to sustain [petitioner's] conviction."); *Huber v. Schriver*, 140 F.Supp.2d 265, 277 (E.D.N.Y.2001) ("[M]ost of petitioner's argument rests on the suggestion that the eyewitness testimony was not credible and should not have been given enough weight to result in his conviction. Petitioner specifically asserts that the testimony of the defense witnesses was more credible than that of [named witness] and the other prosecution witnesses.... However, under ... federal law, issues of credibility, as well as the weight to be given to evidence, are questions to be determined by the jury ..."); *Fagon v. Bara*, 717 F.Supp. 976, 979 (E.D.N.Y.1989) (habeas court "is not free to make credibility judgments about the testimony presented at petitioner's trial or to weigh conflicting testimony"); *Milton v. Riley*, No. 88 CV 2848, 1988 WL 140663 at *1 (E.D.N.Y. Dec.16, 1988) (McLaughlin, D.J.) ("Questions of credibility, however, are not cognizable in a federal habeas corpus proceeding.").

Even if there had been major inconsistencies in the prosecution witnesses' testimony (which there was not), that would not change the result. *See, e.g.*, *United States v. Vasquez*, 267 F.3d 79, 91 (2d Cir.2001) ("The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility."), *cert. denied*, 534 U.S. 1148, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2002); *Gruttola v. Hammock*, 639 F.2d at 928 (rejecting insufficiency claim, holding that jury was entitled to believe prosecution witnesses despite inconsistencies in their testimony); *Means v. Barkley*, 98 Civ. 7603, 2000 WL 5020 at *4 (S.D.N.Y. Jan.4, 2000) ("The testimony of a single uncorroborated witness is sufficient to achieve a showing of guilt beyond a reasonable doubt ... even if that witness's testimony is less than entirely consistent....").[FN23] Indeed, the Second Circuit has held that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979). Thus, simply based on Officer Wells' testimony, a rational jury properly could have convicted Hediam.

> FN23. *See also*, *e.g.*, *Jamison v. Grier*, 2002 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

100642 at *12-13 (inconsistencies in witness testimony does not make evidence insufficient); *Simpson v. Portuondo,* 01 Civ. 1379, 92 Ohio St.3d 1452, 751 N.E.2d 487, 2001 WL 830945 at *9 (S.D.N.Y. Jul. 12, 2001) (Peck, M.J.); *Carromero v.. Strack,* 98 Civ. 3519, 1998 WL 849321 at *5 (S.D.N.Y. Nov.19, 1998) (Preska, D.J. & Peck, M.J.) (evidence sufficient where jury credited prosecution witnesses' testimony "despite some inconsistencies between their trial testimony and prior statements to the police and to the grand jury"); *Davis v. Senkowski,* No. 97-CV-2328, 1998 WL 812653 at *5 (E.D.N.Y. Aug.6, 1998) ("The jury here chose to believe [the prosecution witness]'s testimony despite any inconsistencies in the evidence, and I will not reassess that decision."); *Williams v. Bennet,* 97 Civ. 1628, 1998 WL 236222 at *5 (S.D.N.Y. Apr.20, 1998) (Baer, D.J. & Peck, M.J.) ("Williams relies on inconsistencies in his victim's trial testimony as compared to her statements to the police, the District Attorney's office and before the grand jury. These inconsistencies were placed before the jury by the defense, which made them a central focus of its case. The jury's decision to credit [the victim]'s testimony, despite its inconsistencies, over Williams' testimony, is fully supported by the record."); *Taxiarhopolous v. Spence,* No. CV 92-0790, 1992 WL 403112 at *4 (E.D.N.Y. Dec.28, 1992) (The petitioner "cannot show that the evidence was insufficient to support conviction. For example, he challenges the credibility of the main prosecution witness ..., pointing to alleged inconsistencies in his testimony. This, however, was an argument made to, and properly resolved by, the trial jury.").

Finally, the Court notes that the Antiterrorism and Effective Death Penalty Act ("AEDPA") has further limited this Court's role in determining sufficiency of the evidence habeas petitions. *See* 28 U.S.C. § 2254(d). For a discussion of the AEDPA review standard and its applicability to sufficiency of the evidence cases, *see,e.g.,* *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *12-13 & n. 10, *15 & n. 24 (S.D.N.Y. May 8, 2002) (Peck, M.J.) ( & cases cited therein). This Court cannot say that the First Department's decision affirming

Hediam's conviction was contrary to or an unreasonable application of established federal law or was based on an unreasonable determination of facts.

IV. *COUNSEL WAS NOT INEFFECTIVE UNDER THE* STRICKLAND V. WASHINGTON *STANDARD FOR FAILING TO MAKE A MOTION TO SUPPRESS THE DRUGS*

A. *The Strickland v. Washington Standard On Ineffective Assistance of Counsel*[FN24]

FN24. For additional decisions authored by this Judge discussing the *Strickland v. Washington* standard for ineffective assistance of counsel in language substantially similar to this section of this Report & Recommendation, *see* *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *13-14 (S.D.N.Y. Nov.6, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *9-11 (S.D.N.Y. Oct.15, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *16-19 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug.6, 2002) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *9-11 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *15-17 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *9 (S.D.N.Y. Dec.11, 2001) (Peck, M.J.); *Ennis v. Walker,* 00 Civ. 2875, 2001 WL 409530 at *15-16 (S.D.N.Y. Apr.6, 2001) (Peck, M.J.); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01-2474, 41 Fed. Appx. 497, 2002 WL 144874 (2d Cir. June 28, 2002); *Dukes v. McGinnis,* 99 Civ. 9731, 2000 WL 382059 at *8 (S.D.N.Y. Apr.17, 2000) (Peck, M.J.); *Cruz v. Greiner,* 98 Civ. 7939, 1999 WL 1043961 at *16 (S.D.N.Y. Nov.17, 1999) (Peck, M.J.); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 370 (S.D.N.Y.1999) (Patterson, D.J. & Peck, M.J.); *Santos v. Greiner,* 99 Civ. 1545, 1999 WL 756473 at *7 (S.D.N.Y. Sept.24, 1999) (Peck,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

M.J.); *Franza v. Stinson,* 58 F.Supp.2d 124, 133-34) (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); *Torres v. Irvin,* 33 F.Supp.2d 257, 277 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); *Boyd v. Hawk,* 965 F.Supp. 443, 449 (S.D.N.Y.1997) (Batts, D.J. & Peck, M.J.).

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. This performance is to be judged by an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064; *accord, e.g., Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).

**\*15** Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted); *accord, e.g., Bell v. Cone,* 122 S.Ct. at 1852; *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001).

Second, the defendant must show prejudice from counsel's performance. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact

finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068-69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.[FN25]

FN25. *See also, e.g., Bell v. Cone,* 122 S.Ct. at 1850; *Aparicio v. Artuz,* 269 F.3d at 95; *Sellan v. Kuhlman,* 261 F.3d at 315; *DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.), *cert. denied,* 519 U.S. 824, 117 S.Ct. 83, 136 L.Ed.2d 40 (1996).

The Supreme Court has counseled that these principles "do not establish mechanical rules." *Strickland v. Washington,* 466 U.S. at 696, 104 S.Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.* The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697, 104 S.Ct. at 2069.[FN26]

FN26. *Accord, e.g., Smith v. Robbins,* 528 U.S. 259, 286 n. 14, 120 S.Ct. 746, 764 n. 14, 145 L.Ed.2d 756 (2000).

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690-91, 104 S.Ct. at 2066.[FN27]

FN27. *See also, e.g., Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

(1982) ("We have long recognized ... that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) ("In reviewing *Strickland* claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on ... counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994).

As the Second Circuit noted: "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001).

**\*16** For purposes of this Court's AEDPA analysis, "the *Strickland* standard ... is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.' " *Aparicio v. Artuz,* 269 F.3d at 95 & n. 8 (quoting 28 U.S.C. § 2254(d)(1)); *see also,e.g.,Bell v. Cone,* 122 S.Ct. at 1852;*Sellan v. Kuhlman,* 261 F.3d at 315. "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.' " *Aparicio v. Artuz,* 269 F.3d at 95 n. 8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.... Rather, he must show that the [First Department] applied *Strickland* to the facts of his case in an objectively unreasonable manner."

*Bell v. Cone,* 122 S.Ct. at 1852.

*B. Application of the* Strickland *Standard to Hediam's Trial Counsel Ineffectiveness Claim*

[3] Hediam alleges that although the second bedroom and the contraband that it contained belonged to the boarder who lived there, Hediam "still had an expectation to privacy which society recognizes as reasonable." (Pet.¶ 12(C) Attachment; Ex. L: Hediam § 440 Br. at 11-14.) Under this "expectation of privacy" theory, Hediam claims that his trial counsel should have moved to suppress the drugs and drug paraphernalia found in the second bedroom. (Ex. L: Hediam § 440 Br. at 13-14.)

In order to move to suppress the evidence found in the second bedroom, Hediam would have to have shown that he had a "legitimate expectation of privacy" in the premises searched. *E.g.,Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *see also,e.g.,People v. Ramirez-Portoreal,* 88 N.Y.2d 99, 108-09, 643 N.Y.S.2d 502, 506-07, 666 N.E.2d 207 (1996); *People v. Wesley,* 73 N.Y.2d 351, 358-59, 540 N.Y.S.2d 757, 761, 538 N.E.2d 76 (1989).

Throughout the state court proceedings (and continuing in his federal habeas petition), Hediam has maintained as an integral part of his defense that the police seized the drugs and paraphernalia from a locked bedroom that belonged to boarder Pedro Tavaris; Hediam's unwavering position was that he neither owned nor possessed the recovered contraband nor had access to the locked bedroom. If this was the case, Hediam would not have a legitimate expectation of privacy in the bedroom. It is well-settled that "[o]ne who alone occupies a room in a hotel or an apartment in an apartment house is deemed to have exclusive possession and control over those premises-at least for purposes of search and seizure in the criminal law-and no third party may consent to their being entered or searched by the police." *People v. Wood,* 31 N.Y.2d 975, 976, 341 N.Y.S.2d 310, 311, 293 N.E.2d 559 (1973); *accord,e.g.,Chapman v. United States,* 365 U.S. 610,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

616-18, 81 S.Ct. 776, 779-81, 5 L.Ed.2d 828 (1961) (landlord lacked authority to consent to warrantless search); *United States v. Brown,* 961 F.2d 1039, 1041 (2d Cir.1992) (suppressing gun evidence because "a land[lord] is not ordinarily vested with authority to authorize a search of premises leased to a tenant"); *People v. Ponto,* 103 A.D.2d 573, 577, 480 N.Y.S.2d 921, 923-24 (2d Dep't 1984) ("The prevailing rule in this and a number of other jurisdictions is that the lessor of real or personal property lacks the requisite authority to consent to a warrantless search of the leased property."). As the trial court explained in denying Hediam's C.P.L. § 440 motion, "while [Hediam's] connection to his mother's home may have been sufficient to afford him standing to a general search of her home, under [Hediam's] version of the facts, he had no standing to contest the police search of the tenant's room ." (Ex. O: 6/23/01 § 440 Decision at 4) (citations omitted). Because Hediam claimed that the second bedroom was rented by a boarder, who kept that room locked, Hediam could not have shown on a suppression motion that *he* had a legitimate expectation of privacy to the room sufficient to move to suppress.

**\*17** On the other hand, had Hediam testified differently at a suppression hearing, that is, if he did not say the room was a locked room rented to a boarder, the police testimony that the evidence was in open, plain sight would have resulted in denial of the suppression motion. *See,e.g.,United States v. $557,933.89, More or Less, in U.S. Funds,* 287 F.3d 66, 81-82 & n. 11 (2d Cir.2002) ("It is well-settled that, under the 'plain view' doctrine, law enforcement personnel may seize an item without a warrant provided that it is 'immediately apparent that the object is connected with criminal activity,' and further provided that the officers viewed the object from a lawful vantage point-i.e., that the officers 'have not violated the Fourth Amendment in arriving at the place from where they can see' the object.'); *United States v. Kiyuyung,* 171 F.3d 78, 83 (2d Cir.1999) ("Under the 'plain view' exception, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." ') (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 2136-37, 124 L.Ed.2d 334 (1993)); *United States v. Atherton,* 936 F.2d 728, 733 (2d Cir.1991) ("Once the agents made a lawful entry, the buy money was clearly subject to lawful seizure, since it was

sitting in 'plain view' on a table in front of the door."), *cert. denied,* 502 U.S. 1101, 112 S.Ct. 1187, 117 L.Ed.2d 429 (1992); *United States v. Gomez,* 633 F.2d 999, 1008 (2d Cir.1980) ("Once the agents lawfully entered [defendant s] apartment, they were entitled to conduct a security check, 'a very quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers.' The agents were justified in seizing items observed in plain view during the security check.") (citations omitted), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981). If Hediam thereafter testified at trial to the boarder/locked bedroom scenario, the prosecution could have impeached him with his suppression hearing testimony to the contrary. *See,e.g.,United States v. Geraldo,* 271 F.3d 1112, 1116 (D.C.Cir.2001) ("Sound tactical considerations weighed in favor of counsel's decision not to assert [defendant's] privacy interest in [an apartment]. If [defendant] had testified at the suppression hearing about his interest in the premises, his testimony could have been used to impeach him at trial if he took the stand."); *United States v. Jaswal,* 47 F.3d 539, 543-44 (2d Cir.1995) ( "Prior inconsistent suppression hearing testimony may properly be used to impeach a defendant during trial."); *United States v. Montoya-Eschevarria,* 892 F.Supp. 104, 106 n. 2 (S.D.N.Y.1995) ("Although any sworn statement made by the defendant in support of his motion to suppress may not be used against him at trial on the issue of guilt, prior inconsistent suppression hearing testimony may be used to impeach the defendant during trial.") (citations omitted); *People v. Brown,* 98 N.Y.2d 226, 231-33, 746 N.Y.S.2d 422, 425-26, 774 N.E.2d 186 (2002) (trial court properly permitted defendant to be impeached on cross-examination at trial with prior inconsistent statements his former defense counsel made during a pretrial suppression hearing at which defendant was present). Since Hediam's primary defense, that the second bedroom door was closed and locked, essentially required him to testify at trial, making impeachment likely, Hediam's trial counsel strategically chose not to seek a suppression hearing. In fact, in a conversation with an Assistant District Attorney prior to Hediam's trial, Hediam's trial counsel "explained that he felt a motion for a Mapp hearing would be antithetical to his client's consistent contention t@hat defendant never had any possessory or proprietary interest in the drugs or paraphernalia recovered. Defense Counsel Velez further stated that this was a strategical decision on his part prior to trial." (Ex. M: State § 440 Br., fourth page.) As the §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)
(Cite as: 2002 WL 31867722 (S.D.N.Y.))

440 court found, "counsel's election to forego a *Mapp* hearing was not only a legitimate strategy, but practically the only one open to him under the circumstances." (Ex. O: 6/23/01 § 440 Decision at 4.) This Court agrees.

**\*18** Hediam's counsel's strategic decision not to seek a suppression hearing did not constitute ineffective assistance of counsel under the *Strickland* standard, and more importantly, the state court's decision was not an "unreasonable application" of *Strickland.* Hediam's ineffective assistance habeas claim should be denied.

### CONCLUSION

For the reasons discussed above, all three of Hediam's habeas claims should be denied and a certificate of appealability should not be issued.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Allen G. Schwartz, 500 Pead Street, Room 1350, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Schwartz. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert.denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a),

6(e).

S.D.N.Y.,2002.
Hediam v. Miller
Not Reported in F.Supp.2d, 2002 WL 31867722 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
E.D. New York.
Vance MAXWELL, Petitioner,
v.
Charles GREINER, Superintendent, Greenhaven Correctional Facility, Respondent.
**No. 04-CV-4477 (CBA).**

May 12, 2008.

*MEMORANDUM AND ORDER*

AMON, District Judge.

**\*1** Petitioner Vance Maxwell filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on October 19, 2004. After the government opposed the petition and Maxwell replied, the Court appointed counsel to represent Maxwell for the purposes of further briefing. For the reasons that follow, the petition is denied.

**I. Facts and Procedural History**

The evidence at trial established that on May 26, 1996, Maxwell, along with three other people, robbed Victor Lambert, Ramone Avrea, and Luis Samaniego, employees of the National Car Service in Corona, Queens. Maxwell acted as the getaway driver for the crime. After being chased by the robbery victims, Maxwell abandoned his car. He went to the police precinct later that night claiming to have been the victim of a car-jacking in order to retrieve his car, which had been impounded, and was identified by the victims, who had arrived at the precinct to report the robbery.

Maxwell was charged with and tried for three counts of Robbery in the First Degree and Falsely Reporting an Incident in the Third Degree. At trial, the government called witnesses to establish Maxwell's role in the robbery. Victor Lambert testified that on the night in question he was at the National Car Service with Avrea and Samaniego and that they were robbed. He identified Maxwell as the man who stood lookout and acted as the get-away-driver. (Tr. 291-93 .) Lambert said that the robbery victims got into a car and followed Maxwell's BMW. (Tr. 295-96.) Officer Munoz testified that he found the abandoned BMW in the middle of the street with the lights on and the doors open. (Tr. 384.) He brought the victims of the National Car Service robbery to the car to identify it. (Tr. 385.) He ran the VIN number of the car and it came back to Maxwell. (Tr. 387.) Later that same night, he was approached by Maxwell in the precinct and Maxwell claimed to be the victim of a carjacking. (Tr. 390-91.) Maxwell also told him that he went back to the car to get the keys but then abandoned it again, and that he did not know the individuals who carjacked him and that one put a gun to his head. (Tr. 392-94.) Munoz then brought Maxwell to the car they had recovered, and Maxwell identified it as his own. (Tr. 394.) While Munoz was talking to Maxwell, the victims' identified him and Munoz arrested him. (Tr. 395-96.) Detective Troise testified that he found a Polaroid photograph in the BMW of one of Maxwell's co-defendants, Clifford Jamal. (Tr. 357-59.) Several other witnesses corroborated this evidence. The defendant did not put on a case.

On September 29, 1997, the jury convicted Maxwell on all charges. (Tr. 607-10.) On October 30, 1997, Maxwell was sentenced as a persistent violent felony offender to three concurrent indeterminate prison terms of twenty years to life for each of the first-degree robbery counts and to a concurrent ninety day prison term for the falsely reporting an incident count.

**\*2** Maxwell filed a notice of appeal on October 31, 1997. However, before pursuing his direct appeal, on August 13, 1998, Maxwell filed a motion, pro se, seeking vacatur of the judgment against him pursuant to New York Criminal Procedure Law § 440.10. In that motion Maxwell argued:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

1) that trial counsel's waiver of his *Antommarchi* rights was not binding because the record did not indicate that he had been advised of his rights or knowingly waived them, 2) that he was denied due process, his right to confrontation, and a fair trial because the state violated *Brady v. Maryland,* 373 U.S. 83 (1963), by failing to preserve pictures of the impounded car and allowing it to be sold, and 3) that his right to effective assistance of counsel was violated because his trial counsel had failed to recognize a *Miranda* violation, failed to object to the *Brady* violation committed by the prosecution, failed to request a charge on circumstantial evidence, and failed to establish that Maxwell owned a gray BMW, not a brown BMW. The Supreme Court denied the motion as procedurally defective, explaining that those issues are properly brought on appeal. *People v. Maxwell,* No. 2387/96, slip op. (N.Y.Sup.Ct. Nov. 25, 1998). Maxwell moved for reconsideration on December 8, 1998 and on March 1, 1999, his motion was denied. *People v. Maxwell,* No. 2387/96, slip op. (N.Y.Sup.Ct. Mar. 1, 1999). Maxwell sought leave to appeal this decision on December 29, 1998 and his request was denied on April 13, 1999. *People v. Maxwell,* 98-11232, slip op. (N.Y.App.Div. Apr. 13, 1999).

On April 30, 2002, Maxwell, represented by counsel, pursued his direct appeal. He argued that he was denied: 1) a fair trial because of the introduction of evidence establishing his decade old arrest for robbery with his co-defendant, 2) a fair trial because the jury did not receive an instruction that they should not consider that conviction as proof of his predisposition to commit robbery, 3) effective assistance of counsel because a) counsel failed to seek dismissal on speedy trial grounds of an expired misdemeanor count that provided the basis for the introduction of his prior uncharged crime, b) counsel did not seek a jury instruction prohibiting improper consideration of the uncharged conduct, c) counsel failed to seek a curative instruction for the prosecution's summation, and d) counsel contradicted, on the record, Maxwell's assertion that he did not own or operate the brown car used by the escaping robbers. Maxwell's appeal was denied on November 4, 2002. *People v. Maxwell,* 750 N.Y. S.2d 97 (N.Y.App.Div. Nov. 4, 2002). On December 6, 2002, Maxwell sought leave to appeal the decision of the Appellate Division. The Court of Appeals denied leave on February 18, 2003. *People v. Maxwell,* slip op. (N.Y.2003).

On June 19, 2003, Maxwell filed a pro se motion to set aside his sentence pursuant to New York Criminal Procedure Law § 440.20. In that motion, Maxwell argued that: 1) he was denied his procedural due process right when he was not provided with his prior felony statements prior to sentencing, and 2) he was denied effective assistance of counsel at sentencing because of counsel's failure to object to the constitutionality of his predicate felonies. His motion was denied on December 18, 2003. *People v. Maxwell,* No. 2387/96, slip op. (N.Y.Sup.Ct. Dec. 18, 2003). On January 13, 2004, Maxwell sought leave to appeal this decision to the Appellate Division. His application was denied on May 27, 2004. *People v. Maxwell,* No. 2387/96, slip op. (N.Y.App.Div. May 27, 2004).

**\*3** Maxwell filed a second § 440.10 motion on November 15, 2003. In that motion, he argued that: 1) he was denied his right to a fair trial because the prosecutor and the witnesses misrepresented that they had made a station house identification of defendant, 2) he was denied a fair trial because the car used in the robbery was impounded by the police and the photographs of the car were not preserved, and 3) he was denied effective assistance of counsel because counsel did not object to the lack of preservation of the car. His motion was denied on April 30, 2004. *People v. Maxwell,* No. 2387/96, slip op. (N.Y.Sup.Ct. Apr. 30, 2004). Maxwell sought leave to appeal the decision to the Appellate Division on May 28, 2004. His leave application was denied on August 9, 2004. *People v. Maxwell,* No.2004-05209, slip op. (N.Y.App.Div. Aug. 9, 2004).

Maxwell timely filed his petition for a writ of habeas corpus on October 15, 2004. In his petition, he brings the following claims: 1) Ineffective assistance of counsel for (a) counsel's failure to seek dismissal of the misdemeanor count on speedy trial grounds, where the misdemeanor charge served as the basis for admission of uncharged criminal conduct, (b) counsel's failure to seek an instruction prohibiting consideration of uncharged conduct, (c) counsel's failure to seek a curative instruction during the prosecution's summation regarding the prosecutor's comments on Maxwell's silence at trial, (d) counsel's failure to object to the lack of preservation of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

car or pictures of the car used in the crime, (e) counsel's failure to investigate that the car that Maxwell owns is a gray BMW, and therefore does not match the car used in the robbery and his failure to defend the case on that basis, and (f) counsel's failure to object to the constitutionality of Maxwell's predicate convictions; (2) that he was deprived his right to a fair trial due to the introduction of evidence that he was convicted of a prior robbery with the same co-defendant; and (3) for prosecutorial misconduct because (a) the prosecutor commented on Maxwell's silence, and (b) failed to correct a witnesses' representation that petitioner was identified during a show-up at the police station.

On March 13, 2007, the Court appointed Maxwell counsel in order to further brief the substantive and procedural issues regarding Maxwell's claim that the prosecutor impermissibly commented on his failure to testify. Subsequently, the Court received briefing on this issue from the parties, which is addressed below.

**II. Procedurally Barred Claims**

Three of Maxwell's claims for habeas relief must be dismissed for procedural reasons. First, two of his claims are unexhausted. Second, another of his claims was held to be procedurally barred in state court, and there is therefore an independent and adequate state law ground for decision to which this Court must defer.

*A. Exhaustion*

Two of Maxwell's claims, (1) for prosecutorial misconduct based on the prosecutor commenting on Maxwell's silence at trial, and (2) that Maxwell was deprived of his right to a fair trial due to the admission into evidence of his prior robbery conviction with the same codefendant, were not adequately presented to the highest available New York State court, and are therefore unexhausted. In order to obtain federal habeas review of a claim pursuant to 28 U.S.C. § 2254, the petitioner must have fairly presented the same claim in the state courts and have exhausted all possible state remedies. *See Coleman v. Thompson,* 501 U.S. 722, 731 (1991); *Fama v. Comm'r of Corr. Svcs.,*

235 F.3d 804 (2d Cir.2000). The exhaustion requirement requires the petitioner to have presented to the "highest state court from which a decision can be had" and to have presented "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney Gen. of State of N.Y.,* 696 F.2d 186, 190 n. 3, 191 (2d Cir.1982) (en banc); *Aparicio v. Artuz,* 269 F.3d 78, 89-90 (2d Cir.2001). Maxwell has failed to exhaust two of his claims.

*1. The Prosecutorial Misconduct Claim Based on Comments Regarding Maxwell's Failure to Testify at Trial*

**\*4** Maxwell's prosecutorial misconduct claim based on the prosecutor commenting on Maxwell's silence during his summation was never brought in that form in state court.[FN1] In his direct appeal, Maxwell noted that "the prosecutor highlighted appellant's failure to corroborate, explain, or testify, enticing the jury to draw an improper adverse inference from appellant's silence." (Br. for Def .-Appellant, at 39.) However, Maxwell only made this observation in the context of a claim that his counsel provided ineffective assistance because he failed to request a contemporaneous curative instruction from the trial judge. (*Id.* at 40.) Maxwell's counsel now argues that his prosecutorial misconduct claim was properly exhausted because the Appellate Division "reached the merits of the ineffective assistance of counsel claim, and, in doing so, perforce reached the merits of the adverse comment/prosecutorial misconduct claim as well," citing to *Parron v. Quick,* 869 F.2d 87 (2d Cir.1989). (Supplemental Br. on Exhaustion, dated May 17, 2007.)

FN1. The respondent argues that this claim is unexhausted because, even assuming *arguendo,* that Maxwell raised it before the Appellate Division, he did not raise it in his request for discretionary review before the New York Court of Appeals. However, Maxwell's letter request for leave to Appeal to the Court of Appeals briefly summarizes all of the arguments he made before the Appellate Division. Accordingly, Maxwell is deemed have raised in his petition for review precisely the arguments that he raised before the intermediate appellate court. *See Galdamez v. Keane,* 394 F.3d 68, 74-75 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

Cir.2005). Accordingly, and because the Court of Appeals denied leave, the Court will analyze the exhaustion question by reference to the proceedings before the Appellate Division.

Maxwell cites no clear authority for the proposition that a claim can be exhausted if it is necessarily decided by the state court as an underlying predicate to the determination of another claim.[FN2] Even if this were the law, it is of no help to Maxwell. The Appellate Division did not necessarily decide the propriety of the prosecutor's remarks in order to rule that Maxwell received effective assistance of trial counsel.[FN3] Maxwell's counsel interposed appropriate objections during the summation (with mixed success)[FN4], to those portions which he reasonably believed made improper references to Maxwell's silence at trial. In analyzing the ineffective assistance claim before it, the Appellate Division could have merely determined that counsel's conduct in response to the objectionable comments did not fall below "an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688 (1984). If counsel's actions were found to be reasonable, there was no need for the court to resolve whether or not the prosecutor's comments were actually constitutionally improper. In fact, the Court in this opinion reviews the ineffective assistance of counsel claim without reaching the merits of the underlying prosecutorial misconduct claim. Thus, here, as in *Parron,* the mere fact that the factual basis for an exhausted claim is intertwined with the factual basis for an unexhausted claim does not render the latter exhausted, where the latter need not have been reached by the state court deciding the former. *See* 869 F.2d at 88-91.

FN2. The only legal authority Maxwell cites to to suggest that this is a viable legal theory under the doctrine of exhaustion is *Parron.* Although *Parron* does seem to contemplate the possibility that a claim could be exhausted if it is necessarily decided pursuant to the determination of another claim, that is not the holding of the case.

FN3. The Appellate Division merely stated that Maxwell was not deprived of effective counsel, without elaboration. *See People v. Maxwell,* 750 N.Y. S.2d 97 (N.Y.App.Div. Nov. 4, 2002).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN4. As Maxwell conceded in his direct appeal, the trial judge did sustain one of counsel's objections and issue a curative instruction. (Supplemental Br. on Exhaustion, dated May 17, 2007, at 7.) In addition, during his jury charge the trial judge instructed the jury that Maxwell's failure to testify could not be held against him. (Trial Transcript at 586.)

If a claim has not been exhausted and the petitioner no longer has a state forum in which to raise the claim, the claim should be deemed exhausted but procedurally barred from habeas review. *Bossett v. Walker,* 41 F.3d 825, 828-29 (2d Cir.1994); *see also Ramirez v. Attorney Gen. of the State of N.Y.,* 280 F.3d 87, 94 (2d Cir.2001). Maxwell cannot now return to state court to bring this on the record claim since he has already taken his direct appeal. *See* NYCPL § 440.10(2)(c). Thus, this claim is deemed exhausted but procedurally barred from review by this Court.

**\*5** Federal review of Maxwell's claim remains available if he can "demonstrate cause for the [procedural] default and actual prejudice as a result ... or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750; *Fama,* 235 F.3d 804. Maxwell has not identified any cause for his failure to raise this claim and thus cannot meet the cause and prejudice standard. Moreover, the Supreme Court has held that the exception for fundamental miscarriage of justice is very limited and extends to cases where the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U .S. at 496; *see also Dretke v. Haley,* 541 U.S. 386 (2004). Maxwell is unable to show actual innocence, and therefore cannot establish a fundamental miscarriage of justice necessary to obtain habeas review of any of his procedurally barred claims.

*2. The Claim Regarding Evidence of Maxwell's Prior Conviction With the Same Codefendant*

In addition, Maxwell has failed to exhaust his claim that

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

he was deprived his right to a fair trial due to the introduction of evidence that he was convicted of a prior robbery with the same co-defendant. The factual basis of this claim was raised in Maxwell's direct appeal, but it was brought pursuant to state law without explicit citation to the federal Constitution. The Second Circuit has recognized four ways in which a habeas petitioner can raise a federal claim, for exhaustion purposes, without citing chapter and verse from the U.S. Constitution: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye,* 696 F.2d at 194;*see also Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 361-62 (S.D.N.Y.1999). Maxwell failed to meet any of these four criteria with respect to the claim at issue.

In his brief to the Appellate Division, Maxwell failed to cite the federal (or New York state) constitution. Instead, he discussed and cited cases discussing New York state evidentiary common-law pursuant to *People v. Molineux,* 168 N.Y. 264 (1901) and its progeny. In his letter seeking leave to appeal to the New York Court of Appeals, Maxwell stated, in the introductory paragraph, that this error "violated his constitutional right to a fair trial." However, in the body of the letter he refers to this as "The *Molineux* issue" and again cites only cases discussing New York state evidence law. Maxwell's passing reference to a constitutional right is insufficient in light of the fact that his entire argument exclusively relies on and discusses New York state cases applying New York state law. Moreover, in reviewing this claim, the Appellate Division followed Maxwell's lead and relied exclusively on state law to reject Maxwell's argument. *People v. Maxwell,* 750 N.Y.S.2d at 98. Additionally, this claim does not call to mind a specific right protected by the federal Constitution nor does it allege a pattern of facts that is well within the mainstream of federal constitutional litigation. Accordingly, this claim is unexhausted. [FN5] As above, this Court will deem the claim exhausted but procedurally barred from review by this Court. Again, in order to obtain review by this Court, Maxwell must establish cause and prejudice for the default or show that a fundamental miscarriage of justice will result. As above, Maxwell has not alleged any cause to excuse this failure and thus

cannot satisfy the cause and prejudice standard. Moreover, as the Court already observed, Maxwell makes no claim of actual innocence, and has therefore failed to demonstrate a fundamental miscarriage of justice.

FN5. If the Court were to reach the merits if this claim, it would be rejected. Generally speaking, evidentiary issues do not implicate the federal Constitution, and therefore errors of state evidence law are rarely grounds for habeas relief. *See Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (state law evidentiary issue could not provide the basis for federal habeas relief, "because federal habeas courts do not reexamine state-court determinations on state-law issues"); *United States v. Fell,* 360 F.3d 135, 144-45 (2d Cir.2004) (protections of evidence law generally not constitutionally required). "In order to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial." *Collins v. Scully,* 755 F.2d 16, 18 (2d Cir.1985) (citing *United States v. Agurs,* 427 U.S. 97, 108 (1976)). Here, Maxwell failed to demonstrate that the trial court erred as a matter of New York state law when it admitted the evidence in question, much less demonstrate that he was denied a fundamentally fair trial as a result.

*B. Independent and Adequate State Procedural Ground*

**\*6** In addition to his two unexhausted claims, the Court will not reach the merits of Maxwell's second claim of prosecutorial misconduct-that the prosecutor improperly failed to correct witnesses' representations that they had identified petitioner at a station-house show-up-because it was held to be procedurally barred by the New York courts. A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

miscarriage of justice." *Coleman,* 501 U.S. at 750. When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved. *See Glenn v. Bartlett,* 98 F.3d 721, 724-25 (2d Cir.1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810 (2d Cir.2000). Claims that are disposed of by the state court using this "either/or" language are entitled to AEDPA deference. *Jimenez v. Walker,* 458 F.3d 130, 146 (2d Cir.2006).

The claim at issue was raised in Maxwell's second § 440.10 motion. In an order dated April 30, 2004, the court dismissed all of Maxwell's claims in that motion as "procedurally barred." *People v. Maxwell,* No. 2387/96, slip op. (N.Y.Sup.Ct. Apr. 30, 2004). The claim was held to be barred under New York state law because it is an "on the record" claim that was not raised on direct appeal. *See*N.Y.C.P.L. 440.20(2)(c). Maxwell does not claim any cause for his procedural default and thus cannot meet the cause and prejudice standard. Additionally, as is noted above, Maxwell is unable to show that he is actually innocent, and therefore cannot establish a fundamental miscarriage of justice necessary to obtain habeas review of this claim. Accordingly, the Court will not reach the merits of this claim.

**III. The Ineffective Assistance of Counsel Claims**

The only remaining claims are Maxwell's contentions that he was denied the effective assistance of counsel. The respondent concedes that none of these claims are unexhausted or are procedurally barred. (Aff. and Mem. of Law in Opp'n to Pet., at 31.) Accordingly, they will be addressed on the merits. [FN6]

> FN6. In fact, as will be discussed below, one of Maxwell's ineffective assistance of counsel claims seems to be procedurally barred. In any event, it is without merit.

*A. AEDPA Standard*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the state's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

**\*7** An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

*B. Ineffective Assistance of Counsel Standard*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

The Sixth Amendment of the Constitution of the United States provides, in part, that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." The right to counsel is "the right to effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970); *Campusano v. United States,* 442 F.3d 770, 773 (2d Cir.2006). In order to prevail on an ineffective assistance of counsel claim, a petitioner must meet the two pronged test articulated by the Supreme Court of the United States in *Strickland v. Washington.* A petitioner must show 1) that counsel's representation "fell below an objective standard of reasonableness" and 2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694;*see also Rompilla v. Beard,* 545 U.S. 374 (2005); *Wiggins v. Smith,* 539 U.S. 510 (2003). Concerning the quality-of-representation prong, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and, as a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable" because judicial scrutiny of counsel's performance is deferential. *Strickland,* 466 U.S. at 689-90. However, strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691. With respect to the prejudice prong, the United States Supreme Court has explained that "reasonable probability" of prejudice means "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

*C. The Claims That Were Raised On Direct Appeal*

**\*8** In deciding Maxwell's direct appeal, in which all but one of Maxwell's ineffective assistance of counsel claims were raised, the court stated that "[t]he defendant was not deprived of the effective assistance of counsel" and cited to *People v. Baldi,* 54 N.Y.2d 137 (N.Y.1981) and other New York state cases. *People v. Maxwell,* 750 N.Y.2d 97 (N.Y.App.Div.2002). Under the *Baldi* standard, an ineffective assistance of counsel claim will be denied "so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided

meaningful representation." *Baldi,* 54 N.Y.2d at 147. The *Baldi* standard and the federal *Strickland* standard have different prejudice prongs. Under *Strickland,* when counsel's performance is determined to be constitutionally deficient, an ineffective assistance of counsel claim is established if there is a "reasonable probability" the outcome would have been different. *Strickland,* 466 U.S. at 687. However, the New York standard's prejudice prong looks at the "fairness of the process as a whole rather than [any] particular impact on the outcome of the case." *People v. Benevento,* 91 N.Y.2d 708, 714 (N.Y.1998). The Second Circuit, in *Henry v. Poole,* 409 F.3d 48 (2d Cir.2005), suggested that the *Baldi* standard is contrary to the federal standard. Post-*Henry,* it is unclear that a federal court reviewing a New York state decision which applied the *Baldi* standard should defer to that decision pursuant to the AEDPA standards. Since the court applied the *Baldi* standard rather than the *Strickland* standard in deciding Maxwell's direct appeal, this Court will proceed conservatively and review the ineffective assistance of counsel claims that were brought on direct appeal *de novo.*

*1. Counsel Failed to Seek Dismissal of Misdemeanor Count Which Served As Premise for the Introduction of Uncharged Conduct on Speedy Trial Grounds*

Maxwell argues that his counsel erred by failing to seek dismissal of the lesser included misdemeanor counts in his indictment on speedy trial grounds and that the inclusion of the misdemeanor counts served as the premise for the introduction of uncharged conduct. This argument fails. In his argument on direct appeal, Maxwell states that the judge found that the delay between the indictment and the people's readiness for trial was sixty-one days. (Br. for Def.-Appellant, at 34.) Maxwell argued that this period was greater than the statutory period for readiness for the class B misdemeanor charged in the indictment. (*Id.*) However, pursuant to New York law, the government had six months from the commencement of the criminal action to try Maxwell since he was "accused of one or more offenses, at least one of which [wa]s a felony." N.Y.C.P.L. § 30.30(1)(a). The period of time that the State took to be ready, 61 days, is well within the six months they were entitled to. Therefore, any motion made by his counsel on speedy trial grounds would have failed and, accordingly, Maxwell cannot sustain a claim of ineffective assistance of counsel on this basis. *See United States v. Arena,* 180 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

380, 396 (2d Cir.1999) ("Failure to make a meritless
argument does not amount to ineffective assistance.").

2. *Counsel Failed to Seek Instruction Prohibiting
Consideration of Uncharged Conduct*

**\*9** In his direct appeal brief, Maxwell argues that counsel
failed to provide effective assistance of counsel because
he failed to "request a clear, complete and forceful
limiting instruction" and failed to "object to the weak and
incomplete instruction given by the trial court" after the
introduction of evidence of uncharged crimes, evidence
that Maxwell had been arrested and convicted with one of
his co-defendants. (Br. for Def.-Appellant, at 38.)
Maxwell did not provide that court or this one with any
more information on why the instruction given by the trial
court was flawed. The trial court instructed the jury twice
on the limited purpose of the evidence of uncharged
conduct. When the state introduced the evidence, the court
instructed the jury:

 Ladies and Gentlemen, the testimony that's been offered
 to you through this witness who just appeared, and the
 physical evidence that was introduced while he was on
 the stand, was received for one purpose and one purpose
 only, and that is, solely on the issue of whether, as the
 People contend and the defendant denied, the defendant
 was acting in concert, that is, acting together with, and
 intentionally aiding other individuals who committed
 this alleged robbery. That's the only purpose for which
 this evidence has been offered. And you may consider
 it for no other purpose. (Tr. 481-82 .)

In its final charge to the jury, the court said:

 You will also recall, ladies and gentlemen, that evidence
 was offered at this trial regarding an entirely unrelated
 arrest and conviction that occurred in the mid-1980s. As
 I told you at the time, that evidence was received on one
 issue, and one issue only, namely whether the defendant,
 as the People contend and the defendant denies, had the
 intent to act in concert with other individuals in forcibly
 stealing property. Thus, you may consider this evidence
 on that issue, and that issue alone, and for no other

purpose. (Tr. 581-82.)

Maxwell has demonstrated no error in this charge.
Accordingly, there was no error by counsel in not seeking
a "stronger" charge or objecting to the charge as given.

3. *Counsel Undermined the Defense at Trial by
Contradicting Defendant's Assertion that he Did Not Own
the Brown Car Used by Escaping Robbers*

Next, Maxwell argues that he received ineffective
assistance of counsel because his counsel contradicted his
defense that he did not own the brown car used by the
escaping robbers. His argument is convoluted, at best, but
apparently, he claims that on the night in question he was
carjacked in his gray BMW and that simultaneously, a
brown BMW, which he had previously admitted was
registered to him, was abandoned after a separate crime
took place, and taken to the police station. Maxwell,
apparently, wanted his counsel to further investigate his
purchase of a gray BMW at an unidentified dealership in
New Jersey and use the fruits of this further investigation
to erect a defense that would have denied Maxwell's
ownership of the brown vehicle.

**\*10** As an initial matter, Maxwell has presented no
evidence to suggest that he owned a gray, not a Brown,
BMW, either in this court or at his trial, other than his own
conclusory and wholly unsupported assertion.
Nevertheless, counsel initially investigated this possible
defense, but ceased after being unable to locate the
supposed New Jersey dealership from which Maxwell
claimed to have purchased this separate gray BMW.
Thereafter, at trial the State introduced substantial
evidence that Maxwell indeed owned the Brown BMW
and/or that Maxwell was indeed present and drove the car
used during the crime: (1) the police had run a "VIN
check" on the brown BMW used in the course of the
robbery and determined that it belonged to Maxwell, (2)
one of the victims testified that they had followed the
robbers from the scene of the crime and identified
Maxwell as the getaway driver, (3) Maxwell had told
Officer Munoz that he had been the victim of a carjacking,
and (4) when Officer Munoz brought Maxwell to the
Brown BMW that the police had recovered, Maxwell

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

identified it as his own. Maxwell has not explained why counsel's investigation into the existence of a separate gray BMW was unreasonable under these circumstances, nor has he suggested what counsel should have done differently to "discover" that his BMW was gray, not brown.

In light of the facts available to him and the State's anticipated evidence, counsel made the strategic choice not to further investigate Maxwell's claimed ownership of an unidentified gray BMW purchased from an unidentified New Jersey dealership. He therefore decided not to defend the case by denying Maxwell's ownership of the brown car used during the course of the robbery. By doing so, counsel successfully had masks and rolls of duct tape, which were discovered in the brown car after it was seized, excluded from trial. In addition, by not challenging the ownership of the brown car, counsel was also able to present a coherent theory of the defense in which Maxwell was carjacked and forced to drive the robbers in his own car away from the scene of the robbery. As is noted above, a strategic choice rarely, if ever, will rise to the level of constitutionally deficient assistance of counsel. *See Strickland,* 466 U.S. at 689-91. Certainly, the strategic choices at issue here do not. Moreover, to the extent that counsel did not reasonably believe that Maxwell owned a separate gray BMW, pursuing such a defense would have been improper. *See Nix v. Whiteside,* 475 U.S. 157, 168 (1986) (defendant not entitled under *Strickland* to counsel willing to aid defendant in presentation of perjurious defense). Accordingly, counsel's performance with respect to the "gray BMW" defense was not constitutionally deficient.

Maxwell also alleges a related failure of his counsel, that his counsel failed to object to the absence of photography of the car seized.[FN7] In his first § 440 motion, Maxwell argued that if the photographs of the seized car would have been preserved, they would have shown that he "owned a Gray, 1981, 2rd. BMW, which was not "Marron" (BROWN) as the people's witnesses testified to." First, this statement is illogical. The pictures would have shown the color of the apprehended vehicle. They would not have revealed anything regarding the possible existence of a separate gray car.[FN8] Second, in any event, the Court has already concluded that counsel made the reasonable strategic choice to pursue a different theory of

the defense-that Maxwell was carjacked and did drive the brown BMW, but unwillingly. Accordingly, counsel did not err in failing to secure such a photograph, which would have had little probative value even if counsel had pursued the "gray BMW" defense, and had absolutely none after he decided not to.

FN7. Respondent seems to have missed this claim as it is not addressed in the opposition brief. In addition to failing on the merits, it is procedurally barred. The claim was included in Maxwell's second § 440 motion. The court stated that the claims in that motion were without merit and "in any event, procedurally barred." *People v. Maxwell,* No. 2387/96, slip op. (N.Y.Sup.Ct. Apr. 30, 2004). As was explained above, this alternative language is read as a procedural bar sufficient to preclude review by this Court. Maxwell does not allege cause and cannot show that a fundamental miscarriage of justice would result if this Court does not review this claim.

FN8. In his first § 440 motion, Maxwell's argument is that the car that was impounded was his gray BMW. Thus, the argument seems to be that the brown car used in the robbery was never located. (Aff. in Supp. of Mot. at ¶ 3-4.) His argument is muddled as he states a page later that it was the brown car which was impounded. (*Id.* at 5.)

4. *Counsel Failed to Seek Curative Instruction During Summation When the Prosecutor Commented on Maxwell's Silence*

**\*11** Maxwell's next ineffective assistance claim is that counsel failed to seek a curative instruction when the prosecutor commented on Maxwell's silence. This claim is without merit, because counsel reasonably responded to the prosecutor's comments. When the prosecutor asked "How does [Maxwell] explain Corey Howell's photograph in the trunk of his car?" counsel objected and his objection was overruled. (Tr. 554.) Maxwell's complaint that counsel did not seek a curative instruction does not make sense given that the objection was overruled. Similarly,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

when the prosecutor argued to the jury that Maxwell offered "no reasonable explanation" for why he "was sitting in a car in front of a Car Service at 2 A.M. in the morning," counsel objected and his objection was overruled. (Tr. 561.) Again, Maxwell's complaint that counsel did not seek a curative instruction is illogical. When the prosecutor made the statement during his summation that "it was defendant who did not testify," counsel immediately objected and the court sustained the objection and issued a curative instruction.[FN9]

> [FN9.] The Court acknowledges the fact that the trial judge's contemporaneous jury instruction was not adequate to address the problems raised by the prosecutor's comments. It bears noting, however, that the trial judge ultimately correctly instructed the jury on this point in his jury charge, which immediately followed the people's summation. In this latter charge, the judge stated that "the fact that [Maxwell] did not testify is not a factor from which any inference unfavorable or against him may be drawn." (Trial Transcript at 586.)

Counsel's reactions to the prosecutor's comments do not rise to the level of constitutionally deficient performance within the meaning of *Strickland*. First, it was a reasonable professional decision for counsel not to continue to press the objections on which he was overruled. It is quite possible that, after being overruled, counsel made the reasonable decision that, no matter how meritorious he believed his overruled objection to be, he had preserved it for appeal, and pressing the issue was unlikely to do anything but anger an already unreceptive judge. Second, when his objection was sustained and the judge gave his limiting instruction, counsel could have reasonably determined that further objections to the propriety of the judge's limiting instruction would do more practical harm than good under the circumstances. Accordingly, counsel's performance in reacting to the prosecutor's comments was not deficient.

*D. The Claim That Was Raised in Maxwell's 440.20 Motion*

Maxwell's allegation that his counsel was ineffective because his counsel failed to object to the constitutionality of his prior 1983 guilty plea-which was one of two predicate felonies for the purposes of sentencing in the instant matter-was raised in his motion to vacate the sentence made pursuant to N.Y.C.P.L. § 440.20. That court ruled that his plea in his predicate conviction was valid and thus, counsel had not made an error of constitutional proportions. *People v. Maxwell,* No. 2387/96, slip op. (N.Y.Sup.Ct. Dec. 18, 2003). Because the 440.20 court expressly determined that counsel had not made any unprofessional errors-the first prong of the Strickland analysis-it disposed of this claim using the federal constitutional standard. *Cf. Jackson v. Edwards,* 404 F.3d 612, 621 (2d Cir.2005) (federal claim exhausted even if only state constitutional law presented to state court, where the state and federal constitutional standards are sufficiently similar). Accordingly, the state court's determination as to this claim is entitled to AEDPA deference.

**\*12** In support of his claim that counsel was ineffective, Maxwell has argued in his 440.20 motion and before this Court that his 1983 guilty plea was not entered knowingly, voluntarily and intelligently. In the § 440.20 motion, he argued that he did not make an intelligent decision to take the guilty plea because he did not know of the possibility of receiving Youthful Offender status. (Mem. of Law in Supp. of Mot. to Vacate J., at 19.) Maxwell also argued in that motion that he was not informed of all of the rights that he was waiving and that he did not understand the sentence he faced. Accordingly, he now argues that his counsel was ineffective for failing to investigate this plea prior to sentencing and for not objecting to its use as a basis for sentencing him as a persistent violent felony offender.

A review of the plea minutes from his 1983 case reveals that Maxwell affirmed that he was voluntarily entering the plea and that he was aware that he was waiving his right to a trial by jury. The court deciding Maxwell's § 440.20 motion held that the failure of the court at the plea proceeding to specifically enumerate all of the rights that defendant was waiving did not render the plea invalid.[FN10] The court therefore held that it was not an error of constitutional proportion for counsel to fail to further investigate or challenge the prior plea. The state court's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2039528 (E.D.N.Y.)
(Cite as: 2008 WL 2039528 (E.D.N.Y.))

decision was neither contrary to nor an unreasonable application of established federal law, as determined by the Supreme Court. Accordingly, Maxwell cannot make out a claim for ineffective assistance of counsel on this basis.

> FN10. It is also worth noting that Maxwell failed to challenge the 1983 guilty plea at his 1983 sentencing, during his sentencing for his 1986 conviction, at which the 1983 conviction served as a prior felony conviction, and at the 1997 sentencing at issue here. Thus, even had counsel raised the constitutionality of the 1983 guilty plea at sentencing, the court would likely have held that the challenge was waived under New York law. See N.Y.C.P.L. § 400.15.(7)(b).

**VI. Conclusion**

The petition for a writ of habeas corpus is denied. No certificate of appealability is granted with respect to any of petitioner's claims, petitioner having made no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c). The Clerk of the Court is directed to enter judgment and close the case.

SO ORDERED.

E.D.N.Y.,2008.
Maxwell v. Greiner
Slip Copy, 2008 WL 2039528 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Elbert WELCH, Petitioner,
v.
ARTUS, Superintendent of Clinton Correctional
Facility, Respondent.
**No. 04-CV-205S.**

March 29, 2007.

Elbert Welch, Coxsackie, NY, pro se.

Edward Earl Key, Niagara County District Attorney's
Office, Lockport, NY, for Respondent.

**ORDER**

WILLIAM M. SKRETNY, United States District Judge.

**\*1** 1. On March 29, 2004, Petitioner commenced this
action seeking federal habeas relief under 28 U.S.C. §
2254. On August 29, 2006, Petitioner filed a Motion for
Enlargement on Recognizance or Bail. (Docket No. 19.)

2. On December 5, 2006, this Court referred this matter to
the Honorable Victor E. Bianchini, United States
Magistrate Judge, for all proceedings necessary for a
determination of the factual and legal issues presented,
and to prepare and submit a Report and Recommendation
containing findings of fact, conclusions of law and a
recommended disposition of the case pursuant to 28
U.S.C. § 636(b)(1)(B).

3. In a Report and Recommendation filed on January 23,

2007, Judge Bianchini recommended that Petitioner's
Petition for a Writ of Habeas Corpus be denied and that
his Motion for Enlargement on Recognizance or Bail be
denied. On February 9, 2007, Petitioner filed timely
Objections to Judge Bianchini's Report and
Recommendation in accordance with 28 U.S.C. §
636(b)(1)(C) and Local Rule 72.3(a)(3), and also filed an
Addendum and Supplement to his Objections, with
exhibits. Respondent was afforded the opportunity to
oppose Petitioner's objections, but did not do so.
Nevertheless, on March 14, 2007, Petitioner filed a Reply
in further support of his objections, with additional
exhibits. On March 5, 2007, Petitioner moved to
supplement the record with additional exhibits, and for
other relief. Petitioner's motion was granted to the extent
that he sought to supplement his objections to the Report
and Recommendation with the additional, attached
exhibits.

4. This Court has thoroughly reviewed Judge Bianchini's
Report and Recommendation, Plaintiff's Objections,
Addendum Objections, Reply and Supplemental Exhibits,
and the applicable law. Upon due consideration, this Court
finds no legal or factual FN1 error in Judge Bianchini's
Report and Recommendation. Accordingly, Petitioner's
Objections are denied and this Court will accept Judge
Bianchini's Report and Recommendation in its entirety.

FN1. The sole finding that may be open to some
legitimate dispute is whether Mr. Sansone was
Petitioner's second or third appointed attorney in
the underlying criminal cases. Judge Bianchini
determined that Mr. Sansone was Petitioner's
third attorney. The transcript can be read equally
to suggest that he was the second or the third.
Because this fact has absolutely no bearing on
the analysis employed or the outcome of the
petition, the Report and Recommendation is
accepted without modification.

IT HEREBY IS ORDERED, that this Court accepts Judge
Bianchini's January 23, 2007 Report and Recommendation
(Docket No. 22) in its entirety, including the authorities
cited and the reasons given therein.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

FURTHER, that Petitioner's Objections (Docket No. 23), Addendum Objections (Docket No. 25) and Reply Objections (Docket No. 31) are DENIED.

FURTHER, that Petitioner's petition seeking federal habeas relief (Docket No. 1) is DENIED for the reasons set forth in the Report and Recommendation.

FURTHER, that Petitioner's motion for bail (Docket No. 19) is DENIED for the reasons set forth in the Report and Recommendation.

FURTHER, that because the issues raised in the petition and motion for bail are not the type that a court could resolve in a different manner, and because these issues are not debatable among jurists of reason, this Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2), and accordingly, a Certificate of Appealability is DENIED and shall not issue.

*2 FURTHER, that this Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal would not be taken in good faith.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

## REPORT AND RECOMMENDATION

## INTRODUCTION

Petitioner, Elbert Welch ("Welch"), has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Niagara County Court on two counts criminal possession of a controlled

substance. United States District Judge William M. Skretny has referred this matter to the undersigned for the issuance of a Report and Recommendation. For the reasons set forth below, the Court recommends that Welch's petition for a writ of habeas corpus be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### The Arrest and Pre-Trial Proceedings

The conviction here at issue stems from Welch's arrest on March 3, 1999, after the Niagara County Sheriff's Department executed a search warrant of his apartment at 2789 McKoon Avenue and discovered several packages of crack cocaine with an aggregate weight of about seven grams, a package of marijuana, a large sum of United States currency ($7,375), a stun gun, and items typically used in the sale of narcotics *(e.g.,* a gram scale, razor blades, and small Ziploc plastic baggies). Although three other adults were present at the time of the raid, Welch declared ownership of any drugs and money discovered in the house, and no one else was arrested. A Niagara County grand jury returned Indictment No. 1999-128 [FN1] charging Welch with one count of criminal possession of a controlled substance (crack cocaine) in the third degree (N.Y. Penal Law § 220.16(1)), one count of criminal possession of a controlled substance (crack cocaine) in the fourth degree N.Y. Penal Law § 220.09(1)), one count of criminal possession of a weapon (an electronic stun gun) in the third degree (N.Y. Penal Law § 265.02), and one count of unlawful possession of marijuana (N.Y. Penal Law § 221.05).

> FN1. At that time, another Niagara County indictment (No.1999-051) was pending against Welch involving his alleged involvement in the sale of crack cocaine to Investigator James Phelps, an undercover officer with the Niagara County Sheriff's Department. The conviction obtained as a result of that indictment is the subject of another habeas petition filed by Welch in the District Court for the Western District of New York. *See Welch v. Superintendent Artus, Clinton Correctional Facility,* No.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

03-CV-0865S(VEB)(W.D.N.Y. Mar. 29, 2004).

Welch rejected the services of three different attorneys appointed to represent him on the basis that they refused to investigate his never-substantiated claim that he is the target of a vast conspiracy involving members of the Niagara County Sheriff's Department and City of Niagara Police Department, and various judges and attorneys in Niagara County, and about which Governor Pataki, the F.B.I., Janet Reno, and the United States Attorney's Office purportedly have knowledge. When the trial court (Punch, J.) refused to substitute an appointed attorney of Welch's choosing, Welch elected to represent himself at trial. He was assisted by John Sansone, Esq., who had been his third appointed attorney, as appointed standby counsel. *See, generally,* Transcript of February 25, 2000 Hearing ("2/25/00 Tr."). A suppression hearing was conducted before Judge Punch in Niagara County Court on March 30, 2000, and April 3, 2000. Following the hearing, Judge Punch found that the search and seizure was proper, and that Welch's statements to the police taking ownership of the contraband were made voluntarily after a knowing, intelligent, uncoerced waiver of his constitutional rights.

**\*3** Welch's jury trial commenced on June 5, 2000, in Niagara County Court before Judge Punch and continued through June 13, 2000.

### The Jury Trial-The Prosecution's Case-in-Chief

The prosecution's first witness was Investigator Mark Driess ("Investigator Driess") of the Niagara County Sheriff's Department, who testified that on March 3, 1999, he went to Welch's residence at 2789 McKoon Avenue to execute a search warrant that had been obtained by Investigator Peter Cocco and Investigator William Evans of the Niagara County Drug Task Force with respect to Welch. T.195-96, 839-40.[FN2] In addition to Investigators Driess, Cocco, and Evans, Investigator Michael Messina, Detective John Galie and Detective Paul Pierini participated in executing the warrant.[FN3]

> FN2. Citations to "T.___" refer to the trial transcript.

FN3. Detective Pierini testified that he was part of the Narcotics Intelligence Division of the Niagara Falls Police Department. T.306. He, along with Detective Galie, volunteered to assist the Niagara County Drug Task Force in executing a search warrant at 2789 McKoon Avenue on March 3, 1999. T.307-08.

Because the front door was locked, Investigator Driess and his team forced entry into the house where they encountered Welch on the first floor, along with another black male (Mark Simmons) and two black females (Deborah Jones [FN4] and Shamia (a/k/a Nicole) Johnson). T.202. Jones' two young children were located upstairs. T.203-05. Investigator Driess testified that the other male *(i.e.,* Simmons) was on the first floor, standing under an archway in the kitchen. T.202-03. The two females were in the first-floor bedroom. T.203.

> FN4. Jones, whom Welch described as his fiancée, was pregnant with his child at the time of the arrest.

Investigator Cocco, who was the first person into the house, secured Welch and the other three adults who were present and read them the *Miranda* warnings individually at about 11:15 p.m. T.847. (Investigator Driess testified, on cross-examination, that he was within earshot when Investigator Cocco read the *Miranda* warnings. T.248.) Welch indicated to Investigator Cocco that he understood his rights and did not wish to have an attorney present. T.849. Investigator Cocco testified that he acted as the evidence technician that night and was responsible for inventorying all of the items seized by the other officers during the raid. T.850. Investigator Cocco detailed the procedure he followed and described the items inventoried, including the drugs that he turned over to the forensic chemist, Mark Shaw. *See* T.850-68.

Detective Pierini watched the back entrance to the house while the other members of the Task Force entered through the front door. He testified that when he entered the residence, Welch was already in handcuffs, lying on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

the floor. T.310. Welch said to him, "Paul, I want to talk to you, I got a medical condition, I can't stay on the floor with my hands cuffed behind my back." T.310-11. (Detective Pierini confirmed that he had known Welch prior to the night of the arrest.) Detective Pierini told Welch that he would have to wait a "few minutes" until the house was secured but that he would come back. T.311. Welch did not ask him for any medical assistance. T.325. According to Detective Pierini, Welch "looked perfectly all right[.]" T.326.

Once the house was secured, Detective Pierini returned to Welch; he estimated that about three to seven minutes had elapsed. T.312. Detective Pierini and Investigator Driess helped Welch into a chair. T.246-47. Investigator Cocco recalled that somebody put Welch in a chair in the living room and opened the front door so that he could get some air. T.897; *see also* T.246-47. At that point Welch again was advised of his *Miranda* rights, this time by Detective Pierini T.312, 313-14. Welch said that he understood the warnings and he did not ask for an attorney. T.314-15. Detective Pierini told him that before he could handcuff Welch's hands in front, he would have to search Welch. T.312. During the search, Detective Pierini discovered a quantity of suspected crack cocaine in Welch's right hip pocket; a small amount was packaged in what looked like a gum wrapper and a larger amount was in a pink baggy. T.315-16. Welch later initiated another conversation with Detective Pierini, asking, "[W]ho's going to go to jail, is my girlfriend going to go to jail[?]" T.321. Detective Pierini responded, "I don't know, probably." *Id.* At that time Welch said, "[W]ell, any drugs or money that are found in the house are mine." *Id.* Jones was in the same room at the time. *Id.*[FN5] About five to six minutes had elapsed between the time Detective Pierini had read the *Miranda* warnings to Welch and the moment when Welch admitted that the drugs and money were his. *Id.*

FN5. Investigator Messina also heard Welch say "something about taking responsibility for everything in the house[.]" T.461.

**\*4** Investigator Evans observed Detective Pierini remove the drugs from Welch's pocket. He testified that the officers explained to the house's occupants that they had a search warrant for the person of Elbert Welch and any

and all parties present, along with the premises of 2789 McKoon Avenue. T.511. He then asked Welch "if there was anything in the residence or on his person that shouldn't ought [sic] to be there or that he shouldn't have." *Id.* According to Investigator Evans, "[t]here was a moment of hesitation, moment of silence, no response." *Id.* Shortly thereafter, Welch made a comment to the effect, "[S]upposing there was something in the house would everybody go to jail[?]" *Id.* Investigator Evans replied that if there was something in the house that should not have been there, and "someone was to own up to it, everyone would not go to jail." T.511, 513, 649-51. Investigator Evans confirmed that this conversation occurred after Welch had been read the *Miranda* warnings. At that point Welch stood up, and Investigator Evans saw Detective Pierini pull out a gum wrapper containing a quantity of controlled substance from Welch's right pocket. T.514, 536-37, 551. This was turned over to Investigator Cocco, who field-tested it and obtained a positive result for cocaine. T.551.

Detective Pierini re-handcuffed Welch with his hands in front and then proceeded to search the rest of the house. T.318. In an upstairs bedroom, Investigator Messina and Detective Pierini discovered a medical bracelet with the name "Elbert Welch" on it, a small gram scale, and a razor. T.429-30, 319-20. (According to Investigator Messina, in response to a question *posed by Welch,* the presence of a razor and a small scale in a house where drugs had been found would indicate a "possible connection" to the sale of narcotics. T.434.)

A safe was found by Investigators Evans and Driess in one of the upstairs bedrooms. T.205, 208. Welch was brought upstairs and, from a ring of keys around his neck, he identified the key to unlock the safe. T.210-12, 230, 244. The investigators observed the following items inside the safe: various receipts with Welch's name on them, United States currency (about $5,000 or $6,000 in various denominations), a plastic Ziploc bag containing smaller Ziploc bags, and a plastic bag of suspected crack cocaine. T.220-29. Investigator Driess testified that the smaller baggies were used to package pieces of crack cocaine to sell. T.225. Investigator Evans listed all of the items contained in the safe on an inventory sheet. T.234.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

Detective Galie stayed on the first floor and secured the individuals located in the residence. T.379. He also assisted Investigator Evans in searching a back bedroom. T.380. When they lifted the corner of the mattress, they discovered two packages of suspected crack cocaine. T.381. They also located a stun gun in the closet. T.382. Investigator Evans confiscated the crack cocaine and the stun gun. T.386.

**5** Detective Galie related that he had one brief conversation with Welch during which he observed that Welch had a quantity of light tan-colored material on his lips; Detective Galie asked him if he had ingested cocaine and said that if he had, he should spit it out. Meanwhile, Investigator Evans had discovered an open bag of peanuts. In speaking to Welch, Detective Galie noticed the smell of peanuts on Welch's breath. They concluded that Welch had just been eating peanuts, and had not ingested any crack cocaine.

Investigator Michael Messina, an undercover officer with the Drug Task Force, testified that he was "on the entry" detail during the execution of the search warrant at 2789 McKoon Avenue. T.420-21. He testified that he secured Deborah Jones by handcuffing her hands in front of her body, in consideration of the fact that she was pregnant. T.421-22. Investigator Messina related that he participated in the search of the back bedroom with Detective Galie and Investigator Evans. T.424. In his search of the living room, Investigator Messina discovered a police scanner. T.428. Investigator Messina testified that he never heard Welch complaining about a medical condition, although Welch did complain about the heat. T.446-47. As a result, a window or the front door was opened. T.447. During cross-examination, Welch asked Investigator Messina why no one else got arrested that night. Investigator Messina replied, "I think I answered that already. You took responsibility for all the narcotics in the house and all the contraband." T.465.

Investigator William Evans of the Niagara County Sheriff's Department testified that he had worked as an officer with the Drug Task Force for almost thirteen years. T.503-04. He stated that on March 3, 1999, he went to 2789 McKoon Avenue for the purpose of executing a search warrant on Elbert Welch. T.504. He arrived a little after eleven o'clock p.m. and was part of the team making the initial entry into the house. T.505. Once the front door was breached, Investigator Evans observed Welch, another male, and two females. T.506-07. He and Investigator Messina cleared the second floor of the house, where they found two small children in one of the bedrooms. *Id.* Once all of the adult persons in the house were secured, Investigator Evans witnessed Investigator Cocco read the *Miranda* warnings to them. T.508.

Investigator Evans then heard Investigator Messina make a comment about a safe which he discovered upstairs; Investigator Evans asked Welch where the keys were. Welch replied that the key was on a key ring on a chain around his neck. T.510. Welch confirmed which key was the correct one, and Investigator Evans opened the safe. T.514-15. Inside the safe was a "tannish package" containing a quantity of substance which field-tested positive for the presence of cocaine, a "large sum of U.S. currency", some food stamps, a quantity of coins, a razor blade,[FN6] a Ziploc baggy with smaller gray-colored Ziploc baggies; Investigator Evans photographed the safe and its contents. T.517-18, T.525, T.527-28. Investigator Evans was informed that there was a quantity of controlled substance in the downstairs bedroom which he also retrieved. T.530.

> FN6. Introduced into evidence were two razor blades. However, only one razor blade was recorded by Investigator Cocco on the evidence inventory. Investigator Cocco stated that he was not informed by Investigator Evans that a razor blade had been found in the safe. Welch made much of this discrepancy, and argued that Investigator Evans really had not found a razor blade in the safe but, after the raid, had placed a second razor blade in with the rest of the physical evidence seized-but for some reason did not change the inventory sheet.

**6** Investigator Evans testified that in the course of his duties, he was familiar with the smaller baggies as packaging material for controlled substance and the razor blade used to cut up the substance. T.519. About $1,380 in cash was found in a money clip in Welch's jacket pocket. T.525. The inventory of the money in the safe

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

revealed that the total amount was $5,995. T.526.[FN7]

> FN7. The denominations of the currency found in the safe were as follows: five hundred-dollar bills, seven fifty-dollar bills, 116 twenty-dollar bills, 111 ten-dollar bills, 208 five-dollar bills, and 675 dollar-bills. T.526-27. The denominations of the currency found on Welch's person were as follows: four one-hundred dollar bills, four fifty-dollar bills, thirty-eight twenty-dollar bills, and two ten-dollar bills. T.527. This testimony by Investigator Evans came in without objection, although Welch did object to the introduction of a photograph which showed the currency arranged in stacks by denomination. The trial court sustained that objection under the best evidence rule; the actual money was not available at the time of trial, it having been turned over to the Drug Enforcement Agency under the Federal Assets Forfeiture Act. *See* T.677-78.

Mark Simmons ("Simmons"), the other adult male who was present at 2789 McKoon Avenue on the night of the raid, testified for the prosecution. On the night of March 3, 1999, he had been at the house for about half an hour prior to the police arriving. T.695. He had gone there for the purpose of buying some crack cocaine. T.696. At the time the police arrived, he was in the living room with Welch. T.697. Simmons testified that he had seen Welch earlier that day on the street and had asked him if he could "come see him[.]" T.697-98. Simmons testified that he had only been to 2789 McKoon "[m]aybe once" before "cause [sic] he [Welch] had just moved there." T.698. Simmons was "not sure" when that visit had occurred, stating that it was "[m]aybe a week or two before." *Id* . When asked why he had gone there on the prior occasion, Simmons replied, "I probably was there probably to get some dope." T.699. The prosecutor told the witness to tell the jury what happened, and Simmons continued, "I was probably there to get some dope. I can't say I was there to get dope. I can't say I wasn't there to get dope. I mean, I had been there before to get drugs, not that present residence but his previous residence[.]" At that point, the trial court cut the witness off, stating, "I don't want to get into that." *Id*.

Simmons continued to be equivocal about whether his prior visit to 2789 McKoon Avenue was for the purpose of buying drugs, explaining that he "knew Elbert so it wasn't always just about dope. A lot of time it was but sometimes it wasn't, you know what I mean ." T.699-700. However, on the night of March 3rd, Simmons confirmed that he was going to Welch's house "[t]o get some dope" on "credit," meaning that he would pay Welch for the drugs at a later date. T.700.

Welch did not object at all during Simmons' testimony, but before cross-examination, he raised an objection on the basis that Simmons' testimony was "not even marginally probative" since he "didn't discuss anything with [Welch] about being there that particular night to get any drugs." T.702. Rather, Simmons was saying he "was there merely on a subjective hope" of buying drugs, and that he had not gotten into a discussion with Welch that particular day about purchasing cocaine. *Id.* The trial court pointed out, and the prosecutor agreed, that Simmons' testimony was different than what had been expected based on his grand jury testimony. T.703, 704. The trial judge informed Welch that he "made a big mistake" by not objecting at the time. However, he agreed that Welch made a "valid point" and indicated that he was considering striking that portion of Simmons' testimony. T.704. The trial judge decided not to grant Welch's mistrial motion and stated that unless there was anything further to change his mind, his plan was to strike the testimony, caution the jury not to consider it, and proceed with the trial. T.704-05. At that point the prosecutor asked to be able to question Simmons, in Welch's presence but outside of the presence of the jury, about any conversations Simmons had had with Welch prior to the raid. T.705.

**\*7** The trial judge agreed, and Simmons was examined outside the presence of the jury. He testified that "basically [he] was there [at Welch's residence] to get some crack." T.706. He knew that Welch was going to have crack cocaine at his house based on their conversation earlier that day, in which Simmons "asked him is it possible to hold something." *Id.* Welch said "to call him later ." *Id.* By "hold something," he meant, "Can I get something on credit basically." *Id.* The "something" to which he was referring was "crack cocaine." *Id.* Simmons confirmed that he had used that phrase or "something like" it with Welch in the past. T.706-07.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

Simmons testified that he called Welch later that day and said, "[C]an I come through[?]" T.707. According to Simmons, "Can I come through means can I-can I stop by now, is it possible to stop by now to conduct the business that we talked about earlier." T.708. In the trial court's opinion, that "change[d] the testimony significantly [.]" *Id.* That concluded the prosecutor's offer of proof. The trial court stated that it was going to reserve decision. T.708-09. Simmons then testified, in the presence of the jury, consistently with how he had testified during the prosecutor's offer of proof. *See* T.711-13.

On cross-examination, Welch elicited from Simmons that he believed he had been subpoenaed by Welch to testify before the grand jury. T.714. Simmons denied that he had been "threatened with criminal prosecution in this matter [.]" T.716. Welch introduced Simmons' grand jury testimony in which Simmons acknowledged that he received immunity from prosecution from the district attorney's office. T.718. Simmons stated that he "didn't get pressured" into testifying; rather, he "got a subpoena" and "was brung over from the jail and it was either testify or-or don't testify and getting [sic] a whole 'nother [sic] charge." T.719. However, Simmons then testified that he did not ask for an attorney because he "didn't feel [he] needed one" because he "wasn't in trouble" as he was already in jail. T.720. Simmons denied that he received any deals from the district attorney in return for testify in Welch's case. T .728-29.[FN8]

FN8. During Welch's cross-examination of Simmons, Simmons revealed that he had acted as an informant for the Niagara County Drug Task Force in 1999 after being released from jail. T.829. As a result of this testimony, the trial judge requested that the prosecutor turn over any records regarding what Simmons did for the task force and what, if any, benefits were conferred upon him, and when. T.875. After reviewing all of the pertinent records turned over by the prosecutor, the trial judge concluded that there was no *Brady* material contained therein and no indication that Simmons had received any consideration from the Task Force in exchange for his testimony in Welch's case. T.1111. The trial court indicated that Welch would be permitted to question Simmons regarding the fact that when Simmons appeared before Judge Broderick after testifying at Welch's grand jury proceeding, that judge postponed Simmons' sentencing. After cross-examining Simmons at length on this issue, Welch was not unable to uncover any evidence that a benefit was conferred on Simmons as a result of his testimony, on the prosecution's behalf, at the grand jury.

Welch elicited testimony from Simmons that they had "prior dealings" and that "[s]ometimes it was drug deals, sometimes it wasn't." T.731; *see also* T.744-46, 759-61, 777-78, 786-87. Simmons admitted that he sold drugs to get money to support his habit, and that he also used his Social Security Insurance payments to buy drugs. T.747, 732, 773. Welch cross-examined Simmons regarding his grand jury testimony in which he testified that he had "previous occasions" of "drug activities" with Welch, and elicited testimony that they had had dealings "[f]ifteen, twenty times." T.761; *see also* T.756-62. Welch cross-examined Simmons about his criminal history; Simmons readily admitted that he had convictions for obstruction of governmental administration, disorderly conduct, attempted first degree sexual abuse. *See* T.771 *et seq.*

*8 Mark Shaw ("Shaw") testified for the prosecution that he had been employed as a forensic drug chemist by the Niagara County Sheriff's Department for eighteen years. T.944. On March 4, 1999, the contraband seized during the raid of Welch's house was submitted to the laboratory by Investigator Cocco for the purpose of having the contraband tested for the presence of cocaine. T.945-46. Shaw became involved with the case on the morning of March 5, 1999; he testified that all of the items were in sealed containers and no tampering of the seals had occurred. T.948. Shaw confirmed that the items marked as exhibits at trial were in the exact same condition as when they left his custody at the laboratory and there was no evidence of any tampering. T.949, 950-54. Shaw then described the three different tests he performed on Exhibits H-1, H-2, J-1, J-2, and 8 (all plastic baggies containing suspected crack cocaine), and Exhibit R (a plastic baggy found in a leather jacket containing fake crack cocaine, or "gank," as Investigator Messina testified), which were the cobalt thiocyanate test; stannous

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

chloride test; and the microcrystalline test. All of the items, except Defendant's Exhibit R, testified positive for the presence of cocaine. T.961-63. He then performed a thin-layer chromatography test which involved comparing the test sample against a known cocaine standard, which had been purchased from the Sigma Chemical Company and was guaranteed to be 99.9 percent pure cocaine. T.964-65. All of the items, except Exhibit R, gave same result as the known cocaine standard, meaning that they were positive for the presence of cocaine. T.965. The last test conducted was the foray transfer infrared spectrophotometry ("FTIR") test, which also involved comparing the test samples to the known cocaine standard. T.966. Again, that test yielded positive results for all of the items except Exhibit R. *Id.* Shaw came "to an opinion with a degree of scientific certainty" that all of the items, except Exhibit R, contained cocaine. T.967. Shaw also weighed the items: Exhibit 8 weighed 1.5 grams, Exhibit J-2 weighed .88 grams, Exhibit J-1 weighed 2.78 grams, Exhibit H-1 weighed 1.05 grams, and Exhibit H-2 weighed .82 gram. The total weight was 7.03 grams, or .24 ounce. T.970-72. In addition, Exhibit I tested positive for the presence of marijuana. T.972-74.

Shaw confirmed that he tested the known cocaine standard himself; he explained that when the bottle of the known standard was first opened, it was tested using the FTIR or mass spectrophotometry and was verified to be cocaine. T.978, 980. Welch later recalled Shaw as his witness and elicited testimony that the known standard of cocaine was tested with all five tests. T.1191. Shaw verified that the known standard was verified to be cocaine, pursuant to his own independent testing. T.1192. Shaw stated that the known standard was tested when it first arrived at the lab. *Id.* Although he did not personally test the known standard on the day he tested the evidence seized at Welch's house, it was tested by someone in his lab. T.1193.

**\*9** After Shaw's testimony, the prosecution rested. Welch moved for a trial order of dismissal on the basis that the chemist had no "basis for saying that a known sample [sic][was], in fact, what that known sample was represented to be." T.986-87. Welch also moved to dismiss count two of the indictment which charged Welch with possession of one-eighth of an ounce or more of cocaine. T.988. He contended that the prosecution was not permitted to aggregate the amount of cocaine because

there was no testimony that any police officer had "taken anything from [his] person." T.988. According to Welch, in order for there to be constructive possession of drugs within a dwelling, the contraband "has to be within the grabbable [sic] reach of a person[.]" T.989-91. The prosecutor responded that he was not relying on a theory of constructive possession but rather that Welch actually possessed all of the drugs and money seized during the raid. T.993-94.[FN9] The prosecutor noted that Welch had complete access and control of the residence, that in response to Simmons' request to "hold" some drugs on credit, he directed him to come to the house; all of the drugs were found on the same date and the same time, making it appropriate to aggregate the amounts. *Id.* Finally, the prosecutor argued that it was appropriate to aggregate the amounts of cocaine because they were possessed with the common purpose of selling them. T.994. The trial court rejected Welch's constructive possession argument and reserved decision on the issue of aggregation. T.996, 1000-01.

> FN9. The prosecutor commented, "It's my position that he, in fact, possessed them. That's established with the safe, as the Court was alluding to, by the keys [to the safe] around his neck, the documents *[i.e.,* receipts with Welch's name on them] in the safe, the drugs on his person; by the fact that they were on his person, the drugs in the bedroom, by the bracelet of Elbert Welch, the medical bracelet in the bedroom showing this is a room in this house that he utilizes and finally by his admission to the officer that all of the drugs were his, the admission to Detective Pierini at the close of the evening that all the drugs and the money in the house were his." T.993.

The trial court dismissed the third count of the indictment charging possession of the stun gun on the basis that there was no expert testimony as to whether the gun, in fact, was operable. T.1164, 1314, 1435. The trial court also dismissed the fourth count of the indictment charging Welch with possession of marijuana because there was no testimony that Simmons was going to buy marijuana from Welch. T.1445, 1490-91. As to the second count of the indictment, the trial court indicated that it would charge seventh degree criminal possession of a controlled

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

substance as lesser included offense of count two, noting that there were several stashes of cocaine found in the house, and it was possible for the jury to find that Welch possessed some but not all of them. T.1462.

### The Defense Case

Welch's defense theory was that Simmons and the police officers who executed the search warrant planted evidence and were part of a conspiracy against him. However, none of the police officers testified that they were involved in, or knew of, any conspiracy against Welch. Welch submitted no documentary evidence of a conspiracy and called no witnesses to testify that such a cabal existed.

Welch called his girlfriend, Deborah Jones ("Jones"), who testified that Simmons had come over to the house that night to see Welch. However, Jones testified that she did not know why Simmons had come over,[FN10] and she claimed that she had never seen Simmons in Welch's company before. T.1032. According to Jones, Simmons ran into the downstairs bedroom [FN11] and "threw some dope" under the bed when the police first entered the house. T.1021. Jones stated that $2,000 of the funds found in the safe was money that she had saved from working and from playing bingo; she admitted, however, to applying for public assistance even though she had this money. T.1048. During his cross-examination of Jones, the prosecutor forced her to admit that the first time she ever testified about Simmons throwing drugs under the bed was at trial. When asked whether she ever used cocaine, Jones pleaded the Fifth Amendment. T .1064.

> FN10. The prosecutor, on cross-examination, confronted Jones with her prior inconsistent testimony at the suppression hearing in which she claimed that Simmons was coming over to borrow a coat from Welch. T.1060.

> FN11. All of the police officers testified, however, that they saw Simmons as soon as they entered the house; he was standing in the archway leading to the kitchen.

*10 Welch's theory regarding all of the cash found in the house was that it represented his lottery winnings and funds received as college loan checks from Niagara County Community College ("NCCC"). He also presented testimony that he cut people's hair and earned money that way as well, but he presented no wage records to substantiate that claim. The only employment records Welch had were for a few weeks of work through a temporary service in 1998. He admitted that he received about four thousand dollars in student loans, but only had completed one course in criminal justice at NCCC. T.1324, 1345, 1348. He claimed that he had won "great amounts," T.1327, of money playing the lottery, but neither he, nor any of the witnesses he called who testified that Welch frequently played the lottery, could substantiate that claim. T.1327. In fact, William Mollison ("Mollison"), who owned a liquor store where Welch had purchased tickets, testified that he did not recall any large wins by Welch. T.1238. To the contrary, Mollison recalled that on "one or two" occasions, Welch won forty or eighty dollars. Welch admitted that if one earns over $600 in lottery winnings, one has to file a Form 1099 with the IRS; he acknowledged that he had never filed a 1099 and had not filed a tax return in 1998 or 1999. T.1362-63. Welch introduced a bag filled with a large number of lottery tickets, which the prosecutor was given an opportunity to log and tabulate (with Welch present). These tickets represented an expenditure of $6,785.50. T.1426. Except for two tickets whose winnings totaled $290, all of these tickets were losers. T.1426-27. Welch admitted that the receipts with his name on them were his but denied that he kept them in the safe. T.1371.

In opposition to the police officers' claim that Welch had admitted possessing all of the contraband in the house, Welch presented what was in essence a "chivalry defense." He claimed that because his girlfriend was "crying" he felt compelled to say "arrest me" so as to prevent her from being arrested. T.1318-19. He denied that he was read the *Miranda* warnings that night. T.1320. He also denied that he ever admitted possessing any of the drugs found in the house. T.1318, 1321. Welch stated that he had filed lawsuits against the officers involved in executing the search warrant, and asserted that they were retaliating by "making false allegations, to try to make a charge stick against [him]." T.1324; *see also* T.1322-25. He admitted on cross-examination that the lawsuits he had filed did not involve Investigators Driess, Cocco, Evans,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

or Messina, just Detectives Pierini and Galie.T.1405-07. He admitted that the only proof he had submitted in these proceedings was his own affidavit; he had no affidavits from anyone else. T.1408.

While strenuously asserting that he would not have permitted his girlfriend to use cocaine while she was pregnant with his child, T.1338, Welch testified that he believed that Simmons had come over to the house in order to try to sell cocaine to Jones. T.1390-91 Even though he did not trust Simmons' intentions, Welch testified that he went upstairs while Simmons remained downstairs. T.1393-94. Welch admitted that he was coming down the stairs just as the police were breaking down the door. T.1387, 1393. However, he could not give a reason for why he had gone upstairs in the first place. T.1394-95.

**\*11** The jury was charged on the first two counts of the indictment, and was instructed that it could consider criminal possession of a controlled substance in the seventh degree as a lesser included offense of count two. The jury returned a verdict convicting Welch of the first and second counts in the indictment, rejecting the lesser included offense submitted to it. Welch was sentenced to an indeterminate term of seven to twenty-one years on the third degree possession conviction and to four to twelve years on the fourth degree possession conviction, those sentences to run concurrently with each other. *See* Transcript of July 17, 2000 Sentencing Hearing at 10-11.

Welch represented himself on direct appeal, raising numerous claims which are all asserted as grounds for habeas relief here. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction in a memorandum order entered December 21, 2003. *People v. Welch,* 307 A.D.2d 776, 763 N.Y.S.2d 701 (App.Div. 4th Dept.2003). Leave to appeal to the New York Court of Appeals was denied. Welch also submitted a *pro se* collateral motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 which was denied.

This habeas petition followed. *See* Petition ("Pet.") (Docket No. 1). Welch states that all of the grounds for

relief he is raising are "contained in annexed appeal brief, annexed CPL 440.10 motion ... and annexed documents which are hereby incorporated as part of this petition." Pet. at 5 (Docket No. 1). In the Appellate Brief, Welch asserted the following arguments, which are now raised as grounds for habeas relief: (1) "the trial court committed reversible error by refusing to assign new counsel in Mr. Sansone's stead"; (2) the grand jury proceeding was "defective" and "may have resulted in prejudice to defendant"; (3) "the search warrant was obtained in violation of state and federal constitutions ... [and] was also executed in an unconstitutional and unreasonable manner (N.Y. Const., Art. I, # 12, U .S. Const., Amend.4)"; (4) the evidence was "legally insufficient to prove defendant's guilt beyond a reasonable doubt"; the trial court "committed reversible error in denying defendant's motion for recusal"; (6) denial of a *Rodriguez* hearing as to Mark Simmons was reversible error given the prosecution's lack of notice pursuant to C.P.L. § 710.30(1)(b); (7) erroneous denial of a jury charge on accomplice liability as to Mark Simmons; (8) the police failed to give *Miranda* warnings and the prosecution failed to prove beyond a reasonable doubt that petitioner's statements to the police were voluntary; (9) denial of Sixth Amendment right to present a defense and call witnesses due to the trial court's refusal to issue certain subpoenas; (10) erroneous denial of motion to preclude police officers' identification testimony based on lack of C.P.L. § 710.30(1)(b) notice; (11) denial of a "full and fair hearing" on petitioner's claims that his statements to police were involuntary and that the search and seizure violated the Fourth Amendment; (12) "the defendant was denied his statutory right to a speedy trial"; (13) the cumulative errors of the trial court warrant reversal; (14) "retrial of defendant would subject him to double jeopardy in violation of state and federal constitutions"; (15) erroneous denial of motion to dismiss indictment on grounds of selective prosecution; (16) "defendant was denied the right to counsel of his choosing"; (17) erroneous denial of motion to strike the expert chemist's testimony on the basis that "the chemist did not test the known standard of cocaine"; (18) the prosecutor's "peremptory excusal of a black juror [No. 8] was racially discriminatory and his so-called race neutral explanation was pretextual". *See* Petitioner's Appellate Brief ("Pet'r Appellate Br."), Appendix A ("App.A") to Pet. (Docket No. 1). Under Point Nineteen of that document, Welch states that "upon reversal of defendant's convictions, this court should order defendant reinstated to the parole

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

supervision[.]" *See id.*

*12 In the C.P.L. § 440.10 Motion, Welch argued that the trial judge and the prosecutor had improper *ex parte* contacts with the F.B.I. regarding the state-court criminal proceedings against him and that his appointed attorneys were ineffective because they allegedly refused to investigate and present a defense that Welch was the target of a police conspiracy. *See* App. B to Pet. (Docket No. 1).

In addition, Welch attached Appendix C ("App. C"), which is entitled "Excessive Delay in Appellate Process." Welch contends that the prosecution "deliberately failed to timely make available" to Welch a "transcript of an August 24, 1999, pre-grand jury proceeding held in ADA Claude Jeorg's [sic] office." *See* App. C to Pet. (Docket No. 1).

To summarize, the claims that Welch raises herein as grounds for habeas relief are contained in his brief on direct appeal (App. A to Pet.), his C.P.L. § 440.10 motion (App. B to Pet.), and in the document entitled "Excessive Delay in Appellate Process" (App. C to Pet.). Welch has also submitted a Memorandum of Law ("Pet'r Mem .") in support of the habeas petition, *see* Docket No. 15, as well as a Supplemental Memorandum of Law ("Pet'r Supp. Mem."), *see* Docket No. 21, in which he re-argues the same points raised in the documents attached to his petition.

Respondent answered the petition and did not assert the defense of non-exhaustion or procedural default with regard to any of Welch's claims. The only claim which does not appear to have been raised either on direct appeal or in the C.P.L. § 440.10 motion is the excessive delay in appellate process claim; all of the other claims appear to be fully exhausted and properly before this Court. Even if the appellate delay claim were unexhausted, it would not require dismissal of the petition as a mixed petition since a federal habeas court now has the authority to dismiss unexhausted claims on the merits. *See* 28 U.S.C. § 2254(b)(2). As discussed below, the Court recommends that this claim, like the rest of Welch's claims, be dismissed because they are either not cognizable federal constitutional claims or are without merit.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

For the reasons set forth below, the Court recommends that Welch's request for a writ of habeas corpus be denied and the petition be dismissed.

**DISCUSSION**

*Standard of Review*

Because the filing of this petition postdates the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's revisions of 28 U.S.C. § 2254 govern this proceeding. *See Williams v. Taylor,* 529 U.S. 362, 402 (2000). When Congress enacted Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it "significantly curtailed the power of federal courts to grant the habeas petitions of state prisoners." *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001) (citing *Williams,* 529 U.S. at 399). A Federal court may not grant a habeas petition on a claim that was adjudicated on the merits in State court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), (2). Thus, review under AEDPA is presumptively deferential to a denial of relief by the state court, assuming that the claim was adjudicated on the merits. However, the Second Circuit has refused to interpret this so-called "AEDPA deference" as "blind obedience." *Gutierrez v. McGinnis,* 389 F.3d 300 (2d Cir.2004).

*Merits of the Petition*

**Point One/Point Sixteen: The trial court committed reversible error by refusing to assign new counsel and denying petitioner appointed counsel of his choice**[FN12]

> FN12. This claim is also argued under Point One of Pet'r Mem. (Docket No. 15).

Case 9:07-cv-00334-TJM-GHL   Document 17   Filed 03/25/10   Page 81 of 121

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

**\*13** Welch contends that the trial court committed reversible error by failing to provide substitute assigned counsel; Welch asserts that his third assigned counsel, John Sansone, should have been relieved because he failed to investigate "defendant's conspiracy defense and had contacted no witnesses." Pet'r Appellate Br. at 1 (citing 2/25/00 Tr. at 3-4), App. A. to Pet. (Docket No. 1). Welch further contends that he was entitled to have a court-appointed attorney of his own choosing and maintains that he did not voluntarily choose to represent himself at trial. *See* Pet'r Mem. at 7-14 (Docket No. 15).

On February 25, 2000, Welch appeared in Niagara County Court (Punch, J.) with attorney Sansone on the two matters pending in that court. Judge Punch noted that he had "gotten contradictory correspondence" regarding whether or nor Welch wanted assigned counsel. *See* 2/25/00 Tr. at 2. At this point, Welch was on his third assigned attorney. *See id.* at 3. Welch stated that he "did have a sincere wish to have counsel" and that his "foremost request was that [his] right to counsel of choice be honored." *Id.* He noted that he had filed several motions for the court on that issue; Judge Punch reiterated that he had already ruled on those applications and had denied the request for reconsideration. *Id.* at 3-4.

Welch proceeded to complain that none of the attorneys had "done anything for [him]" and stated that they had not "done any pretrial investigation" or contacted any of his witnesses, despite his indication to them that he had "numerous sources of information from the Department of Justice that [he] intended to present in this case." *Id.* Welch explained that he was "dissatisfied"with attorney Sansone because he had not investigated Welch's conspiracy defense. *Id.* at 4.

Judge Punch noted that he had taken "considerable time" to review Welch's "numerous submissions," and "not once ha[d][he] seen anything that specifically allege[d] facts that would justify issuing a subpoena to the FBI or any of these other people." *Id.* Judge Punch noted that attorney Sansone had prepared a full set of omnibus motions, one for each indictment, but Welch criticized those efforts as well. *See id.* at 5, 6. Judge Punch then inquired as to whether Welch desired to discharge attorney Sansone; Welch responded that he felt "compelled" to do so. *Id.* at

5-6.

Judge Punch then questioned attorney Sansone regarding his familiarity with the two pending matters, and learned that counsel had obtained both files from the previous attorney; had reviewed the paperwork; and had prepared extensive omnibus motions, one on each case. Attorney Sansone noted that he had met with Welch four times, including the present court date, and stated that they had had "extensive conversations." *Id.* at 6-7. Attorney Sansone represented that he had included in his motions some of the issues that Welch thought were important. *Id.* at 7.

**\*14** Counsel agreed that they had encountered "substantial differences and disagreements" as to which matters were important and had a legal and factual basis. *Id.* The attorney related that he had explained to Welch that they "needed a factual basis in order to issue this information to the Court or to challenge the evidence." *Id.* In short, attorney Sansone explained, "We just don't agree. He doesn't comply with advice. I don't even know if he considers the advice that I give him." *Id.*

Judge Punch then asked Welch, "So you want to proceed *pro se* under the circumstances; is that correct? *Id.* Welch responded affirmatively. *Id.* Judge Punch placed on the record "his willingness to assign Mr. Sansone," who was an "experienced, competent criminal defense attorney." The judge also observed that attorney Sansone had performed competently so far, and had met with the defendant "an adequate number of times with enough substance in those meetings." *Id.* at 8. The judge concluded by noting that there was nothing that attorney Sansone had done which would warrant the judge relieving him of his assignment. *Id.* The following colloquy occurred:

> The Court: That record having been made, at the request of the Defendant, and being cognizant of my prior colloquy with the Defendant, wherein I asked him several questions relating to his ability to represent himself, and having found previously that he is still or that he was then and still is competent to represent himself, I will relieve you of your assignment, Mr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

Sansone, and permit the Defendant to proceed *pro se.*

Now, the next issue with regard to counsel, Mr. Welch, is I'll offer you the opportunity to have standby counsel. Now, the role of standby counsel is simply to be with you during court appearances and to answer questions that you may have. I would expand his role within reason to sign subpoenas, but not beyond that. Well, you know, I don't want the attorney to be forced to potentially abuse his subpoena power as I think about this. I think I'll subpoena whoever you want me to, but you'll have to make a showing that they have some relevant and material evidence or testimony in this case. And I'll sign the subpoenas myself. Now, do you want standby counsel.

Mr. Welch: For the purposes in [sic] assisting me in ways that I can't assist myself, I would appreciate a standby attorney.

The Court: Do you feel at this point that you're able to conduct your own defense?

Mr. Welch: Your Honor, incarcerated, [sic] it's very difficult, I have to admit, but it's very difficult because of incarceration. However, I feel in my particular situation I have a defense here that's a valid defense.

The Court: I'm just asking you a simple question. Do you feel that you are capable of defending yourself in this, in these proceedings?

Mr. Welch: With the assistance of standby counsel, I believe I could, your Honor.

The Court: All right then. Then I'll assign you as standby counsel at this point, Mr. Sansone.

**15** 2/25/00 Tr. at 8-10.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On direct appeal, Welch contended that the trial court erred in refusing to substitute a new assigned attorney of his own choosing. The Appellate Division rejected this claim as follows:

Contrary to the contention of defendant, County Court did not abuse its discretion in denying his request for substitution of counsel. The right of an indigent criminal defendant to the services of a court-appointed lawyer does not encompass a right to appointment of successive lawyers at defendant's option[.] It is incumbent upon a defendant to show good cause for the requested substitution[.] Here, defendant's contention that defense counsel's trial strategy conflicted with defendant's desire to pursue a conspiracy theory as a defense does not constitute the requisite good cause for substitution[.]

People v. Welch, 2 A.D.3d at 1355, 770 N.Y.S.2d at 233 (citing, *inter alia*, People v. Sides, 75 N.Y.2d 822, 824, 551 N.E.2d 1233, 1234, 552 N.Y.S.2d 555 (N.Y.1990)); other citations and quotation marks omitted). As discussed below, the Appellate Division's rejection of this claim was clearly in line with established Supreme Court precedent.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. However, "the right to choose one's own counsel is not absolute." United States v. Jones, 381 F.3d 114, 119 (2d Cir.2004) (citing Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); United States v. Locascio, 6 F.3d 924, 931 (2d Cir.1993)). Rather, "[t]he Sixth Amendment guarantees a criminal defendant an effective advocate, not necessarily the advocate of his or her choosing." *Id.* (citing Wheat, 486 U.S. at 159; Locascio, 6 F.3d at 931). As the Second Circuit has observed, because a defendant's right to counsel of his or her choice is "not absolute," a trial court "may require" a defendant to proceed to trial with counsel not of defendant's choosing, although it "may not compel" defendant to proceed with an attorney who is "incompetent." United States v. Schmidt, 105 F.3d 82, 89 (2d Cir.1997); *see also* United States v. Mills, 895 F.2d 897, 904 (2d Cir.1990) (holding that an indigent defendant is not entitled to counsel of his choice; rather, he is entitled only to effective

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

representation); *United States v. Graham,* 91 F.3d 213, 217, 221 (D.C.Cir.1996) (holding that defendant must establish prejudice to obtain reversal based on court's refusal to appoint substitute counsel). Thus, the law is clear that as a matter of both federal and state constitutional law, Welch was not entitled to appointed counsel of his own choosing, and neither was he constitutionally entitled to standby counsel of his choice. *See Mills,* 895 F.2d at 904 (defendant wanted to represent himself at trial and retain his original attorney (who had very little experience litigating criminal matters in federal court) as standby counsel; the Second Circuit held that it was within the trial court's discretion to appoint someone other than the original attorney, to act as standby counsel) (citing *United States v. Campbell,* 874 F.2d 838, 848-49 (1st Cir.1989)).

*16 Turning to the question of whether trial court erred in refusing to substitute a fourth attorney to be Welch's appointed counsel, the Court notes this question is evaluated under an abuse of discretion standard. *United States v. Simeonov,* 252 F.3d 238, 241 (2d Cir.2001) (citing *Morris v. Slappy,* 461 U.S. 1, 13, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) ("The determination of whether or not the motion for substitution of counsel should be granted is within the discretion of the trial court....")). In evaluating whether trial court abused its discretion in denying a defendant's motion for substitution of counsel, the Second Circuit has looked at the following factors: the timeliness of the defendant's motion; adequacy of the trial court's inquiry into the defendant's complaint about counsel; and whether the attorney/client conflict was " 'so great that it had resulted in total lack of communication preventing an adequate defense.' " *Id.* (quoting *Morris,* 461 U.S. at 13) (citing *United States v. Allen,* 789 F.2d 90, 92 (1st Cir.1986); *United States v. Whaley,* 788 F.2d 581, 583 (9th Cir.1986)); *accord United States v. John Doe No. 1,* 272 F.3d 116, 122 (2d Cir.2001).

Here, it appears that Welch's motion for substitute counsel was timely and, as detailed above, the transcript reflects that the trial court conducted a thorough inquiry into Welch's complaints about attorney Sansone's representation. The Court recognizes that by both Welch's and attorney Sansone's account, they were experiencing a breakdown in communication; this was due to counsel's unwillingness to pursue Welch's "conspiracy" defense,

which counsel had ample reason to believe was not factually supported. [FN13] Even if this were a situation that could be characterized as a "total lack of communication preventing an adequate defense," it is apparent that substituting a fourth court-appointed attorney would not have solved the problem. This is because the only attorney that would have been acceptable to Welch was a lawyer who would have pursued his so-called "conspiracy" defense.

> FN13. On January 14, 2000, prior to the hearing before Judge Punch in which attorney Sansone was relieved of his role as appointed counsel, he wrote to Welch and noted, "as we discussed, both in person and via telephone, I will not submit allegations of a 'conspiracy theory' concerning information regarding William Watson and several FBI agents until I am able to look at documents and information with my own eyes. I will, however, reference that a response to your FOIL request was provided indicating the existence of voluminous records which would require further time to track down and provide to you." *See* Letter from John Sansone to Petitioner, dated Jan. 14, 2000, attached to Pet'r Mem. (Docket No. 15).

Even now, Welch has not been able to articulate who the members of this supposed "conspiracy" allegedly are, let alone what, exactly, they are conspiring to do to him. The Court has attempted, unsuccessfully, to discern this from his pleadings. In his argument in his Memorandum of Law (Docket No. 15) under the point heading regarding trial counsel's shortcomings in failing to investigate the conspiracy defense, Welch notes that Detectives Pierini and Galie, who provided back-up assistance to the Niagara County Drug Task Force team who executed the search warrant, were "named as defendants" in two "pending civil rights lawsuit" by Welch in the Western and Northern Districts of New York and were the "targets of an FBI investigation conducted by the Buffalo and Niagara Falls FBI offices as is reflected in the FBI documents petitioner submitted as exhibits to the trial court." [FN14] Petitioner's Memorandum of Law at 9 (Docket No. 15).Welch continues, "[i]ndeed, in the Western District case this Court certified claim of false arrest and malicious prosecution against these and other police officials; and in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

the Northern District case the Court certified claim of conspiracy to violate civil rights of this petitioner." *Id.* Welch concludes by saying that "[c]ertainly petitioner had the right to pursue this matter as his defense in these two criminal cases." *Id.*

> FN14. Welch has submitted a handful of documents that purport to relate to an investigation by the FBI. *See* Ex. C to Pet'r Mem. (Docket No. 15). The Court has reviewed these documents and they do not any way substantiate his claims of a conspiracy.

**\*17** Presumably, Welch is alleging that because he has named Detectives Pierini and Galie in a lawsuit alleging false arrest and malicious prosecution, the two detectives had a motive to conspire to falsely accuse him of the crimes the subject of this petition in order to discredit and interrupt his lawsuit against them. However, this Court's review of the docket sheets in the numerous lawsuits filed by Welch in the Western District of New York involving alleged civil rights violations indicate that Welch's claims have been without merit and the cases have been closed. Moreover, because of these cases the Second Circuit has issued strongly worded mandates warning Welch that due to his "uncontrollable propensity repeatedly to pursue vexatious and harassing litigation, [he] is put on notice that future frivolous petitions or appeals might result in sanctions ." *See* Mandate of the United States Court of Appeals for the Second Circuit (Docket No. 16 filed on April 25, 2003, in *Welch v. United States Department of Justice, et al.,* No. 02-CV-0722 (W.D.N .Y. filed Oct. 10, 2002)); *see also* Mandate of the United States Court of Appeals for the Second Circuit ("Appeal filed by Elbert Welch denying appellant's motions for the appointment of counsel and *in forma pauperis* status and the appeal is dismissed because it lacks an arguable basis in law or in fact.... Furthermore, appellant has previously been put on notice that future frivolous petitions or appeals might result in sanctions.") (Docket No. 74, filed on Nov. 21, 2003, in *Welch v. Phelps, et al.,* No. 00-CV-0208 (W.D.N.Y. filed Mar. 7, 2000).

In sum, Welch has offered nothing to rebut the conclusion of the trial court and the Appellate Division that this alleged "conspiracy" is based on nothing but speculation.

Because this so-called "conspiracy defense" was unsupportable, it is inconceivable that Welch would have been able to find a competent, ethical attorney who would have been willing to pursue such strategy at trial. A lawyer has an obligation to apply his or her independent professional judgment in deciding which arguments to make; counsel need not and should not simply make the arguments a client wishes to make, thereby reducing his or her role to that of a mere mouthpiece for the client. *See Jones v. Barnes,* 463 U.S. 745, 751, 752-54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

Finally, as to Welch's claim that he was forced into representing himself at trial, the Court notes that he did seem to express some hesitancy during the initial questioning by the trial judge, when he indicated the difficulty of representing oneself while incarcerated. However, when pressed by the trial judge to answer the specific question concerning self-representation, he unequivocally indicated that he could represent himself. This forecloses the granting of relief on this point. As set forth in detail above, the trial court conducted a thorough inquiry into Welch's complaints regarding his assigned attorney and his desire to proceed *pro se.* Moreover, the record contains no objections by Welch to attorney Sansone's appointment as standby counsel at that time or at any time thereafter. The Court discerns from the record that the only "forcible circumstances" to which Welch claims he was subjected are that he was that he was denied the assistance of a court-appointed attorney of *his choice.* As discussed above, he was not entitled to an attorney of his own choosing; he simply was entitled to an attorney who was competent, which he had at the time of the February 25, 2000 hearing. Thus, the trial court's refusal to appoint another attorney cannot constitute a "forcible circumstance." Moreover, Welch agreed that he was able to proceed *pro se* with the assistance of stand-by counsel. In sum, Welch has not shown that he was in any way forced or coerced into proceeding *pro se.* This claim is without merit.

**Point Two: Defects in the grand jury proceeding**[FN15]

> FN15. Welch also argued this claim under Point Two of his Memorandum of Law (Docket No. 15).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

**\*18** Welch contends that the integrity of the grand jury was impaired by the "prosecution's deprivation of defendant's right to counsel of his choice and [his] right to testify before [the] grand jury." Pet'r Appellate Br. at 6, App. A to Pet. (Docket No.1); *see also* Pet'r Mem. at 15-19 (Docket No. 15). He also claims that Investigator Evans provided "known false testimony." *Id.* at 22 (Docket No. 1). Welch contends that the indictment was rendered null and void as a result of these alleged errors. *See id.* at 25 (Docket No. 1).

Welch's claims alleging defects in his grand jury proceeding are not cognizable on habeas review because he was convicted by a petit jury after a fair trial. *See United States v. Mechanik,* 475 U.S. 66, 68 (1986). Confronted with a constitutional attack on a federal grand jury proceeding, the Supreme Court held in *Mechanik* that "the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.* at 70 (footnote omitted); *see also id.* at 68. In *Lopez v. Riley,* 865 F.2d 30 (2d Cir.1989), which involved a collateral attack on a state court conviction by means of federal habeas, the Second Circuit relied on that proposition from *Mechanik:* "If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in federal court." *Lopez,* 865 F.2d at 32 (holding that habeas petitioner's "claims of impropriety before the grand jury in this case concern[ing] the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law" ... were "cured in the trial before the petit jury, which convicted"); *Davis v. Mantello,* 42 Fed. Appx. 488, 490-91 (2d Cir.2002) ("Claims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court.") (citations omitted) (unpublished opinion), *cert. denied,* 538 U.S. 986, 123 S.Ct. 1803 (2003). Accordingly, the guilty verdict rendered by the jury after Welch's trial precludes habeas review of his claims relating the grand jury proceeding.[FN16]

FN16. Welch cites *Saldana v. State of New York,* 665 F.Supp. 271 (S.D.N.Y.1987), and argues that *Mechanik* should not apply to his claim. *See* Pet'r Mem. at 19 (Docket No. 15). In *Saldana,* the district court granted habeas relief on the basis that petitioner was denied his statutory right under New York law to appear before the grand jury. However, the Second Circuit reversed the granting of the writ in that case. *Saldana v. State of New York,* 850 F.2d 117 (2d Cir.1988), *cert. denied,* 488 U.S. 1029 (1989). After reviewing the evidence presented at trial, and "how unlikely it [was] that any testimony by [the petitioner] himself ... could have made any difference in the charges filed by the grand jury," the Second Circuit held that the petitioner "[was] not entitled to relief in the federal courts because the State's failure to allow him to testify before the grand jury could not have made any constitutional difference because he suffered no prejudice." *Id.* at 119. Less than six months later, having failed to "reach the propriety of raising a challenge to state grand jury proceedings in a habeas corpus petition" in *Saldana,* due to its finding that the petitioner in that case suffered no prejudice, the Second Circuit in *Lopez v. Riley,* 865 F.2d at 32, held that such challenges in fact were not cognizable on federal habeas review. Thus, the district court's opinion in *Saldana* is no longer good law and cannot support Welch's claim.

**Point Three: The search warrant was obtained in violation of petitioner's Fourth Amendment rights**[FN17]

FN17. This claim also appears as Point Four in petitioner's Supplemental Memorandum of Law (Docket No. 21).

Welch contends that the police allegedly conducted an illegal search and seizure in violation of his Fourth Amendment rights. When this claim was raised in the state courts, it was found to be lacking in merit. *See, e.g., People v. Welch,* 2 A.D.2d 1354, 220 N.Y.S.2d at 233-34 ("We reject defendant's contention that the search warrant

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

was improperly obtained.... [B]oth the basis of knowledge and reliability requirements of the *Aguilar-Spinelli*[FN18] test were met[.] ... We further conclude that the warrant described the items to be seized with sufficient particularity and that it was not overly broad ....") (internal and other citations omitted). However, as discussed below, clearly established Supreme Court precedent holds that Fourth Amendment claims are not redressable on federal habeas review.

FN18.*See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), both abrogated by *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (expanding *Aguilar-Spinelli* test to enable a court to look at the "totality of circumstances" in issuing a search warrant), and *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (allowing a "good faith" exception to the strict credibility and reliability tests of an informant). The New York Court of Appeals, however, has rejected both of these expansions of the rule and retained the original *Aguilar-Spinelli* "two-prong" test. *See People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439 (N.Y.1985); *People v. Bigelow,* 66 N .Y.2d 417, 497 N.Y.S.2d 630, 488 N.E.2d 451 (N.Y.1985); *People v. Griminger,* 71 N.Y.2d 635, 529 N.Y.S.2d 55, 524 N.E.2d 409 (N.Y.1988).

*19 In *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that "where the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at his trial." *Powell,* 428 U.S. at 481-82 (emphasis added). Notably, all that must be shown is that the State has provided an opportunity to litigate the petitioner's Fourth Amendment claim; it matters not whether the petitioner actually "took advantage of the State's procedure." *Graham v. Costello,* 299 F.3d 129, 134 (2d Cir.2002). Indeed, as the Second Circuit has noted, "the 'federal courts have approved New York's procedure for litigating

Fourth Amendment claims, embodied in N.Y.Crim. Proc. Law § 710.10*et seq.* (McKinney 1984 & Supp.1988), as being facially adequate.' " *Capellan v. Riley,* 975 F.2d 67, 70 n. 1 (2d Cir.1992) (quoting *Holmes v. Scully,* 706 F.Supp. 195, 201 (E.D.N.Y.1989) and citing *Gates v. Henderson,* 568 F.2d 830, 837 & n. 4 (2d Cir.1977)(en banc), cert. denied,434 U.S. 1038 (1978); *Shaw v. Scully,* 654 F.Supp. 859, 864 (S.D.N.Y.1987)).

Welch does not-and-cannot-contend that New York failed to provide a corrective procedure to redress his alleged fourth amendment claim. To the contrary, Welch has fully availed himself of the procedures embodied in Sections 710.10 *et seq.* of New York's Criminal Procedure Law, and in the process of doing so has been afforded an opportunity for the full and fair consideration of all Fourth Amendment violations claimed in his federal petition. Rather, Welch disputes the assertion that he received a "full and fair hearing" on his Fourth Amendment claims. *See* Pet'r Mem. at 27-32 (Docket No. 15) (citing, *inter alia, Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)).[FN19]

FN19. Welch cites *Townsend v. Sain,* 372 U.S. 293, for the "circumstances when litigant does not receive full and fair hearing in state courts[.]" Pet'r Mem. at 27 (Docket No. 15). *Townsend* did not address the issue of whether Fourth Amendment claims were cognizable on habeas review and does not set forth the parameters of what constitutes a "full and fair" hearing in such cases. Rather, the aspect of *Townsend* which the Supreme Court singled out in *Powell* was its holding that "a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." 372 U.S. at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

313. Thus, *Townsend* is inapposite to Welch's claim.

Following *Stone v. Powell,* the Second Circuit developed a "litmus test" to determine when a state prisoner has been denied "an opportunity for full and fair litigation" of his fourth amendment claims. *Capellan v. Riley,* 975 F.2d at 69-71 (citing *Gates v. Henderson,* 568 F.2d at 839). The panel in *Gates* observed that " 'all that the [Supreme] Court required was that the state [ ] provide[ ] the *opportunity* to the state prisoner for a full and fair litigation of the Fourth Amendment claim....' " *Id.* (quoting *Gates,* 568 F.2d at 839) (emphasis in original). The Second Circuit concluded that review of Fourth Amendment claims presented by habeas petitioners would be undertaken in only one of two instances: (a) if the state provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an "unconscionable breakdown in the underlying process." *Id.* (quoting *Gates,* 568 F.2d 840 and citing *McPhail v. Warden, Attica Correctional Facility,* 707 F.2d 67, 70 (2d Cir.1983)); *accord Graham v. Costello,* 299 F.3d at 134 ("As a general rule, Fourth Amendment claims are not reviewable by the federal courts when raised in a petition brought under [28 U.S.C.] § 2254 unless the state prisoner shows that he or she has not had a full and fair opportunity to litigate that claim in the state court.") (citations omitted).

*20 Thus, Welch must demonstrate either that there was a complete absence of corrective process, or that there was an "unconscionable breakdown in the underlying process." As it is clear that New York provides a corrective process, which Welch admittedly used, he may only gain review of his Fourth Amendment claims by demonstrating an "unconscionable breakdown" in the state's procedure for litigating such issues. The Second Circuit has held the focus of the inquiry as to whether there has been an "unconscionable breakdown" in the state corrective process is on "the existence and application of the corrective procedures themselves" rather than on the "outcome resulting from the application of adequate state court corrective procedures." *Capellan v. Riley,* 975 F.2d at 71. As the Second Circuit noted in *Capellan,* its decision in *Gates v. Henderson* "did not fully expand on

precisely when an unconscionable breakdown has occurred. It referred, however, to the several cited sources within *Gates* which illustrate the sort of " 'disruption or obstruction of a state proceeding' " typifying an unconscionable breakdown. *Id.* (quoting *Shaw v. Scully,* 654 F.Supp. at 864 and citing *Cappiello v. Hoke,* 698 F.Supp. 1042, 1050 (E.D.N.Y.), *aff'd,*852 F.2d 59 (2d Cir.1988)*(per curiam)).*

For instance, the *Gates* court cited the notorious case of *Frank v. Mangum,* 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915), as an example of an unconscionable breakdown. In that case, the Supreme Court, over the dissents of Justices Holmes and Hughes, refused to grant a writ of habeas corpus to a petitioner convicted of murder in a state trial claimed to have been dominated by an angry mob. The *Gates* court also cited to a law review article[FN20] in which situations such as the bribing of a trial judge; the government's knowing use of perjured testimony, or the use of torture to extract a guilty plea, all without opportunity to obtain state review, were cited as circumstances justifying federal habeas inquiry. As the district court succinctly stated in *Cappiello v. Hoke,* "[i]n short, an unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society."

FN20. Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 HARV. L.REV.. 441 (1963).

Most of the reasons that Welch cites as evidence that he was not afforded a "full and fair" hearing constitute mere disagreements with the state courts' determinations of the issues presented in his suppression motion. To the extent that he claims (without any substantiation) that certain witnesses perjured themselves, such a claim is similarly insufficient to amount to an "unconscionable breakdown." *See Kahn v. Flood,* 550 F.2d 784, 785-86 (2d Cir.1977) (citing *Mapp v. Warden,* 531 F.2d 1167, 1172-73 (2d Cir .1976) (footnote omitted) ("This apparent inconsistency [in the affidavit submitted in support of the application for a warrant and defense testimony elicited at trial] merely challenges the accuracy of the information furnished by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

the informant. Probable cause is not defeated because an informant may have erred or lied, 'as long as the affiant accurately represented what was told him,' *United States v. Sultan,* 463 F.2d 1066, 1070 (2d Cir.1972), and there is no evidence that [the affiant] misrepresented what he was told."); *United States ex rel. DeRosa v. La Vallee,* 406 F.2d 807, 808 (2d Cir.), *cert. denied,* 396 U.S. 854, 90 S.Ct. 115, 24 L.Ed.2d 103 (1969) (probable cause determined upon information furnished issuing magistrate unless materially false "to the knowledge of the affiant"); *United States v. Perry,* 380 F.2d 356, 358 (2d Cir.) (probable cause is established if facts alleged establish illegality if true and affiant has reasonable grounds for believing them true; accuracy of informant's information "not relevant"), *cert. denied,* 389 U.S. 943, 88 S.Ct. 307, 19 L.Ed.2d 299 (1967)).

**\*21** Welch also claims that the prosecutor failed to produce the contraband seized during the arrest, and that the trial court refused to grant an adjournment to allow Welch to obtain "FBI evidence" regarding his "substantial claims" of a conspiracy against him, improperly limited cross-examination of police witnesses, and refused to reopen the suppression hearing. Again, such allegations do not establish an "unconscionable breakdown." *See, e.g., Abreu v. Mantello,* No. CV 98-3028(RR), 2001 WL 811926, at *3 (E.D.N.Y. June 5, 2001) ("A liberal reading of Abreu's papers suggests that he faults the state review process for not requiring the informant to appear before the court.... [A] trial court's decision not to require the appearance of a confidential informant is not the sort of "breakdown" to which the Court of Appeals was referring."); *Cappiello v. Hoke,* 698 F.Supp. at 1050 ("In this context, the [unconscionable] "breakdown", of which petitioner complains is that the first Appellate Division panel erred in refusing to order a new hearing on his Fourth Amendment claim and that, as a result, the second Appellate Division panel erred in not applying *Dunaway [v. New York,* 442 U.S. 200, 218-19, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) ] to his case. This is not the sort of "breakdown" referred to in *Gates.*"). Absent the type of extraordinary circumstances described in *Gates v. Henderson,* a federal court has "no authority" to grant a writ of habeas corpus simply because it may disagree with the result of a state court on a Fourth Amendment question. *Gates v. Henderson,* 568 F.2d at 840.

At bottom, Welch is complaining about the outcome of the suppression hearing. The law is well-settled that this is plainly insufficient to overcome the *Stone v. Powell* bar to re-litigating Fourth Amendment claims on federal habeas. *See Capellan,* 975 F.2d at 71 ("Even if [petitioner] were correct in his allegation that the Appellate Division erroneously decided this issue, a petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result.") (citing *Gates,* 568 F.2d at 839). The Second Circuit has explicitly rejected the notion of reading *Stone v. Powell* to require a reviewing court "to focus on the correctness of the outcome resulting from the application of adequate state court corrective procedures, rather than on the existence and application of the corrective procedures themselves, ... would be assuming, implicitly at least, that state courts were not responsible forums in which to bring constitutional claims such as is presented herein." *Capellan,* 975 F.2d at 71. According to the Second Circuit, *Stone v. Powell* "expressly discourage[d][it] from making any such assumption." *Id.* (citing *Powell,* 428 U.S. at 493-94 n. 35) ("[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States."). Thus, to the extent that Welch claims that the Appellate Division erred in its ruling, this does not give this Court the authority to review his claims "since a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Id.* Accordingly, Welch's Fourth Amendment claims are not cognizable in this federal habeas proceeding.

**Point Four: Insufficiency of the evidence**[FN21]

> **FN21.** This claim appears as Point Five in petitioner's Supplemental Memorandum of Law (Docket No. 21).

**\*22** Welch contends that the evidence against him was insufficient to support his conviction. In particular, Welch claims that "it is clear that absent the incompetent expert chemist testimony ... there would be no evidence which could reasonably be relied on to prove that the substances were controlled substances[.]" Pet'r Mem. at 33-34

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

(Docket No. 15). As discussed below, the Court rejects Welch's separate claim that the forensic chemist's testimony was improperly admitted. Thus, the testimony was competent evidence to prove that the contraband seized was crack cocaine.

Welch also contends that the testimony of Simmons, Investigators Cocco and Evans, and Detective Pierini were "self-contradictory, contrary to experience, impossible of belief because manifestly untrue and in some respects impossible of belief because of impossibility of having occurred." Pet'r Appellate Br. at 54, App. A. to Pet. (Docket No. 1). Welch then goes on to detail, at great length, the inconsistencies he perceives in these witnesses' testimony.

To the degree Welch claims that his guilt was not proven beyond a reasonable doubt, the only relevant question for this Court is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). A habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court,* 109 F.3d 836, 840 (2d Cir.1997); *see also Gruttola v. Hammock,* 639 F.2d 922, 927 (2d Cir.1981) ( "[T]he standard enunciated in *Jackson* remains a difficult one for petitioners to meet."). In the present case, the Appellate Division summarily rejected Welch's claim as "without merit."

To the extent that Welch is challenging the credibility of Simmons based on his history of criminal and dishonest behavior, he simply repeats testimony and arguments already presented to the jury. The jury rejected this argument; in the context of a challenge to the sufficiency of the evidence, the Court may not attempt to second-guess a jury's credibility determination. *United States v. Florez,* 447 F.3d 145, 156 (2d Cir.2006) (rejecting insufficiency-of-the-evidence claim where defendant challenged the accomplices' credibility based on their plea agreements with the government and their long histories of criminal and dishonest behavior) (citing *United States v. Autuori,* 212 F.3d 105, 118 (2d Cir.2000)

("It is not for the court on a Rule 29 motion to make credibility determinations...."); *United States v. Rea,* 958 F.2d 1206, 1221-22 (2d Cir.1992) ("Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and we are not entitled to second-guess the jury's assessments.")). Rather, the Court must "assume that the jury 'resolve[d] all issues of credibility in favor of the prosecution.' " *Id.* (quoting *United States v. Khan,* 787 F.2d 28, 34 (2d Cir.1986) (alteration in original)).

**\*23** The same reasoning holds true for Welch's contention that the police officers were not to be believed because, *inter alia,* they allegedly were part of a vast conspiracy to frame him and that they had a motive to lie due to the fact that he had filed lawsuits against some of them. Those assertions regarding the credibility of the police officers were presented to the jury, which rejected them; it is not the province of this Court to revisit the jury's credibility determinations regarding the police witnesses. *See, e .g., Florez,* 447 F.3d at 156; *Gruttola v. Hammock,* 639 F.2d at 927 (2d Cir.1981) ("[Petitioner] Gruttola's attempt to describe the police officers' testimony as a 'cover up' was an attack on the credibility of these witnesses, a matter settled by the jury."); *United States v. Dhinsa,* 243 F.3d 635, 648 (noting that on federal habeas review a court " 'may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury' ") (quoting *Autuori,* 212 F.3d at 114).

Welch made much of the discrepancy regarding the razor blades discovered during the search and argued that it proved that the police had planted a razor blade in the safe. As the trial court noted, this was an minor inconsistency which the jury which easily, and reasonably, could have been excused by the jury as a matter of a lapse in recall or a clerical error. Apart from this, the police officers were all consistent in their testimony regarding what occurred on the night of Welch's arrest. *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998) ("We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

The jury also had the opportunity to observe Welch and his witnesses, who provided the only support for his arguments regarding the alleged incredibility of the testimony offered by the prosecution's witnesses. The Court notes that both Welch and his girlfriend, Jones, were witnesses with a decided interest in the outcome of the trial. The jury was entitled to consider that in weighing their testimony, along with the many inconsistencies and implausibilities in that testimony. Moreover, the witnesses whom Welch called to testify concerning his lottery-playing offered nothing to substantiate the amount of money that he claimed to have won. Even if the jury believed that Welch had won "great amounts" of money playing the lottery, that would not negate the fact that quantities of crack cocaine and large sums of money were found on Welch's person, under the bed in his house, and in a safe which he admitted owning and to which he possessed the key, and which contained receipts with his name on them and photographs of him, his girlfriend, and her children. Moreover, the jury had ample basis for rejecting the notion, supported only by Jones' testimony, that Simmons ran into the bedroom and threw a package of crack cocaine under the bed.

**\*24** In sum, "the jury's decision was largely a matter of choosing whether to believe [Welch's] version of the events or to believe the version offered by the State[,]" *Gruttola v. Hammock,* 639 F.2d at 928. Welch subjected all of the prosecution's witnesses to extensive, and often confusing, questioning on cross-examination. Nevertheless, they all, including Simmons, remained consistent in their testimony. Any inconsistencies that Welch discerned in the testimony offered by the prosecution's witnesses were minor, especially in comparison to those contained in his testimony, as well as that offered by his girlfriend.

In order to believe Welch's version of events, the jury would have had to accept, without a shred of concrete evidence, that numerous police officers were conspiring, along with Simmons' help, to frame Welch. Looking at this in another way, to reject the straightforward case of actual possession presented by the prosecutor, the jury would have had to draw inferences that not only were convoluted and illogical and supported, at most, by Welch's bare assertions and the discrepancy in the number of razor blades alleged found in the house.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Court has reviewed the transcript in its entirety and has no doubt that the jury acted rationally in adjudging Welch guilty. Accordingly, Welch's claim based on the sufficiency of the evidence should be dismissed.

**Point Five: Failure of trial court and prosecutor to recuse themselves**

Welch contends that his due process rights were violated because the state court trial judge was prejudiced against him and that the trial judge and the prosecutor were part of a far-reaching conspiracy against him, involving, among other entities, police officers, judges, the FBI and the United States Attorney's Office. Welch argues that the trial judge and the prosecutor should have recused themselves because they were "acting in cooperation" with the FBI and the United States Attorney's Office and "repeatedly thwarted" his attempts to introduce "FBI evidence regarding the longtime conspiracy against [him]." Pet'r Appellate Br. at 73, 74, App. A to Pet. (Docket No. 1); *see also* Petitioner's Motion for Recusal at 2, 4, Ex. H to Pet'r Mem. (Docket No. 15). Welch also contends that the trial judge was impermissibly biased against him; as evidence of this, Welch points to all of the trial judge's rulings with which he disagrees. *See* Pet'r Mem. at 20-25 (Docket No. 15); *see also* Pet'r Appellate Br. at 79, App. A. to Pet. (Docket No. 1). In denying his recusal motion, the trial court held as follows:

Although the defendant states that the Court has made several comments and rulings which the defendant feels indicates that he will not obtain a fair trial, there is nothing contained in his papers to support that position. This Court has and will continue to treat the defendant in a fair and unbiased manner. Decisions made regarding the defendant's numerous motions have been properly based on the law. Additionally, there have been no improper extra-judicial contacts with the FBI, as is alleged by the defendant[,] and his allegation that the Court, the District Attorney and the United States Attorney's Office [FN22] are acting in cooperation is completely unfounded.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

FN22. It appears that the Niagara County District Attorney's Office did have some contact with the United States Attorney's Office, but it was not in furtherance of a conspiracy, as Welch contends. Claude Joerg, the assistant district attorney who prosecuted this case ("A.D.A.Joerg"), explained in his affidavit opposing Welch's recusal motion that the matter "was originally referred to the United States Attorney's Office for review due to the large amount of crack cocaine which was seized, and the hand gun which was located in the safe with the crack cocaine." Affidavit of A.D.A. Claude Joerg ("Joerg Aff."), ¶ 3, attached as Ex. I to Pet'r Mem. (Docket No. 15). A.D.A. Joerg explained that after consulting with the U.S. Attorney's Office, he determined to prosecute the case in New York state court "due to the enhanced penalties which could be leveled against the Defendant due to his status as a persistent felony offender." Joerg Aff., ¶ 5, attached as Ex. I to Pet'r Mem. (Docket No. 15). The prosecutor affirmed that he had no further contact with the U.S Attorney's Office regarding the prosecution of Welch under Indictment No. 1999-128, and that office "in no manner ... assisted or otherwise [has] been involved in th[e] prosecution." Id., ¶ 6.

*25 See Niagara County Court Order dated May 26, 2000, attached as Ex. J to Pet'r Mem. (Docket No. 15). On direct appeal, the Appellate Division "reject[ed] as baseless the contention of defendant that the court should have granted his motion for recusal based on his unsubstantiated allegations that the court and the Assistant District attorney were part of an FBI conspiracy against defendant." People v. Welch, 2 A.D.3d at 1357, 770 N.Y.S.2d at 234. That court also summarily rejected Welch's "remaining contentions" as "without merit." Id. at 1358.

" 'A fair trial in a fair tribunal is a basic requirement of due process.' " Peters v. Kiff, 407 U.S. 493, 501, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)). However, the Supreme Court "has recognized that not '[a]ll questions of judicial qualification ... involve constitutional validity. Thus matters of kinship, personal

bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.' " Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 819, 106 S.Ct. 1580, 1584 (1986) (quoting Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) (alteration in original) and citing FTC v. Cement Institute, 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level")). A state's adoption of a statute that permits disqualification for bias or prejudice "alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause." Id. (citing Berger v. United States, 255 U.S. 22, 31, 41 S.Ct. 230, 232, 65 L.Ed. 481 (1921)). Thus, the Supreme Court has held that " 'it is normally within the power of the State to regulate procedures under which its laws are carried out, and its decision in this regard is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " Id. (quoting Patterson v. New York, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (citations omitted in original)). Where the grounds for disqualification involve bias or prejudice, the Supreme Court has held that "only in the most extreme of cases would disqualification ... be constitutionally required." Aetna, 475 U.S. at 821.

In New York, statutory grounds for disqualification are set forth in New York Judiciary Law § 14, entitled "Disqualification of Judge By Reason of Interest or Consanguinity." In addition, New York's Code of Judicial Conduct provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned," including instances where "the judge has a personal bias or prejudice concerning a party." N.Y. Jud. Law Canon 3(E)(1); N.Y. Comp.Codes R. & Regs. tit. 22 § 100.3(E)(1) (same); see also N.Y. Comp.Codes R. & Regs. tit. 22 § 700.5(c) ( "A judge shall preside at such trial unless he is satisfied, upon challenge or sua sponte, that he is unable to serve with complete impartiality, in fact or appearance, with regard to the matter at issue or the parties involved."). Absent statutory grounds, the trial judge is the "sole arbiter of recusal"; the decision whether to recuse oneself is discretionary-"within the personal conscience of the court." People v. Moreno, 70 N.Y.2d 403, 405-06, 521 N.Y.S.2d 663, 516 N.E.2d 200 (1987) (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

Further, the New York Court of Appeals has observed that, absent statutory grounds, a trial judge's alleged bias, prejudice, or unworthy motives will not constitute grounds for recusal unless shown to affect the result. *Id.* at 407 (citation omitted). In fact, even where recusal may be the "better practice ... to maintain the appearance of impartiality," the judge is still the "sole arbiter" of the decision. *Id.* at 406.

**\*26** The Court turns first to Welch's claim that alleges improper contact among the trial judge, the prosecutor, the FBI, and the U.S. Attorney's Office, and the existence of a conspiracy against Welch involving these individuals and entities, among others. The Court has thoroughly reviewed Welch's pleadings in support of his recusal motion and agrees with the Appellate Division that they are entirely "baseless." Beyond the speculation and innuendo contained in his pleadings, Welch has not set forth any evidence whatsoever of the alleged "conspiracy" involving "former Niagara County Court Judge Charles Hannigan, attorney Michael Violante, former prosecutor Peter Broderick (now Niagara County Judge), former Niagara County District Attorney Aldo DiFlorio, and others whose names are not now set forth ." Petitioner's Recusal Motion at 1, Ex. H to Pet'r Mem. (Docket No. 15). Having set forth no credible proof that a "conspiracy" existed or that the trial judge and the prosecutor had any improper contact with any of the individuals or agencies named in Welch's pleadings, Welch has presented this Court with no basis upon which either the trial judge's or the prosecutor's impartiality might reasonably be questioned. *See Fulton v. Robinson,* 289 F.3d 188, 199 (2d Cir.2002) (denying motion for recusal pursuant to 28 U.S.C. § 455(a)).

In *Fulton,* the basis for petitioner's recusal motion was that the district judge had ruled against him on all of his motions and that the judge had been an assistant district attorney in Monroe County; petitioner Fulton speculated that the judge may have been acquainted with respondent Robinson. *Id.* at 199. The Second Circuit observed, however, that the district judge stated on the record that he did not know Robinson, and Fulton presented no evidence to the contrary, nor any evidence whatever of bias. Thus, the Second Circuit found, the grounds asserted by Fulton did not require recusal. *Id.* (citing *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474

(1994) (recusal not warranted merely because of repeated judicial rulings against the movant); *Sewer Alert Committee v. Pierce County,* 791 F.2d 796, 798 (9th Cir.1986)*(per curiam)* (holding that recusal not required merely because of judge's prior acquaintance with defendants); *United States v. Dandy,* 998 F.2d 1344, 1349-50 (6th Cir.1993) (holding that recusal not warranted by judge's acquaintance with witness), *cert. denied,*510 U.S. 1163, 114 S.Ct. 1188, 127 L.Ed.2d 538 (1994); *Chitimacha Tribe v. Harry L. Laws Co.,* 690 F.2d 1157, 1166 (5th Cir.1982) (holding that recusal not required merely because judge, when he was an attorney more than six years earlier, had represented one of the parties), *cert. denied,*464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983)).

Welch's contention that the trial court's adverse rulings evidence "deep-seated favoritism or antagonism that makes fair judgment impossible," Petr' Mem. at 21 (Docket No. 15) (quoting *Liteky,* 510 U.S. at 555), likewise does not warrant habeas relief. As the Supreme Court explained in *Liteky,* "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky,* 510 U.S. at 555 (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966)). "In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion)," a trial judge's rulings "cannot possibly show reliance upon an extrajudicial source; and can *only in the rarest circumstances* evidence the degree of favoritism or antagonism required ... when no extrajudicial source is involved." *Id.* (emphasis supplied). First, Welch has not alleged that the trial judge's rulings were made in reliance upon an extrajudicial source, and there is no basis in the record whatsoever for such an allegation. Thus, Welch would have this Court find "favoritism or antagonism" within the "four corners" of the trial judge's various rulings. As the Supreme Court has explained, such bias can only be found to be inherent in a trial judge's rulings "only in the rarest circumstances." *See id.* This without a doubt is *not* one of those exceedingly rare circumstances. *See, e.g., Fulton,* 289 F.3d at 199;*Liteky,* 510 U.S. at 556.

**\*27** In *Liteky,* the manifestations of alleged bias in the district judge's conduct of the trial below included the judge's admonishment of one defendant's counsel and codefendants; questions he put to certain witnesses, his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

alleged "anti-defendant tone," his cutting-off of testimony said to be relevant to the defendant's state of mind, and his post-trial refusal to allow petitioners to appeal *in forma pauperis*. However, the Supreme Court found that all of these grounds were inadequate to demonstrate the degree of animosity that would warrant recusal. Rather, the alleged instances of bias consisted merely of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. *Id*. The rulings all occurred in the course of judicial proceedings, and neither relied upon knowledge acquired outside such proceedings nor displayed deep-seated and unequivocal antagonism that would render fair judgment impossible. *Id.; see also* United States v. Grinnell Corp., 384 U.S. at 583 ("During the trial [the judge] ruled certain evidence to be irrelevant to the issues and when the lawyer persisted in offering it Judge Wyzanski said, 'Maybe you will persuade somebody else. And if you think so, all right. I just assure you it is a great ceremonial act, as far as I am concerned.' We do not read this statement as manifesting a closed mind on the merits of the case but consider it merely a terse way of repeating the previously stated ruling that this particular evidence was irrelevant."); *compare with* Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). In *Berger,* a World War I espionage case against German-American defendants, the judge allegedly stated, "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." The Supreme Court in *Liteky* opined that such comments "reveal[ed] such a high degree of favoritism or antagonism as to make fair judgment impossible."

In the present case, by contrast, Judge Punch conducted himself admirably throughout Welch's criminal proceedings. He consistently evidenced a concern for the defendant's rights and ruled in Welch's favor on several occasions. For instance, he granted Welch's motion to dismiss the third count of the indictment because the prosecution failed to present expert testimony regarding whether the gun was operational and precluded the prosecutor from introducing a photograph showing all of the money seized arranged in stacks according to denomination. Moreover, the trial judge afforded Welch considerable latitude in questioning witnesses and in complying with evidentiary rules. There were, to be sure, moments when Judge Punch expressed his annoyance with

Welch's repetitive arguments and daily motions for a mistrial. However, the Supreme Court clearly has held that "*[n]ot* establishing bias or partiality ... are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as ... judges, sometimes display." Liteky, 510 U.S. at 555-56 (emphasis in original). Overall, this trial judge demonstrated remarkable patience and skill in his conduct of the trial.

**\*28** In sum, none of the grounds asserted by petitioner required disqualification of the trial judge or prosecutor. The trial judge certainly did not abuse his discretion under state statutory law in declining to recuse himself. Moreover, as a matter of federal constitutional law, Welch's allegations do not come close to establishing a violation of his due process rights. Accordingly, habeas relief should not be granted on his recusal claim.

**Point Six: Trial court's failure to conduct a *Rodriguez* hearing**

Welch disputes the admission of the identification testimony provided by prosecution witness Simmons at trial, arguing that the trial court and Appellate Division permitted the testimony "despite CPL 710.30(1)(b) notice violation because Simmons' identification was merely confirmatory in nature [.]" Pet'r Supp. Mem. at 43 (Docket No. 21). The Appellate Division "reject [ed] the contention of defendant that the court erred in denying his motion to preclude identification testimony. The court properly determined that the identification was merely confirmatory in nature and thus no notice or Rodriguez hearing was required[.]" *People v. Welch,* 2 A.D.2d at 1357 (citing N.Y.Crim. Proc. Law § 710.60; *People v. Rodriguez,* 79 N.Y.2d 445, 452-453, 583 N.Y.S.2d 814, 593 N.E.2d 268 (N.Y.1992); *People v. Wharton,* 74 N.Y.2d 921, 550 N.Y.S.2d 260, 549 N.E.2d 462 (N.Y.1989)).

In United States v. Wade, 388 U.S. 218, 236-37, 242, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Supreme Court held that an evidentiary hearing was required to determine whether a witness' in-court identification of a defendant had "an independent source," apart from post-indictment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

identification in a line-up at which the defendant's counsel was not present, or whether, in any event, the introduction of the evidence was harmless error. The function of a *Wade* hearing is not only to test the fairness of the pretrial identification procedure in order to determine whether there may be trial testimony of the procedure itself but also to determine whether-if the pretrial identification procedure was unduly suggestive-the witness has an independent basis for testifying at trial that the defendant is the perpetrator.

Under New York law, a defendant who challenges the admissibility of a witness' identification of him or her is presumptively entitled to a *Wade* hearing even if, on a motion to suppress the allegedly impermissibly suggestive procedures, the defendant fails to assert specific facts establishing the deficiency. *See People v. Rodriguez,* 79 N.Y.2d at 453;*accord Alvarez v. Fischer,* 170 F.Supp.2d 379 (S.D.N.Y.2001). However, when the prosecution alleges that, by virtue of a prior relationship between a witness and the defendant, the witness is "impervious to police suggestion," and his identification is therefore untainted by an otherwise suggestive pretrial identification procedure, a *"Rodriguez* hearing" is held in lieu of a *Wade* hearing for the purpose of establishing a "prior relationship" foundation. *People v. Rodriguez,* 79 N.Y.2d at 452-53;*People v. Vargas,* 118 Misc.2d 477, 481, 461 N.Y.S.2d 678, 681 (N.Y.Sup.Ct.1983) ("Where the defendant is known to and is a familiar figure to the witness before the crime, there is virtually no danger of a trial misidentification owing to a pretrial viewing, whether corporeal or by photo. Where the witness-either the victim or some other eyewitness-knows the defendant, suggestiveness is irrelevant [.]") (citing *People v. Tas,* 51 N.Y.2d 915, 434 N.Y.S.2d 978, 415 N.E.2d 967 (N.Y.1980); *People v. Gissendanner,* 48 N.Y.2d 543, 423 N.Y.S.2d 893, 399 N.E .2d 924 (N.Y.1979)).

**\*29** Furthermore, New York has provided, by statute, that defendants generally are entitled to notice of out-of-court identifications so as to allow them adequate opportunity to test the suggestiveness of police identification procedures. *See* N.Y.Crim. Proc. Law § 710.30; *People v. Smith,* 149 Misc.2d 998, 1002, 567 N.Y.S.2d 577, 578) (N.Y.Sup.Ct.1991) ("Historically, CPL 710.30, as it relates to identifications, was a legislative response to the problem of suggestive and misleading pretrial

identifications involving, *e.g.,* line-ups, show-ups or photographs for the purpose of establishing the identity of the criminal actor at trial. The statute sets forth a procedure to provide notice to a defendant who might otherwise be unaware that the People are in possession of such evidence and thus allows the defendant to test the reliability of the identification at a pretrial hearing[.]") (citing *People v. White,* 73 N.Y.2d 468, 474, 541 N.Y.S.2d 749, 539 N.E.2d 577 (N.Y.1989)).

Here, the Court is somewhat mystified as to why Welch is insisting that C.P.L. § 710.30 notice was required respect to Simmons as there was no police-arranged identification procedure by Simmons in this case. *See, e.g., People v. Vargas,* 118 Misc.2d at 481. Section 710.30 of the C.P.L. is, by its terms, limited to "police arranged confrontations." N.Y.Crim. Proc. Law § 710.30; *see also People v. Gissendanner,* 48 N.Y.2d at 552;*People v. Berkowitz,* 50 N.Y.2d 333, 338, n. 1, 406 N.E.2d 783, 428 N.Y.S.2d 927 (N.Y.1980). No pre-trial identification procedure was conducted by the police. Thus, the prosecution did not have to comply with the strictures of C.P.L. § 710.30. *See, e.g., People v. Zambrano,* Indictment No.: 00208-03, 2003 WL 22922437, at *8 (N.Y.Sup.Ct. Nov. 24, 2003) ("The evidence introduced at the hearing establishes that the police did nothing to 'arrange' identifications of any of the defendants by these witnesses. The 'point out' identifications which did occur were the spontaneous product of an accidental encounter between the witnesses and the suspects. There being no governmental action involved there exists no basis for the suppression of any of the identification testimony [ .]") (citing *People v. Dixon,* 85 N.Y.2d 218, 623 N.Y.S.2d 813, 647 N.E.2d 1321 (N.Y.1995), *People v. Capel,* 232 A.D.2d 415, 648 N.Y.S.2d 327 (App.Div. 1st Dept.1995)).

The Court turns next to Welch's contention that a *Rodriguez* hearing should have been held to determine the "extent of the [the witness'] prior familiarity with the defendant." *People v. Williamson,* 79 N.Y.2d 799, 800 (1991); *People v. Rodriguez,* 79 N.Y.2d at 451. At most, Welch is arguing that the trial court committed an error of state law by not holding a *Rodriguez* hearing; the Supreme Court clearly has held that the state is *not* required by the due process clause of the Fourteenth Amendment to conduct a hearing out of the jury's presence whenever a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

defendant contends that a witness' identification of him was arrived at improperly. *Watkins v. Sowders,* 449 U.S. 341, 345-50, 101 S.Ct. 654, 657-59, 66 L.Ed.2d 549 (1981); *see also* *Brown v. Harris,* 666 F.2d 782, 785 (2d Cir.1981), *cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982). In *Watkins v. Sowders,* the Supreme Court declined to hold that the Due Process Clause of the Fourteenth Amendment in all cases requires a trial judge to hold a "fair hearing," *Jackson v. Denno,* 378 U.S. 368, 377, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964), to decide the admissibility of eyewitness identification. The Supreme Court noted that while "[a] judicial determination outside the presence of the jury of the admissibility of identification evidence may often be advisable" and may "[i]n some circumstances ... be constitutionally necessary[,]" it did "not follow that the Constitution requires a *per se* rule compelling such a procedure in every case." 449 U.S. at 349. Thus, the right to a so-called "*Rodriguez* hearing" prior to trial to determine an eyewitness' familiarity with the defendant is purely a creature of New York state decisional law and statutory law. Furthermore, courts in this Circuit have observed that New York's standard for determining when a pre-trial hearing on the suggestiveness of an identification procedure should be held "may be more rigorous than the federal doctrine as applied in this Circuit." *Alvarez v. Fischer,* 170 F.Supp.2d at 385-86 (citing *Garcia v. Kuhlmann,* 897 F.Supp. 728, 731 (S.D.N.Y.1995)).

**\*30** Insofar as the decision as to whether to grant a *Rodriguez* hearing is solely a matter of state law, the general rule is that it is not reviewable on a habeas petition. *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted). Federal constitutional law does not give defendants a *per se* right to pre-trial or mid-trial hearings on the admissibility of identification testimony. *Watkins v. Sowders,* 449 U.S. at 349. Because the Supreme Court has explicitly declared that there is no *per se* constitutional rule compelling an evidentiary hearing with regard to witness identification of an accused, nor has it clearly articulated the circumstances under which a pre-trial hearing may be constitutionally

necessary, the state courts' refusal to hold a hearing on Simmons' identification of petitioner could not have been contrary to nor constituted an unreasonable application of clearly established federal law in this matter. *Accord* *Alvarez v. Fischer,* 170 F.Supp.2d at 384. Simply put, Welch was not entitled, as a matter of federal constitutional law, to a pre-trial *Rodriguez* hearing regarding Simmons' identification of him. *See, e.g., id; Garcia v. Kuhlmann,* 897 F.Supp. at 731.[FN23]

> **FN23.** In any event, even if a *Rodriguez* hearing had been held, there is no doubt that Simmons' had the requisite familiarity with Welch. Before the grand jury, Simmons testified that he had been to Welch's previous residence to buy drugs about fifteen to twenty times prior to the date of the raid, and on the date in question, he had gone to the McKoon Avenue house to "get some dope" on "credit ." *See* Pet'r Appellate Br. at 15, App. A to Pet. (Docket No. 1). Notably, Welch has not specifically denied any familiarity with Simmons. Nor has he denied the existence of a mutual relationship with Simmons-he merely disputes the purpose of that relationship. *See id.* at 80 ("Defendant's affidavit, at paragraphs 41-50, stated that he denied that Simmons was present at his residence to get drugs and denied that he had prior drug dealings activities with Simmons."). Moreover, at trial, Welch acknowledged that he and his girlfriend knew Simmons; he testified that Simmons had come over on the night of March 3, 1999, to visit Jones. Thus, Welch's claim that Simmons did not have the requisite familiarity to identify Welch is specious.

Moreover, courts in this Circuit have held that a *Wade* hearing is unnecessary where the identification evidence offered at trial is not the product of a pre-arranged police identification procedure such as a lineup, showup, or photographic array. *United States v. Pagan,* 829 F.Supp. 88, 91-92 (S.D.N.Y.1993), *aff'd,* 28 F.3d 102 (2d Cir.), *cert. denied,* 513 U.S. 904 (1994). Under such circumstances, the state trial court's failure to conduct a *Wade* hearing does not provide a basis for federal habeas corpus relief. *Id.; see also* *James v. Senkowski,* No. 97 Civ. 3327(DLC), 1998 WL 217903, at \*6 (S.D.N.Y. Apr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

29, 1998). As the district court stated in *Pagan,* "the absence of any police identification procedure whatsoever necessarily dooms any attempt to exclude a subsequent in-court identification allegedly derived from that procedure." 829 F.Supp. at 91;*see also Hall v. Alexander,* No. 98-CV-0320H, 1999 WL 299309, *2 (W.D.N.Y. Apr. 13, 1999) ("In this case, Sergeant Hernandez' identification testimony was based on information obtained during the execution of the search warrant. It was not the product of a lineup, showup, photo array, or some other procedure pre-arranged solely for the purpose of identifying or confirming the identification of the perpetrator. This is what the trial court found in its summary denial of petitioner's application for a pretrial identification hearing. Accordingly, petitioner is not entitled to habeas corpus relief on the ground that the trial court failed to conduct a *Wade* hearing to assess the reliability of the identification evidence offered at trial by Sergeant Hernandez.").

**\*31** Finally, even if a constitutionally tainted identification were admitted at trial, its admission would still be subject to harmless error analysis. *See Dunnigan v. Keane,* 137 F.3d 117, 130 (2d Cir .1998); *Brown v. Harris,* 666 F.2d at 787. These cases instruct that the *Wade* hearing does not derive from mandatory constitutional rule but rather is a discretionary procedure grounded on the reliability of the identification evidence at issue. *E.g., United States v. Finley,* 245 F.3d 199, 203 (2d Cir.2001); *Dunnigan,* 137 F.3d at 129-30;*United States v. Archibald,* 734 F.2d 938, 943 (2d Cir.1984); *Brown v. Harris,* 666 F.2d at 785-86;*Watkins v. Sowders,* 449 U.S. at 349. Here, the admission of Simmons' testimony identifying Welch certainly was harmless under any standard. Identity has not been, and is not now, at issue in this case; Welch never stated that he was not the person who was arrested at 2789 McKoon Avenue on the night in question, or that Simmons was not also present in the house at the time. Indeed, part of Welch's defense at trial was that Simmons had come to the house for the purpose of planting drugs for the police to find. This claim is wholly lacking in merit, and should not provide a basis for federal habeas relief.

**Point Seven: Failure to issue jury instruction on accomplice liability**[FN24]

[FN24.] Welch also argues this claim under Point Nine of his Supplemental Memorandum of Law (Docket No. 21).

Welch contends that the trial court erred in refusing to charge the jury on witness Simmons' alleged accomplice liability. *See* Pet'r Supp. Mem. at 45 (Docket No. 21). Welch's assertion that Simmons was an accomplice as a matter of law is apparently based on the testimony of his girlfriend, Jones, who stated on direct examination that Simmons ran into the bedroom and "threw some dope under the bed" at the time the police entered Welch's residence. T .1021, 1054-55. On cross-examination, she described it as a package that was "just all white like cotton" and stated that it resembled Exhibit J-1, a clear cellophane package containing an off-white substance later determined to be cocaine. T.862. Welch argued to the trial court that this uncorroborated testimony made Simmons an accomplice to possession of the controlled substance. T.1463. As a result, Welch argued, Simmons' testimony had to be corroborated by independent proof "because of the fact that he's implicated himself as an accomplice in the bedroom possession at the very least." *Id.* The trial court responded that if Jones' testimony were true, "[t]hat would make him [Simmons] guilty of possession" but did not see how it would "affect [Welch] as being criminally liable for that possession[,]" since it was "an all or nothing kind of thing." T.1464. However, the trial court reserved decision on whether he would charge the jury that it had to determine the factual issue of Simmons' accomplice status. T.1465.

The following day, the trial judge ruled that an accomplice jury instruction was not appropriate. Welch continued to object to this ruling, stating that "there's testimony clearly implicating Mr. Simmons in the throwing of drugs in the lower bedroom[.]" T.1472. The trial judge explained that if the jury believed Jones' testimony on that issue, then Simmons was "not an accomplice, he [was] simply guilty of the act of possession, he didn't somehow jointly possess that cocaine when he threw it under the mattress." *Id.* Thus, Welch "would be absolved of any liability of that because [he] had nothing to do with it all[.]" *Id.* The trial judge explained, "[S]o that's the reason I'm giving the seventh degree [possession of a controlled substance] charge as a lesser included offense" because if the jury "find[s] that he [Simmons] did that, then that-that could

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

reduce the amount that they find [Welch] possessed." T.1473. FN25 On direct appeal, the Appellate Division rejected Welch's claim, holding that the witness was not an accomplice "as a matter of law" and there was an "insufficient basis" on which to submit his accomplice status to the jury. *People v. Welch,* 2 A.D.2d 1354, 770 N.Y.S.2d at 234 (quotation omitted).

> FN25. The trial judge held that he was "not going to read the accomplice corroboration requirements" because there was "no reasonable view of the evidence that warrants the reading of the instruction[.]" The judge noted that in his view, "it would just needlessly confuse the jury" and "would leave them with the question, who in the heck was the accomplice here and ... that serves no purpose." T.1470.

*32 "[I]t is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. at 67-68; *accord Davis v. Strack,* 270 F.3d 111, 123 (2d Cir.2001). Where a habeas petitioner alleges an error in a jury instruction or that there was an erroneous omission of an instruction, he must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *accord, e.g., Davis,* 270 F.3d at 123. "The question is not whether the trial court gave a faulty instruction, but rather 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " *Davis,* 270 F.3d at 123 (quoting *Cupp,* 414 U.S. at 147 and citing *Estelle,* 502 U.S. at 72 (quoting and reaffirming *Cupp)) .*

In *Davis,* the Second Circuit stated that it "has repeatedly held that '[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right

guaranteed to him by federal law.' " *Id.* (quoting *Casillas v. Scully,* 769 F.2d 60, 63 (2d Cir.1985) and citing *Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir.1990) (quoting *Casillas,* 769 F.2d at 63) (same); *Sams v. Walker,* 18 F.3d 167, 171 (2d Cir.1994) (quoting *Casillas,* 769 F.2d at 63) (same)). In this context, "[w]hat due process requires will often depend on what state law is." *Id.* Thus, while a habeas court may not grant habeas relief for a " 'mere error of state law,' " *Davis,* 270 F.3d at 123 (quoting *Blazic,* 900 F.2d at 541), a determination that the petitioner was "erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights," *id.*

New York's Criminal Procedure Law defines "accomplice" as "a witness in a criminal action who, according to evidence adduced in such action, may reasonably be considered to have participated in: (a) [t]he offense charged; or (b) [a]n offense based upon the same or some of the same facts or conduct which constitute the offense charged." N.Y.Crim. Proc. Law § 60.22(2). FN26 "[A] 'witness is an accomplice as a matter of law only if the jury could *reasonably reach no other conclusion* but that he [or she] participated in the offense charged or an offense based upon the same or some of the same facts or conduct which constitute the offense charged.' " *People v. Hines,* 24 A.D.3d 964, 806 N.Y.S.2d 737, 739 (App.Div.3d Dept.2005) (quoting *People v. Caban,* 5 N.Y.3d 143, 153, 800 N.Y.S.2d 70, 833 N.E.2d 213 (N.Y.2005) and *People v. Besser,* 96 N.Y.2d 136, 147, 726 N.Y.S.2d 48, 749 N.E.2d 727 (N.Y.2001) (emphasis supplied) and citing N.Y.Crim. Proc. Law § 60.22(2)). However, " 'if different inferences may reasonably be drawn from the proof regarding complicity ... the question should be left to the jury for its determination[.]' " *Caban,* 5 N.Y.3d at 153; *see also People v. Basch,* 36 N.Y.2d 154, 157, 365 N.Y.S.2d 836, 325 N.E.2d 156 (N.Y.1975).

> FN26. That section further provides that "[a] witness who is an accomplice as defined in subdivision two is no less such because a prosecution or conviction of himself would be barred or precluded by some defense or exemption, such as infancy, immunity or previous prosecution, amounting to a collateral impediment to such a prosecution or conviction,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

not affecting the conclusion that such witness engaged in the conduct constituting the offense with the mental state required for the commission thereof." N.Y.Crim. Proc. Law § 60.22(3).

**\*33** The Court agrees that with the state courts that, clearly, Simmons was not an accomplice as a matter of law. Moreover, it appears that there was an insufficient basis to find that Simmons' accomplice status was an appropriate question of fact for the jury. *See People v. Jones,* 73 N.Y.2d 902, 903, 536 N.E.2d 615, 615, 539 N.Y.S.2d 286, 287 (N.Y.1989) ("Moreover, defendant's unsupported contentions that Langhorne served as a 'lookout' and remained at the scene to recover the proceeds of the crimes are clearly an insufficient basis for an accomplice instruction[.]") (citations omitted). As the trial judge pointed out, Simmons could not be an accomplice to Welch with respect to the crime possession-either Welch possessed the contraband or he did not; it was, as the trial judge remarked, an "all or nothing" question.

Welch wanted a determination that Simmons was an "accomplice" because, pursuant to C.P.L. § 60.22(1), "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense." N.Y.Crim. Proc. Law § 60.22(1). Welch appears to reason that, because there was no testimony from other witnesses corroborating Simmons' testimony that he was going to purchase drugs from Welch on the night in question, there would be no evidence to prove that Welch possessed the drugs with intent to sell. Welch neglects to mention, however, the circumstantial evidence *(e.g.,* the large sums of cash, the razor blades, the gram scales) strongly tending to establish that Welch sold crack cocaine out of his residence at 2789 McKoon Avenue. Moreover, Welch admitted to the police that he possessed the drugs and money found in the house.

There was no error of state law, let alone any error of constitutional magnitude. The trial judge correctly declined to charge the jury on accomplice liability as there was no basis in fact or in law for finding that Simmons was an "accomplice" to the possession of any drugs found in Welch's house. This claim is plainly without merit and

should not provide a basis for habeas relief.

**Point Eight: *Miranda* violation**

Welch contends that the prosecution failed to prove beyond a reasonable doubt the voluntariness of his statements made to the police at the time of his arrest. Before trial, a two-day hearing pursuant to *People v. Huntley,* 5 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), was held before Judge Punch to determine whether Welch's statements to police were voluntarily made after he waived his rights under *Miranda.* After hearing the testimony, Judge Punch ruled against Welch from the bench. On direct appeal, the Appellate Division summarily rejected this claim as "without merit." *People v. Welch,* 307 A.D.2d at 778.

The Due Process Clause of the Fourteenth Amendment is violated if statements that are a product of coercion are admitted against a criminal defendant. *See, e.g., Rogers v. Richmond,* 365 U.S. 534, 540-41, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Before the state can introduce a statement made by a defendant in custody during an interrogation without the presence of an attorney, the state must show that the defendant made a voluntary, knowing, and intelligent waiver of his right to counsel and his right not to incriminate himself. *See generally Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *accord, e.g., Michigan v. Tucker,* 417 U.S. 433, 446, 94 S.Ct. 2357, 2364-65, 41 L.Ed.2d 182 (1974); *New York v. Quarles,* 467 U.S. 649, 661-62, 104 S.Ct. 2626 (1984) (O'Connor, J., concurring); *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The Supreme Court has made clear that the "[d]etermination of whether a statement is involuntary ... requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona,* 437 U.S. 385, 401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The ultimate issue of the "voluntariness" of a confession is not an issue of fact presumed, under statute, to be correct in a federal habeas corpus proceeding, but rather is a legal question requiring independent federal determination. *See, e.g., Miller v. Fenton,* 474 U.S. 104, 110, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). However, a state court's determinations of factual matters, such as the "length and circumstances of the interrogation, the defendant's prior

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

experience with the legal process, and familiarity with the *Miranda* warnings," are considered questions of fact, which are entitled to a presumption of correctness. *Miller, 474 U.S. at 117.*

**\*34** At the *Huntley* hearing, Investigator Cocco testified that he read the *Miranda* warnings from a pre-printed card to Welch at approximately 11:17 p.m. on the night of the arrest. H.101-03.[FN27] Welch indicated to Investigator Cocco that he understood those rights. Investigator Cocco did not interrogate Welch at that time but instead proceeded to advise the other occupants of the house of their rights. H.103. Detective Pierini also was present on the night of the raid and testified that he had known Welch prior to the drug-bust. When he first encountered Welch, Welch was lying on the floor, handcuffed behind his back. According to Detective Pierini, Welch advised him that he had a "medical problem" and that he wanted to get up. Detective Pierini replied that Welch had to wait until the house was secured; once that was accomplished, Detective Pierini returned several minutes later and advised Welch the *Miranda* warnings from a pre-printed card and helped him into a chair. H.151-53. According to Detective Pierini, Welch indicated that he understood. H.153.

> **FN27.** Citations to "H.___" refer to the transcript of the *Huntley* hearing held on March 30, 2000, and April 3, 2000.

Detective Pierini did not speak with Welch further until after he had completed a search of the house and Welch's person and had discovered some suspected crack cocaine in one of Welch's pockets [FN28] and in the safe located in an upstairs closet. Detective Pierini testified that after the discovery of the drugs, Welch "wanted to know who-who was going to go to jail." H.156. Welch "was concerned with who was going to go to jail because of the drugs and the money and at that time he says [sic] well, the drugs, the money and the drugs in this house are mine." *Id.* Welch's cross-examination of Investigator Cocco and Detective Pierini did not shake their testimony that they advised Welch of his *Miranda* warnings and that Welch did not ask for any medical assistance at the time. H.168.

> **FN28.** Welch was complaining that having his

hands cuffed behind his back was uncomfortable; Detective Pierini said that it could be switched to the front, but that he would have to search Welch first. Welch agreed, and that is when Detective Pierini discovered some crack cocaine on Welch's person.

During the *Huntley* hearing, Welch submitted to the trial judge a subpoena for "medical records" directed to Buffalo General Hospital. H.383. The trial judge indicated that the subpoena was much too vague, that the request should have been made "a long time ago," and that he was "not subpoenaing anything else" Welch had not already submitted. H.383-84. The trial court then inquired as to Welch's "medical attention [sic]" and Welch stated that he has been treated for "high blood pressure and a blockage[.]" H.385-86. He explained that the blockage "cause[d] him breathing problems at times[.]" The following colloquy ensued:

> The Court: Does it [the "blockage"] make you admit to crimes that you didn't mean to admit to?

> Mr. Welch: It puts me in threatening positions when officers deliberately ignore it and when I'm complaining about the condition and I'm deliberately ignored-

> The Court: Does it affect your ability to think?

> Mr. Welch: It affects my ability to function at times, Your Honor.

At that point, the trial court indicated that Welch could make an offer of proof but that it was "too late for th[at] hearing." H.386. At the close of the hearing, the trial judge issued a ruling from the bench on the voluntariness of Welch's statements:

**\*35** Furthermore, with regard to the *Huntley* issues, I find the People have proven, beyond a reasonable doubt, that the statements given by the defendant were voluntary. They clearly show he was in custody at the time the statements were given although no formal arrest took place until a few minutes later or sometime

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

later. Nevertheless, his liberty was clearly restrained. Nevertheless, the *Miranda* warnings were given to him prior to his giving those statements and he acknowledged that he understood those warnings and waived his Constitutional rights and proceeded to give a couple of statements that were listed in the [C.P.L.] 710.30 [notice]....

H.465-66.

Welch raises several grounds for challenging the admission of his statements to the police. First, he characterizes as "highly incredible, self-contradictory, contrary to experience, inconsistent ... and unworthy of belief" the testimony given by the police officers that they administered *Miranda* warnings to Welch and that he waived his constitutional rights. *E.g.,* Pet'r Appellate Br. at 99, App. A to Pet. (Docket No. 1). Although the ultimate question of the validity of a defendant's waiver of his rights under *Miranda* is "a legal question requiring an independent federal determination," *Miller v. Fenton,* 474 U.S. at 110, and not an issue of fact to which a presumption of correctness would apply to a determination by a state court, the question of whether or not the police read the *Miranda* warnings to Welch in the first instance is a factual issue. Thus, the presumption of correctness set forth in 28 U.S.C. § 2254(e)(1) applies to the trial court's finding that "the *Miranda* warnings were given to him prior to his giving those statements [.]" *See Hunter v. Filion,* No. 01-CV-0992(JBW), 03-MISC-0066(JBW), 2003 WL 22953073, *4 (E.D.N.Y. Oct. 22, 2003) (holding that the hearing court's finding that the prosecution had proven beyond a reasonable doubt that the *Miranda* warnings were administered prior to petitioner's statement was a "factual conclusion [that] must be presumed by this court to be correct and must be rebutted by petitioner with clear and convincing evidence"). Welch has not offered any rebuttal evidence, merely a convoluted maze of alleged inconsistencies in the police officers' testimony. This is not the type of clear and convincing evidence required under 28 U.S.C. § 2254(e)(1) to rebut a state court's finding of fact.

The Court also finds that the state courts correctly found that the prosecution proved beyond a reasonable doubt that Welch gave a valid waiver of his constitutional rights

after being read the *Miranda* warnings, and that his statements were not induced by threats or promises. Welch contends that his alleged statements admitting to possessing the crack cocaine and money found during the raid were induced by promises of lenity made by the police officers. According to Welch, the police officers "made direct or implied promises that defendant's then pregnant fiancee (who also had two minor children in the house) would not go to jail." Pet'r Appellate Br. at 107, App. A. to Pet. (Docket No. 1). Welch has mischaracterized the conversation on which he is basing his claim that the police officers allegedly made promises to him:

**\*36** Elbert [Welch] did ask Det. Pierini and Inv. Evans, "Supposes [sic] someone takes responsibility for anything that might be here, would anybody else go to jail, get arrested? Would everybody else be let go?" Inv. Evans [sic] reply was if someone owned up to any contraband that might be in the house, no one else would get arrested and would be free to leave. At that time, Elbert Welch stood up and directed Det. Pierini to a pocket on the article of clothing that he was wearing, where Det. Pierini recovered a quantity of controlled substance. Elbert then directed your writer and Det. Pierini to an upper room closet, where we located a Sentry safe. The safe was locked. Elbert did indicate that the key that unlocked the safe was on a key chain around his neck[.] Elbert showed Inv. William E. Evans the correct key to unlock the safe. Once the safe was unlocked, your team members did find inside the safe a quantity of controlled substance.

Police Report of Petitioner's Statement to Police, quoted in Respondent's Memorandum of Law ("Resp't Mem.") at 28 (Docket No. 9). It is apparent that Welch initiated the above conversation, and that it was he, rather than the police officers, who brought up the subject of whether the occupants of the house would go to jail if someone were to take responsibility for possession the drugs and the money uncovered by the police during the execution of the search warrant. This was not a case where the police officers somehow coaxed or coerced Welch into admitting to ownership of the contraband in exchange for treating the other occupants of the house with leniency. In short, this claim is credible and is not supported by the record. There is no basis for finding that Welch's statements to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

police were not " 'the product of a rational intellect and a free will.' " *Lynum v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922, 922 (1963) (quoting *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960)).

To the extent that Welch claims that he had a "serious medical condition" which rendered his statements involuntary, this is unsupported by the record and not believable. As an initial matter, the Court notes that a seriously ill patient-even one confined to a hospital bed-may give a knowing, voluntary and intelligent waiver of his *Miranda* rights. *See Pritchett v. Portuondo,* No. 02CIV0824(MBM)(GWG), 2003 WL 22472213 (S.D.N.Y. Oct 31, 2003) (holding that petitioner's *Miranda* waiver, made while in the hospital recovering from "serious injuries" was valid; hospital records supported police officers' testimony that defendant was mentally alert at the time of this interrogation; defendant had been removed from the Intensive Care Unit and the detectives had received medical clearance to speak with the defendant; mere fact that Pritchett was being administered medication did not show that he was unable to knowingly waive his *Miranda* rights) (citing *United States v. Cristobal,* 293 F.3d 134, 143-44 (4th Cir.) (confession given by seriously injured patient following emergency surgery voluntary where patient never indicated a desire for questioning to stop and account was lucid and detailed), *cert. denied,*537 U.S. 963 (2002); *Campaneria v. Reid,* 891 F.2d 1014, 1029 (2d Cir.1989) (statement given by defendant in intensive care unit held to be voluntary where defendant, despite being in significant pain, was alert and awake, and the interrogation relatively short; court held that "[a]lthough he suffered pain and discomfort, it was not so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation by his interrogators" and "[h]is inculpatory statements, therefore, were not the product of unconstitutional coercion"), *cert. denied,*499 U.S. 949 (1991); *United States v. Martin,* 781 F.2d 671, 673-74 (9th Cir.1985) (statement made while suffering great pain and under the influence of Demerol found voluntary where accused was awake and relatively coherent)), Report and Recommendation adopted by *Pritchett v. Superintendent, Shawangunk Corr. Fac.,* No. 02 Civ. 0824(MBM), 2004 WL 3623207 (S.D.N.Y. Mar. 1, 2004); *see also Ford v. Hoke,* No. CV-91-4093, 1994 WL 594283, at *6 (E.D.N.Y. Oct. 25, 1994) (holding that

petitioner's *Miranda* waiver, made while in the hospital recovering from surgery, was valid; "Obviously an operation which confirmed permanent loss of eyesight would provide a shock that might temporarily overwhelm a person's ability to reflect on his rights and to determine whether to waive them. Most arrested defendants are, however, probably under some emotional strain. Here there is no basis for believing that emotional strain overwhelmed reason. Although petitioner's gunshot wound caused serious harm to his eyesight, it did not subject petitioner to a level of pain or mental debilitation that prevented him from knowingly waiving.").

*37 Here, Welch produced no medical records at the *Huntley* hearing. He attempted to introduce some medical records at trial, but the prosecutor successfully objected to their admission on the grounds that they were not relevant. Although some of the police officers corroborated Welch's testimony that he stated that he was having trouble breathing, there was no testimony that he requested medical assistance or appeared to be in any kind of acute distress. Moreover, Welch's request to be moved off the floor was accommodated by the police, *see, e.g.,* T.246-47, and a door was opened because Welch complained about the heat.

The Supreme Court has explained that only if the "totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). In the present case, the totality of the circumstances reveals that Welch possessed the requisite intelligence to understand the *Miranda* warnings, which were read to him by the police; that he was not suffering from a medical condition that would have prohibited him from being able to voluntarily and intelligently waive his rights; that he was not in any type of physical distress; and that he was not threatened, coerced, or promised lenity. Because petitioner's statements were properly admitted at trial, it is not necessary to reach the question of whether the admissions would have been harmless error. For all of the foregoing reasons, the Court recommends that habeas relief be denied as to this claim.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

**Point Nine: Denial of the right to call witnesses and present a defense**

Welch contends that the trial court erroneously denied his requests to subpoena, "inter alios [sic], four FBI agents, Governor George Pataki, United States Attorney Denise O'Donnell of Western District of New York, and Justices of the Appellate Division, Fourth Department." Pet'r Appellate Br. at 112, App. A to Pet. (Docket No. 1). According to Welch, it was "apparent from the face of this document that defendat [sic] took the position that the FBI and U.S. Attorney's offices possessed information pertaining to a conspiracy against defendant and his family which would be relevant to the conspiracy defense defendant intended to raise at trial." *Id.* The trial court denied these subpoenas in an order entered May 26, 2000, finding that there was no "justification" for issuing the subpoenas. On direct appeal, the Appellate Division held as follows:

We further conclude that, because defendant did not provide any reliable basis to believe that witnesses he proposed to call in support of his conspiracy defense could have provided any relevant or probative testimony, "the court providently exercised its discretion in precluding the witnesses' testimony[.]"

*People v. Welch,* 2 A.D.2d 1354, 770 N.Y.S.2d at 234 (citations omitted). Notwithstanding the fact that the Appellate Division apparently did not analyze the claim as a denial of petitioner's Sixth Amendment right to compulsory process, the Court agrees with the ultimate conclusion of the Appellate Division that there was no error of evidentiary or constitutional law in the trial court's refusal to issue the requested subpoenas.

**\*38** The Sixth Amendment to the Federal Constitution guarantees every criminal defendant "the right ... to have compulsory process for obtaining witnesses in his favor...." U.S. CONST. amend. VI. Although some have suggested that the Compulsory Process Clause only guarantees the power to subpoena witnesses, *see Taylor v. Illinois,* 484 U.S. 400, 407-08 nn. 10-12, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), the Supreme Court of the United States has consistently held that such a right would be

meaningless unless it were also interpreted as a right to present those witnesses at trial. *See Michigan v. Lucas,* 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991); *Taylor,* 484 U.S. at 407-08 ("Our cases establish at a minimum, that criminal defendants have ... the right to put before a jury evidence that might influence the determination of guilt.") (citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). The right to present exculpatory testimony is central to the concept of an adversary system, *see Taylor,* 484 U.S. at 408-09 (citing *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)), and is "a fundamental element of due process of law," *id.* at 409 (citing *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). *See also Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense").

However, the right to compulsory process exists only where a defendant "make [s] some plausible showing of how [the desired witness'] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). The Supreme Court has observed that "more than the mere absence of testimony is necessary to establish a violation of the right" to compulsory process. *Id.* (citing *Washington v. Texas,* 388 U.S. at 19). In *Valenzuela-Bernal,* the Supreme Court read the Sixth Amendment to limit, by its own terms, which witnesses are covered by the right to compulsory process; the Sixth Amendment does not grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses but rather guarantees him "compulsory process for obtaining witnesses in his favor," U.S. CONST., Amend. 6. In *Washington v. Texas,* the Supreme Court found the compulsory process clause violated when the defendant was "arbitrarily deprived of 'testimony [that] would have been relevant and material, and ... vital to the defense.' " 388 U.S. at 16. The Supreme Court in *Valenzuela-Berna* relied upon this language and held that in order to establish a violation of his constitutional right to compulsory process a defendant "must at least make some plausible showing" of how the witness' testimony would have been "both material and favorable" to the defense. *Accord, e.g., United States v. Korodgosky,* 4 F.Supp.2d 262, 268 (S.D.N.Y.1998) (rejecting Compulsory Process claim where petitioner failed to show

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

that the testimony sought from any desired witness would be either material or favorable to his defense).

**\*39** Here, Welch has made no "plausible showing" of what the purported testimony of Governor Pataki and the rest of the witnesses he wanted to subpoena would have been, much less how it would have had any relevance to his case. Apart from Welch's bald assertions that there existed a vast conspiracy whose purpose was to imprison him illegally and kill him, and which purportedly was being investigated by the F.B.I., Welch has never submitted any credible evidence of this alleged conspiracy. Furthermore, Welch has not shown that the witnesses whom he wanted to call had any knowledge of this alleged conspiracy, let alone that they even knew of *him.* In short, Welch has made no showing whatsoever of how Governor Pataki and the other witnesses would have provided testimony material and favorable to his defense. For these reasons, Welch's claim under the Compulsory Clause of the Sixth Amendment should be dismissed.

**Point Ten (App. A to Pet.): Lack of C.P.L. § 710.30 notice regarding identification testimony by police officers**

Welch contends that the trial court committed reversible error by denying his motion to preclude the identification testimony of the police officers who participated in the execution of the search warrant on the basis the prosecution failed to provide notice under C.P.L. § 710.30(1)(b) of its intention to offer that evidence at trial. Section 710.30(1)(b) provides in relevant part that when the prosecution intend to offer at a trial "testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has previously identified him as such, they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered." N.Y.Crim. Proc. Law § 710.30(1)(b).

This claim must be dismissed as not cognizable on habeas review because an alleged violation of C.P.L. § 710.30 involves only the prosecution's claimed failure to comply with a state procedural rule. Welch cites no authority for

the proposition that such a claim presents an issue of constitutional magnitude, and indeed, this Court has uncovered none in its research. To the contrary, courts in this Circuit have held that an alleged violation of C.P.L. § 710.30 is not cognizable on habeas review. *See, e.g., James v. Senkowski,* No. 97 Civ. 3327(DLC),1998 WL 217903, at *6 (S.D.N.Y. Apr. 29, 1998); *Pacyon v. New York State Parole,* No. 90-CV-0796E(H), 1996 WL 528812, at *2 (W.D.N.Y. Sept. 3, 1996) (holding that petitioner's C.P.L. § 710.30 claim "fails to state a claim of a constitutional magnitude"); *Roberts v. Scully,* 875 F.Supp. 182, 191 (S.D.N.Y.1995); *Brown v. Harris,* 666 F.2d at 785 ("Brown cites no case indicating that this statute *[i.e.,*C.P.L. § 710.30], or that a notice requirement in general, is constitutionally mandated.").

Moreover, Welch has not shown that there was any error of New York state law. Of note is the fact that it does not appear that the police officers made any out-of-court identification of Welch. Welch attempts to circumvent this by arguing that "the police viewings [sic] of defendant during execution of the search warrant were clearly 'police arranged' [identification procedures] and not within the category of confirmatory identification." This argument, albeit creative, is unsupported by the case-law. New York courts clearly have held that C.P.L. § 710.30(1)(b) does not require the prosecution to give prior notice of an in-court identification of the defendant by a witness who had not previously identified him out-of-court. *People v. Trammel,* 84 N.Y.2d 584, 588, 644 N.E.2d 1310, 1312, 620 N.Y.S.2d 754, 756 (N.Y.1994); *accord, e.g., People v. Pinckney,* 27 A.D.3d 581, 582, 811 N.Y.S.2d 751, 752 (App.Div.2d Dept.2006) (citing N.Y.Crim. Proc. Law § 710.30(1)(b); *People v. Rohan,* 214 A.D.2d 755, 755, 625 N.Y.S.2d 948, 949 (App.Div.2d Dept.1995); *People v. Trottie,* 167 A.D.2d 438, 561 N.Y.S.2d 841, 842 (App.Div.2d Dept.1990); *People v. Dozier,* 150 A.D.2d 483, 484, 541 N.Y.S.2d 224, 225 (App.Div.2d Dept.1989)); *see also People v. McCorkle,* 272 A.D.2d 273, 274, 709 N.Y.S.2d 519, 521 (App.Div. 1st Dept.2000).

**\*40** This claim does not present a cognizable federal constitutional issue and is, in any event, wholly without merit. Accordingly, it should be dismissed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

**Point Ten (App. C to Pet.; Supp. Mem.): Denial of Due Process by "Excessive Delay in the Appellate Process"**

In Point Ten of petitioner's Supplemental Memorandum of Law, he asserts that he "adopts the facts and legal arguments set forth in appendix C, Point seventeen to the habeas petition concerning the excessive delay in the appellate process and the prejudice that resulted as a consequence." Pet'r Supp. Mem. at 46 (Docket No. 21). However, Point Seventeen of the habeas petition concerns the allegedly erroneous introduction of the expert chemist's testimony. *See* Docket No. 1. He goes on to argue that the prosecution "deliberately withheld" a "transcript dated August 24, 1999, of a pre-grand jury proceeding held by petitioner, the assigned counsel, Mr. Perry and the prosecutor ADA Jeorg [sic]" and only produced it as an appendix to the prosecutor's answering brief on appeal which "prevented petitioner from making appropriate challenges to gross inaccuracies therein prior to the perfection of the appeal[.]" *Id.*

Leaving aside the fact that his "argument" on this point is essentially incomprehensible,[FN29] Welch has utterly failed to demonstrate a denial of his federal constitutional rights. The Second Circuit has observed that "[n]ot every denial of a free transcript to an indigent results in a denial of equal protection of the laws." *United States ex rel. Cadogan v. La Vallee*, 428 F.2d 165, 167 (2d Cir.1970) (citing *Roberts v. LaVallee*, 389 U.S. 40, 42, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967)(per curiam) ("Our decisions for more than a decade now have made clear that differences in access to the instruments *needed to vindicate legal rights*, when based upon the financial situation of the defendant, are repugnant to the Constitution.") (emphasis supplied)). Here, Welch has not made any showing that the transcript requested-which occurred before the grand jury even was impaneled-was "needed to vindicate [his] legal rights," *Roberts v. La Vallee*, 389 at 42; *accord Cadogan*, 428 F.2d at 168 ("But where, as here, it is clear that the transcript would not have been useful there is no reasonable ground for requiring that it be provided."). Welch has not set forth a colorable claim that his constitutional rights were somehow violated. Accordingly, the Court recommends that habeas relief should not be granted.

FN29. This issue comes back to the alleged "vast conspiracy" against Welch, involving the Federal Bureau of Investigation, New York State Governor George Pataki, the Niagara County Police Department, among others. Welch contends that the transcript at issue would prove the prosecutor's "threat to penalize petitioner if he testified about a police conspiracy and the truth about the fact that ADA Jeorg [sic] demanded that petitioner provide information about what the FBI agents would testify to if called [.] Pet'r Supp. Mem. at 48 (Docket No. 21). According to Welch, with this information, his "challenge to the indictment would likely have succeeded on appeal." *Id.* However, Welch completely fails to explain how this allegation, even if true, had any bearing whatsoever on the sufficiency of the grand jury evidence supporting his indictment.

**Point Eleven: Denial of Full and Fair Hearing on Fourth Amendment and *Miranda* Claims**

Welch asserts that he was "denied a full and fair hearing on his claims of involuntariness of alleged statements to police and on his claims of illegal search and seizure." Pet'r Appellate Br. at 122, App. A. to Pet. (Docket No. 1). Welch raises no additional or new arguments on this claim that would change this Court's conclusions regarding his arguments, presented elsewhere in his petition and memoranda of law, concerning the denial of his Fourth Amendment claims and the denial of his motion to suppress his statements to the police. As discussed elsewhere in this Report and Recommendation, the two-day pre-trial suppression hearing afforded to Welch was eminently "full and fair." Welch has offered no basis for this Court to find otherwise.

**\*41** Post-AEDPA, "the Supreme Court and Congress have severely limited the situations in which a habeas court is required or even permitted to hold an evidentiary hearing to consider factual claims by a habeas petitioner." *Nieblas v. Smith,* 204 F.3d 29, 31 (2d Cir.1999); *accord, e.g., Ruine v. Walsh,* No. 00 Civ. 3798, 2005 WL 1668855, at *2, (S.D.N.Y. July 14, 2005). Section 2254(e)(2) prohibits a district court from holding an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

evidentiary hearing where the habeas applicant "failed to develop the factual basis of a claim in State court proceedings" unless the applicant meets several stringent requirements. *Id.* (quoting 28 U.S.C. § 2254(e)(2)). An evidentiary hearing is appropriate where "[28 U.S.C.] § 2254(e)(2)'s provisions do not apply to the claim because the petitioner did not fail to develop the factual basis of the claim in the state court proceedings, or ... where the petitioner's claim falls under one of the two exceptions to § 2254(e)(2)." *Ruine,* 2005 WL 1668855, at *3 (citing *Millan v. Keane,* No. 97 CIV. 3874(JGK), 1999 WL 178790, at *7 (S.D.N.Y. Mar. 31, 1999) (in turn citing *Miller v. Champion,* 161 F.3d 1249, 1253 (10th Cir.1998)). If the statute does not apply-as it does not here-the Court "should consult pre-AEDPA standards." *Id.* Under the pre-AEDPA standards, a "petitioner is entitled to an evidentiary hearing ... if he has alleged facts that would entitle him to relief and the state courts, for reasons not attributable to him, denied him a full and fair hearing to explore those facts." *United States ex rel. Hampton v. Leibach,* 347 F.3d 219, 244 & n. 12 (7th Cir.2003) (cited in *Ruine,* 2005 WL 1668855, at *3). Moreover, "[e]ven if a petitioner meets the requirements of 28 U.S.C. 2254(e)(2), whether that petitioner ought to be afforded an evidentiary hearing remains an issue committed to the district court's sound discretion." *Ruine,* 2005 WL 1668855, at *3 (citing *Nieblas,* 204 F.3d at 32). Because Welch developed the factual basis of the claims that he was deprived a full and fair hearing on his Fourth Amendment claims and *Miranda* claims at trial, he is entitled to an evidentiary hearing *only* if the "facts would entitle [him] to relief and the state courts ... denied him a full and fair hearing to explore those facts." *Leibach,* 347 F.3d at 244; *accord, e.g., Gardine v. McGinnis,* No. 04 CIV 1819 KMW DFE, 2006 WL 3775963, at *7 (S.D.N.Y. Dec. 20, 2006).

Welch primarily complains that, at the *Huntley* hearing, the prosecution did not produce the physical evidence seized during the execution of the search warrant. Pet'r Appellate Br. at 124, App. A to Pet. (Docket No. 1). At the start of the second day of the hearing, held on April 3, 2000, the prosecutor indicated that he had brought the evidence from the Sheriff's Department and that Welch had an opportunity to examine it. H.261.With respect to the narcotics evidence, the prosecutor informed Welch that it "remain[ed] in the laboratory and that if [he] [were] given direction [he] would have the laboratory package

that[.]" *Id.* At that time, Welch did not request that the trial court direct the prosecutor to do so. *See id.* Finally, it is true that the money was not produced, but it was never introduced into evidence at trial. The money was not, and is never going to be physically available to Welch. Holding an evidentiary hearing is not going to change that fact. In any event, he was permitted to aggressively cross-examine the police officers and overtly state that he believed that they had stolen the money. He did not need to examine the cocaine himself to make the argument-which he did make-that the forensic chemist's testimony was incompetent to prove that the seized drugs were cocaine. In any event, the Court cannot discern how petitioner's strategy or the outcome of the trial would have been different were an evidentiary hearing to be held.

**\*42** Welch also argues that his cross-examination of the police officers was restricted at the *Huntley* hearing and that "good-faith bases for [his] claims of conspiracy to illegally imprison and harm him" were set forth in various motion papers submitted to the trial court. With regard to this assertion, he "adopts the factual parts of his recusal arguments raised under POINT FIVE[.]" Pet'r Appellate Br. at 127, App. A. to Pet. (Docket No. 1). As discussed above, Welch's recusal claim is without merit. There is no need for further discussion of it here. However, the Court will note that Welch was able to cross-examine all of the prosecution's witnesses *ad nauseam* regarding their alleged participation in the alleged conspiracy against him.

The remaining grounds asserted for holding an evidentiary hearing are that the prosecution belatedly disclosed a Clarion Hotel receipt belonging to Welch and dated February 9, 1999, which allegedly would have disproved the statement in the search warrant application that Welch made a drug sale to a confidential informant "TP10" on that date; the trial court failed to order the production of "all" confidential informants; and the trial court refused to issue subpoenas for medical records. The claim regarding the hotel receipt is plainly frivolous. Moreover, that claim as well as the claim regarding the alleged failure to produce confidential informants only bear, if at all, on the issue of probable cause for the search and seizure. Such Fourth Amendment issues may not be re-litigated on federal habeas, as discussed above. *See Stone v. Powell,* 428 U.S. at 481-82. Finally, the trial court's refusal to issue the subpoenas for certain medical records was due to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

Welch's delay in submitting the subpoenas as well his conceded failure to "technically specify 'Elbert Welch' " in the subpoenas. Pet'r Appellate Br. at 130, App. A to Pet. (Docket No. 1).

In sum, Welch cannot meet the rigorous standard required for this habeas court to hold an evidentiary hearing. The facts he seeks to uncover in the evidentiary hearing have been fully explored at trial. After hearing that evidence-including the alleged inconsistencies in the witnesses' testimony-the jury made credibility determinations and concluded that the prosecution had proven beyond a reasonable doubt that his statements to the police were voluntary and that there was probable cause for the search and seizure that occurred. Welch simply disagrees with the state courts' conclusions on these issues; this is an insufficient basis for an evidentiary hearing at this stage of the case. Because an evidentiary hearing would provide no new information, Welch's request should be denied. *Accord, e.g., Gardine v. McGinnis, No. 04 CIV 1819 KMW DFE, 2006 WL 3775963, at *7 (S.D.N.Y. Dec. 20, 2006).*

**Point Twelve: Violation of C.P.L. § 30.30 (Statutory Right to "Speedy Trial")** [FN30]

> FN30. This claim also appears as Point Thirteen in petitioner's Supplemental Memorandum of Law (Docket No. 21).

Welch contends that he was "denied his statutory right to a speedy trial" because the prosecution made a belated declaration of readiness for trial, in violation of New York Criminal Procedure Law § 30.30. *See* Pet'r Supp. Mem. at 54-55; Pet'r Appellate Br. at 134-35, App. A to Pet. (Docket No. 1). This claim of an alleged violation of C.P.L. § 30.30 is purely a state law claim, and does not state a federal constitutional claim cognizable on habeas review.

**\*43** As an initial matter, the Court wishes to point out that Welch did not argue on direct appeal, and does not argue now, that his Sixth Amendment right to a speedy trial was violated. Indeed, when he briefed this argument on direct

appeal and in support of his habeas petition, he referred *only* to C.P.L. § 30.30, dealt only with state statutory ready-for-trial issues under C.P.L. § 30.30, and employed only state cases and state law analysis. With regard to this "speedy trial" claim, there is no reference in the point heading or in the argument section to any federal case law or to the federal constitution. Clearly, the claim Welch raised in state court and raises here rests solely on state procedural grounds.

C.P.L. § 30.30 requires only that the prosecution be ready for trial within a prescribed time frame, and not that the defendant actually be afforded a speedy trial. *See People v. Anderson, 66 N.Y.2d 529, 498 N.Y.S.2d 119, 488 N.E.2d 1231 (N.Y.1985)* (stating that C.P.L. § 30.30, setting forth time limitations in which People must be ready for trial, addresses only problem of prosecutorial readiness, and is not a "Speedy Trial" statute in the constitutional sense). Because C.P.L. § 30.30 is merely a state law provision requiring the prosecution to be ready for trial, a claim under this provision does not raise a federal constitutional claim. *Accord, e.g., Gibriano v. Attorney General of the State of New York, 965 F.Supp. 489, 491-492 (S.D.N.Y.1997)* (denying habeas relief and noting that "Section 30.30 [of the New York Criminal Procedure Law] is a statutory time in which the People of New York must be ready for trial; Section 30.30 is not, as such, a statutory embodiment of the constitutional guarantee to a speedy trial."); *Rodriguez v. Miller, No. 96 Civ. 4723(HB), 1997 WL 599388, at *2 (S.D.N.Y. Sept. 29, 1997)* ("[A] C.P.L. § 30.30 claim has been held not to raise the federal constitutional speedy trial claim for purposes of a federal habeas petition."); *Jackson v. McClellan, No. 92 Civ. 7217(JFK), 1994 WL 75042, at *2 (S.D.N.Y. Mar. 4, 1994)* (holding that petitioner failed to fairly present constitutional speedy trial issue to state court where petitioner argued "entirely in terms of New York Statutory law [C.P.L. § 30.30]"). Courts in this Circuit have consistently held that a C.P.L. § 30.30 claim present nothing but an issue of state statutory law. Accordingly, this claim should be dismissed as it does not present a federal constitutional question cognizable on federal habeas review.

**Point Thirteen: Cumulative trial error**

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

Welch contends that "the combined errors committed during the proceeding, including each of the numerous errors set forth as grounds for this appeal [sic] in this brief, when considered for their cumulative effect, deprived defendant of his state and federal due process rights to a fair trial and require reversal in the interest of justice." Pet'r Appellate Br. at 137 (citations omitted), App. A to Pet. (Docket No. 1). Welch asserts that all of the errors which he separately has raised as claims for habeas relief support a claim of cumulative trial error. In addition, Welch sets forth an exhaustive list of further alleged errors by the trial court. *See id.* at 138-40. As discussed below, the claims of purported errors are wholly lacking in merit.

**A. Failure to turn over the transcripts of Simmons' probation violation hearings**

**\*44** Despite having the information he needed to request Simmons' probation hearing transcripts, Welch did not make a timely request for them, and the trial court refused to grant a continuance. Welch had a significant amount of impeachment material to use against Simmons, and the probation hearing transcripts would have been, at best, cumulative. The trial court did not abuse its discretion in denying Welch's belated request.

**B. Refusal to strike testimony of "the prosecutor's secretary"**

This claim refers to testimony presented regarding the cost of all of the lottery tickets that Welch introduced into evidence at trial. Both the prosecutor and Welch were given an opportunity to count and tabulate the face-value of the lottery tickets offered by Welch; the prosecutor had the assistance of Mary Danna ("Danna"), a secretary from the District Attorney's office, in logging the tickets. T.1424-25. This occurred in Welch's presence. T.1426.

Danna testified, without objection, that the total amount of lottery tickets was $6,785.50. *Id.* There were two tickets found that indicated prize money; one was in the amount of $40 and one was in the amount of $250. T.1426-27. The record of this tabulation was introduced into evidence as Exhibit 41, without objection. When Welch

cross-examined Danna, he elicited testimony that the prosecutor tallied the amounts; she only knew how much the total was based on what the prosecutor told her and did not have personal knowledge of what the total was. T.1427-28. The trial court sustained Welch's objection, and stated that he would "allow the testimony at this point as to what was in there but ... it does appear that there would be additional testimony required for the foundation for that to come in." After this witness was dismissed, Welch argued that the prosecutor put himself in the place of being an unsworn witness "by using a document that he basically took part in the matter [sic]," T.1430, and "by allowing the secretary to testify to the results that he tallied up," T.1431. Later, Welch also argued that Danna's testimony was "not proper rebuttal testimony." T.1484.

Contrary to his assertion, Welch did not object at all during Danna's testimony. Thus, Welch permitted the testimony to come in without objection. However, the trial court sustained Welch's objection that was made during his cross-examination of Danna, and thus ruled in Welch's favor. When Welch complained that he "didn't get a chance to finish adding up all the amounts." *Id.* the trial court pointed out, Welch had an entire day to do his own tabulation and had access to the material "for months" prior to the trial. Moreover, Welch offered no basis for finding that tally was inaccurate. Finally, the lottery tickets were *Welch's* exhibit; he offered them into evidence. The fact that he did not like what the exhibits tended to demonstrate is something he perhaps should have considered before introducing them at trial. There was no error on this point.

**C. Refusal to charge the jury on the defense of conspiracy**

**\*45** Welch contends that the trial court erroneously failed to charge the jury on "defendant's only defense of conspiracy." T.1452-53. This was not error, since Welch did not introduce any evidence of a conspiracy. As the trial court noted,

Frankly, your claims of conspiracy have never been borne out. There's not evidence, in fact, of a conspiracy, except the possible inference that the officers somehow

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

conspired to plant evidence *[i .e., the razor blade found in the safe]* but forgot to add it into the list of evidence, which, if you're going to plant evidence I would suggest that you're the custodian of the evidence, you're not going to leave that out of your inventory and make it stick out like a sore thumb[.]

T.1452. Welch was permitted to, and did argue at length, that the presence of the razor blade in the safe was completely fabricated. However, the trial court certainly was not required to charge the jury that this one incident was evidence of a conspiracy. In order to establish a *prima facie* case of conspiracy, there must be some evidence of an "illicit agreement," *People v. Berkowitz,* 50 N.Y.2d 333, 341, 406 N.E.2d 783, 787, 428 N.Y.S.2d 927, 931 (N.Y.1980), among the alleged co-conspirators. This Welch failed to demonstrate, and the trial court properly declined to instruct the jury on the issue of a conspiracy.

**D. Failure to charge the jury on the law regarding *Miranda* warnings**

Welch contends that the trial court failed "to charge the jury on the law concerning the requirement of giving *Miranda* warnings prior to police interrogation despite the substantial issues raised at trial regarding a *Miranda* violation." Pet'r Appellate Br. at 138, App. A to Pet. (Docket No. 1). In instructing the jury that it needed to find both that the defendant's statements were voluntary and truthful, the trial court did not mention *Miranda* specifically. However, the trial court informed the jury that a statement may not be considered voluntary if, *inter alia,* it was obtained "in violation of the defendant's rights under the Constitution," including the "right to remain silent and the right to the advice and assistance of a lawyer before the defendant answers-before the defendant answers any questions and give a statement to the police or prosecutor and in this case the defendant alleges that he felt compelled to give the statement by the circumstances that were testified to." T.1603. This charge accurately stated the law and was not detrimental to Welch's case.

**E. Erroneous refusal to give the "moral certainty" circumstantial evidence charge**

Welch contends that the trial court erred in "delet[ing] from its circumstantial evidence charge the 'moral certainty' requirement thus allowing the jurors to convict on proof less than beyond a reasonable doubt." Pet'r Appellate Br. at 138, App. A to Pet. (Docket No. 1). As the prosecutor pointed out, there was direct evidence in this case, namely Welch's statement to Detective Pierini stating that all of the drugs and money found in the house were his. T.1453. The rule is clearly settled in New York that the "moral certainty" standard of proof does not apply to a situation where, as here, both direct and circumstantial evidence are employed to demonstrate a defendant's culpability. *People v. Barnes,* 50 N.Y .2d 375, 380, 406 N.E.2d 1071, 1073, 429 N.Y.S.2d 178 (N.Y.1980).

**F. Refusal to give adverse inference charge regarding prosecution's failure to preserve money seized**

**\*46** Welch contends that the trial court erred in failing to give an adverse inference charge regarding the prosecution's failure to preserve the cash seized during the execution of the search warrant. *See* T.1480-81.[FN31] Such objections to jury instructions are primarily matters of state law that do not ordinarily provide a basis for federal habeas relief. *Davis v. Strack,* 270 F.3d at 123;*accord, e.g., Mena v. Smith,* No. 03 Civ. 3295(GEL), 2004 WL 2071668, *2 (S.D.N.Y. Sept. 16, 2004) (stating that petitioner's objection that the trial court erred in refusing to instruct the jury that it could draw an adverse inference from the mishandling of certain physical evidence by the police was a matter of state law, which ordinarily does not provide a basis for federal habeas relief). In order to establish a denial of constitutional rights, petitioner must show not merely that the court's instructions were erroneous, but also that they denied him some right guaranteed by the federal constitution. *Cupp v. Naughten,* 414 U.S. at 146. Welch cannot meet this rigorous standard.

> FN31. Welch contended that he had requested discovery with respect to the actual money seized during the raid; the trial court noted that Welch's motion requested "a discovery of items that were to be submitted into evidence." T.1483. However, the police turned over the confiscated money to the federal government, and it was not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

submitted into evidence. *Id.; see also* T.673.

Here, the evidence was not lost or destroyed; rather, it was turned over to the Drug Enforcement Agency as part of the federal asset-forfeiture program on March 3, 1999, or shortly thereafter. T .628, 639-40. Nevertheless, the trial court agreed with Welch's concern regarding the prosecution's failure to allow Welch to have inspection of the money and consequently sustained Welch's objection to the introduction of several photographs of the money seized-one which showed the money in the safe next to an inoperable handgun and one which showed the money arranged by denominations.

On these facts, the Court finds that an adverse inference instruction would not have been justified. Even if such an instruction were appropriate, it nevertheless was within the trial court's sound discretion whether or not to give such a charge. *See, e.g., Mena v. Smith,* 2004 WL 2071668, *2 (noting that the refusal of the trial court to charge the jury that it could draw an adverse inference from the mishandling of certain physical evidence by the police was "discretionary"); *see also United States v. Torres,* 845 F.2d 1165, 1170-71 (2d Cir.1988) (holding that the decision whether to give a missing witness charge rests within the sound discretion of the trial court); *accord Reid v. Senkowski,* 961 F.2d 374, 377 (2d Cir.1992). There is no basis for finding that the trial court abused its discretion in refusing to give the desired charge.

Although Welch asserted that the police officers colluded to steal the money, he presented no evidence, in fact, that the money was stolen or intentionally mishandled. Furthermore, he was permitted to urge the jury to draw an adverse inference based on the prosecution's failure to introduce the actual money into evidence. T.1560. Under these circumstances, the Court cannot find that the trial court's failure to give the adverse inference charge made the "resulting conviction invalid under the Fourteenth Amendment," *Cupp,* 414 U.S. at 146.

**G. Unfair marshaling of the evidence**

**\*47** Welch points to several pages in the trial court's jury

charge in which he contends shows the judge's "unfair marshaling of the evidence and commenting thereon in favor of the prosecution while highlighting the People's contentions and ignoring defendant's claims[.]" Pet'r Appellate Br. at 138 (citing T.1609-13), App. A to Pet. (Docket No. 1). This claim is spurious. The pages about which Welch complains consist of the trial court's instructions to the jury on each of the elements of the crimes with which Welch was charged. Contrary to Welch's contention, the trial court certainly was not "marshaling" evidence here by instructing the jury on the law.

**H. Refusal to allow comment on the failure to preserve the money seized**

Welch argues that the trial court erred in refusing to allow him to "comment of [sic] the missing money which the People failed to preserve without opening the door to the photos being introduced in evidence[.]" As discussed above, one of the police officers testified, without objection from Welch, as to the denominations found and the amount of each denomination. However, the trial court, based on Welch's objection that he did not get to inspect the actual money, precluded the prosecutor from introducing photographs of the money arranged by denominations, noting that the best evidence rule was violated under those circumstances. T.678. The trial court did indicate that if Welch "g [o]t into the appearance of the money in that photograph in implying with [his] questions that there's not as much money there as what the testimony indicates, [he was] opening the doors for some evidence to come in that I've previously sustained [his] objections on and that is the photograph with the money, with the gun and possibly even the photograph of the money arranged by denomination[.]" T.914. Thus, the trial court fashioned a compromise evidentiary ruling with respect to the money seized during the execution of the search warrant. However, the trial court's limitation on Welch's argument was not improper. In any event, Welch was allowed to comment that there was a "failure of these officers to even preserve for your examination the actual proceeds that were the money[.]" T.1560. He questioned, "why would they [the police] not provide an opportunity for the defendant to examine [the money] and use it before trial[?]" Thus, Welch was able to place before the jury his argument that there was something improper in the way

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

the money was handled by the police.

**I. Refusal to introduce petitioner's medical records**

Late during the trial, and well after the police witnesses had testified, Welch sought to introduce certain medical records into evidence. T.1263. The trial court noted, the "thrust of th[e] information seems to be that you [Welch] are experiencing problems when you masturbate." *Id.* The judge questioned how that "possibly [could] be relevant to the issues" in Welch's case. T.1263-64. Welch explained that the record was relevant because it contained "an indication that the defendant has ... visited hospitals on complaints about breathing problems." T.1264.[FN32] The trial court detailed the contents of the records and noted that the "only diagnostic impression which wouldn't even be admissible anyway, would be autoerotic syncope or something and then the EKG [results would] require expert testimony, obviously." T.1265. The trial court found that even if the records were admissible as business record, they "can't contain things like medical conclusions." Accordingly, the trial court sustained the prosecutor's objection. There was no error in the trial court precluding this wholly irrelevant medical record.

FN32. The medical history apparently indicated "that more or less after [Welch] masturbated [he] tried to get up and [he] felt lightheaded." T.1265. Welch did not effectively contradict that.

**\*48** In order for petitioner to state a constitutional claim, he must do more than simply demonstrate that the trial court's evidentiary ruling was erroneous. Instead, he must show "that the error deprived [him] of a *fundamentally fair* trial." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.), *cert. denied,* 464 U.S. 1000 (1983) (emphasis in original). Here, the trial court's decision clearly did not deprive petitioner of his right to a fundamentally fair trial. This evidence was neither relevant nor probative to the issues in the case, and the trial judge was well within his discretion to preclude Welch from introducing the medical record. *See Herrara v. Lacy,* No. CV-94-0125 (CPS), 1995 WL 669675, at \*7 (E.D.N.Y. Nov. 5, 1995) ("The trial record does not indicate that this evidence was overwhelmingly compelling, and its probative force

without any supporting documentation would have been minimal. The court left the door open for the petitioner to introduce expert testimony to support his hypothesis, as this evidence would have been much more relevant and reliable. The trial court was completely within its discretion to preclude evidence of the current status of petitioner's wounds as not relevant."). Moreover, even were the decision erroneous, it was harmless, under any standard, in the context of the trial, since it could have had no effect or influence on the jury's verdict whatsoever.

**J. Denial of immunity to defense witness**

Welch contends that the prosecutor should have granted immunity to defense witness Jones, who pleaded the Fifth Amendment when asked about her cocaine usage. He argues that it was unfair, given that Simmons, who testified for the prosecution about his drug purchases from Welch, was granted immunity.

Simmons was granted immunity by operation of law when he testified before the Grand Jury. *See* N.Y.Crim. Proc. Law § 190.40(2)). Moreover, in New York, Section 50.30 of the Criminal Procedure Law "vests in the prosecutor alone the power to obtain immunity for witnesses." *People v. Benedict,* 115 A.D.2d 795, 796, 495 N.Y.S.2d 735, 736 (App.Div.3d Dept.1985). As the Appellate Division noted in *People v. Benedict,* on occasion, the prosecutor's exercise of that power has infringed upon a defendant's due process right to a fair trial, "particularly when the prosecution builds its case on immunized witnesses favorable to the People, but is unwilling to accord immunity to potential defense witnesses, or affirmatively threatens the defendant's witnesses with prosecution for perjury if they give evidence favorable to the defense[.]" *Id.* (citing *People v. Shapiro,* 50 N.Y.2d 747, 760, 431 N.Y.S.2d 422, 409 N.E.2d 897 (N.Y.1980); *People v. Adams,* 53 N.Y.2d 241, 247, 440 N.Y.S.2d 902, 423 N.E.2d 379 (N.Y.1981)); *see also Earl v. United States,* 361 F.2d 531, 534, n. 1 (D.C.Cir.1966) (Burger, J.), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967).

The Second Circuit clearly has explained that "[a]s a matter of New York law it is clear that the defense cannot

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

require a prosecutor to grant immunity to a witness."
Grochulski v. Henderson, 637 F.2d 50, 52 (2d Cir.1980)
(citing People v. Sapia, 41 N.Y.2d 160, 391 N.Y.S. 93,
359 N.E.2d 688 (N.Y.1976), cert. denied,434 U.S. 823,
98 S.Ct. 68, 54 L.Ed.2d 80 (1977)). According to the
Second Circuit, "[n]o constitutional right is thus violated."
Id. Even in federal prosecutions where a witness can be
granted mere "use immunity" in order to overcome his
invocation of the Fifth Amendment, the Second Circuit
has held that "the circumstances under which a prosecutor
might be under a duty to confer such immunity on a
witness pursuant to defense request are extremely narrow."
Id. (citing United States v. Turkish, 623 F.2d 769, 771-79
(2d Cir.1980); accord United States v. Dolah, 245 F.3d
98, 105 (2d Cir.2001),FN33abrogated on other grounds by
Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354,
158 L.Ed.2d 177 (2004)).

FN33. The Second Circuit noted in Dolah that
although as a general rule the Government may
not be required to confer immunity for the
benefit of the defense, it has recognized that in
"narrowly defined circumstances the
Government will face a choice between either
not immunizing witnesses who invoke the
self-incrimination privilege and whom the
prosecution might wish to call, or else
immunizing both its own recalcitrant witnesses
and those the defense might wish to call." The
government must make such a choice when "the
following special circumstances are present: (1)
the government has engaged in discriminatory
use of immunity to gain a tactical advantage or,
through its own overreaching, has forced the
witness to invoke the Fifth Amendment; and (2)
the witness' testimony will be material,
exculpatory and not cumulative and (3) is not
obtainable from any other source." Id. (citation
omitted) (footnote omitted).

*49 In contrast, under New York law, only full
transactional immunity can be granted. Grochulski, 637
F.2d at 52;N.Y.Crim. Proc. Law §§ 50.10, 50.20. The
Second Circuit explained that the category of such
circumstances set forth in Turkish "cannot be any broader"
under New York law since the "expanded immunity means
that the prosecutorial interest in avoiding such compelled

grants of immunity (an interest given paramount
recognition in Turkish) will be even greater than in the
context in which Turkish was decided." Id. In Grochulski,
petitioner claimed that one witness "would have testified
in such a way possibly as to exculpate him," but did "not
suggest in what manner it would have done so." The
Second Circuit characterized petitioner's argument as
"precisely the one [it] rejected in [United States v.]
Turkish-that Due Process requires that defense witness
immunity be granted when 'it seems fair to grant it.' " Id.
Moreover, there was nothing to support a finding that the
claim fell within the "narrow category left open by
Turkish." Id.FN34

FN34. The Second Circuit explained in Turkish
"trial judges should summarily reject claims for
defense witness immunity whenever the witness
for whom immunity is sought is an actual or
potential target of prosecution. No hearing
should be held to establish such status." 623 F.2d
at 778.

Contrary to Welch's contention, the prosecution did not
"build its case" on the testimony of immunized
witnesses-Simmons was the only witness whose testimony
was immunized. See People v. Benedict, 115 A.D.2d at
796 ("Initially, we observe that here the testimony of but
a single witness for the People was immunized; plainly,
there was no impermissible building of the People's
case."). Moreover, there was no indication of bad faith or
misconduct on the part of the prosecution in declining to
confer immunity on Jones. See id. Welch's sole argument
is that it was "only fair" for his witness to have been
granted immunity; this was explicitly rejected by the
Second Circuit in Turkish and the cases following it.
Plainly, no violation of state or federal law has occurred
here.

K. Failure to give curative instruction regarding
defense witness' invocation of Fifth Amendment

Welch complains that the trial court wrongly refused to
issue a curative instruction regarding the invocation of the
Fifth Amendment by defense witness Jones. Petitioner's
Appellate Brief at 139, attached to Petition (Docket No.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

1). Welch asserts no case law, federal or state, to support this novel proposition that he was constitutionally entitled to such a jury instruction. As noted above, Welch was not entitled under federal or state law to have Jones granted immunity. Accordingly, the Court cannot see how he would be entitled to a jury instruction regarding Jones' invocation of the Fifth Amendment.

**L. Improper comments by the trial judge**

The next allegation in Welch's litany of complaints is that the trial judge made numerous improper comments. *See* Pet'r Appellate Br. at 139, App. A. to Pet. (Docket No. 1). However, these comments, in the main, were made off the record, outside the presence of the jury. Thus, there can be no argument that they somehow prejudiced the jury against the petitioner's cause. Moreover, Welch has taken several these comments out of context and "selectively quoted" them so as to make them appear improper when, in fact, they really were not. Furthermore, the allegation that the trial court "constantly rushed" Welch is totally unfounded; rather, the trial court entertained Welch's daily motions for a mistrial and other relief, allowed him to extensively and repetitively cross-examine witnesses, and placed no time limitations on his testimony or his closing statement. This claim is factually and legally baseless.

**M. Failure to hold evidentiary hearings**

**\*50** Welch also contends that the trial court erred in failing to hold a hearing on his motion to dismiss the indictment pursuant to C.P.L. § 210.45 and his motion challenging the racial composition of the jury venire pursuant to C.P.L. § 270.10. *See* Pet'r Appellate Br. at 140, App. A to Pet. (Docket No. 1). Welch was not entitled as a matter of right to a hearing on either of these motions as a matter of state law, *see, e.g.,* C.P.L. §§ 210.45(5); 270.10. More important, he cannot demonstrate that his federal constitutional rights were denied by the trial court's failure to conduct hearings on these applications. *See* Hines v. Miller, 318 F.3d 157, 162 (2d Cir.2003) (stating that "[t]he proper analytical approach" to deciding whether state criminal procedural rules violate due process is to determine if they " 'offend[ ] some principle of justice so rooted in the traditions and

conscience of our people as to be ranked as fundamental.' ") (quoting Medina v. California, 505 U .S. 437, 445, 442-46, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (in turn quoting Patterson v. New York, 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). To the extent that Welch is claiming that the trial court was required under C.P.L. § 210.45 to hold a hearing, he is asserting a violation of a state statutory provision, not a federal constitutional violation. Thus, any alleged violation of C.P.L. § 210.45 does not state a proper ground for federal habeas relief. *See* 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. at 67-68. C.P.L. § 270.10 contains no provision regarding the trial court's obligation to hold a hearing on a motion brought pursuant to that section. Welch has not offered any federal precedent establishing that he was entitled as a matter of right to an evidentiary hearing on a motion challenging the racial composition of the jury venire. Thus, the failure to hold an evidentiary hearing on such a motion does not offend a deeply rooted or "fundamental" principle of justice. Accordingly, habeas relief is inappropriate. *See* Hines v. Miller, 318 F.3d at 162.

**N. Refusal to sanction prosecution for failing to preserve money seized**

Welch contends that the trial court should have imposed sanctions on the prosecutor for failing to preserve the actual currency seized during the execution of the search warrant. *See* Pet'r Appellate Br. at 140, App. A to Pet. (Docket No. 1). Welch has not set forth a due process violation based on this allegation.

It is axiomatic that the prosecution has a duty to disclose exculpatory evidence to a criminal defendant. *See* Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *accord* United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); Kyles v. Whitley, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Failure to disclose such evidence when that evidence is in the possession of the prosecution, "irrespective of the good faith or bad faith of the prosecution," is a violation of due process. Brady, 373 U.S. at 87. The Supreme Court, however, has distinguished instances in which the prosecution fails to disclose evidence in its possession from those in which the

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

prosecution fails to preserve evidence. *See Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 488-89, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). In order to establish a due process violation based on lost or destroyed evidence, a defendant must show both "bad faith on the part of the police," *Youngblood,* 488 U.S. at 58, and that the evidence would have played "a significant role in [his] defense," *Trombetta,* 467 U.S. at 488-89; *accord, e.g., Panzarino v. Phillips,* No. 03 Civ.2535 PKC GWG, 2004 WL 99868, *14 (S.D.N.Y. Jan. 22, 2004)* (Report & Recommendation); *Feliciano v. Berbary,* No. 03 Civ. 4832(NRB), 2003 WL 22832638, at *4 (S.D.N.Y. Nov. 25, 2003). Federal habeas courts have rejected efforts to find constitutional error based on the admission of testimony regarding lost or destroyed evidence that did not meet these criteria. *See, e.g., Panzarino,* 2004 WL 99868, * 14; *Feliciano,* 2003 WL 22832638, at *4; *Scott v. Senkowski,* No. 97 CV 2411(SJ), 2002 WL 31051592, at *6-*7 (E.D.N.Y. Aug. 15, 2002); *Gonzalez v. Fischer,* No. 01Civ. 217(SHS)(DF), 2002 WL 31422882, at *6 (S.D.N.Y. Feb. 26, 2002)* (Report and Recommendation adopted by Order, 01 Civ. 2177(SHS), filed Mar. 22, 2002).

*51 Welch contends that if he were to examine the actual money, it would show that a much smaller amount was seized than what the prosecutor and police represented, which would purportedly bear out his claim of police misconduct. Strongly undercutting this assertion is the police photograph of the money arranged in stacks according to denomination, which, according to the record, gives an accurate picture of just how much money was found. Even if Welch had been able to examine the actual money, the Court is unconvinced that it would assist him in supporting his claim of police misconduct. Thus, the Court can find no basis for concluding that the physical presence of the money at the trial would have played a significant role in Welch's defense at trial. With respect to the "bad faith" requirement, Welch strenuously has alleged misconduct on the part of the police officers and the district attorney's office in the handling of the money. However, apart from his conclusory assertions, Welch has never been able to come forward with any credible evidence that the money was stolen or mishandled. Thus, there is no basis for finding that the police acted in bad faith. This fact alone bars any due process challenge. *Accord, e.g. Panzarino,* 2004 WL

99868, at *14-15.

In sum, Welch has not demonstrated that the failure of the prosecution to preserve the actual money amounted to a denial of due process. On the facts of this case, the failure of the trial court to "sanction" the prosecutor was not erroneous and certainly did not deprive Welch of a fundamentally fair trial.

**O. Cumulative effect of the alleged errors**

The Court has reviewed each and every claim of trial court error raised by Welch in his voluminous pleadings and has attempted to address them all specifically here. In the event that an error was not specifically addressed herein, the Court avers that it has considered it and found it to be patently lacking in merit. The alleged errors presented by Welch, taken singly or together, did not "produce[ ] a trial setting that was fundamentally unfair, thereby depriving him of his constitutional right to due process." *Jimenez v. Walker,* 458 F.3d 130, 148 (2d Cir.2006) (citing *Taylor v. Kentucky,* 436 U.S. 478, 487 n. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)). Moreover, in all of the alleged infirmities in the trial court's rulings and conduct, this Court has not discerned any actual errors at all-a finding which is fatal to Welch's claim. *See United States v. Yousef,* 327 F.3d 56, 161 (2d Cir.) ("Without citing to any cases, [one defendant] argues that the cumulative effect of all the District Court's trial errors denied him his right to a fair trial. We have recognized such claims. However, because we have concluded that there were no trial errors as to [one defendant], much less cumulative errors, this claim fails.") (internal citation omitted), *cert. denied,* 540 U .S. 933, 124 S.Ct. 353, 157 L.Ed.2d 241 (2003). Accordingly, the Court recommends that this claim be denied.

**Point Fourteen: Violation of the Double Jeopardy Claim**[FN35]

> FN35. This claim appears as Point Six in Welch's Supplemental Memorandum of Law (Docket No. 21).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

**\*52** Welch contends that the prosecutor and the trial judge conducted themselves so egregiously as to bar his retrial under the Double Jeopardy clause of the Constitution. He asserts that "[t]he conduct of the trial judge and prosecutor here fits squarely within the fundamental principle that prohibits retrial on double jeopardy grounds as enunciated by state and federal courts." Pet'r Appellate Br. at 141, App. A. to Pet. (Docket No. 1). The "deliberate errors" to which Welch points are just a rehashing of the rest of the arguments he raised on appeal and in support of his habeas petition, *e.g.,* that the trial court refused to dismiss a "clearly defective grand jury indictment," that the evidence was obtained pursuant to an illegal search and seizure, the trial court and the prosecutor had "extrajudicial contact" with the F.B.I., and so forth. As discussed below, fatal to his Double Jeopardy claim is the absolute lack of improper conduct on the part of either the prosecutor or the trial judge.

"Analysis of double jeopardy begins with the language of the Fifth Amendment and the rights it aims to safeguard." *United States v. Pavlovianis,* 996 F.2d 1467, 1472 (2d Cir.1993). The Fifth Amendment states that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. One of the rights to which a defendant typically is entitled under the Double Jeopardy clause "is to have his trial completed in and by the particular tribunal where he is presently on trial, except where in the trial court's discretion, the right must give way to the public interest in having 'fair trials designed to end in just judgments.' " *Id.* (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)). Thus, the Double Jeopardy clause also protects against prosecutorial misconduct and judicial overreaching. *See id.*

As the Second Circuit has explained, "[t]he key double jeopardy policy aimed to be protected where there has been prosecutorial or judicial error is to retain for the defendant primary control over whether he wants to continue on trial where he is, thereby avoiding the expense and anxiety of a lengthy appeal and possible retrial, or whether he wants to end that trial in light of the taint in the proceedings." *Id.* at 1473 (citing *United States v. Dinitz,* 424 U.S. 600, 608-09, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)). In determining whether Double Jeopardy bars re-prosecution, the "crucial question" is whether the

prosecutor engaged in the misconduct in order to prejudice the defendant's chance of obtaining an acquittal or to "goad" him into moving for a mistrial. *Dinitz,* 424 U.S. at 611 ("[The Double Jeopardy Clause] bars retrials where 'bad-faith conduct by judge or prosecutor,' threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant.") (citation omitted).

**\*53** It must be noted that the Supreme Court has circumscribed the *Dinitz* rule regarding the effect of a defendant-initiated mistrial on a claim of Double Jeopardy. *See Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Under the rule set forth in *Kennedy,* a defendant who has moved for and been granted a mistrial may successfully invoke the Double Jeopardy Clause to prevent a second prosecution only when the prosecutor's misconduct that precipitated the mistrial was *intended* to "goad" or provoke the defendant into moving for the mistrial. *Id.* at 673; *see also id.* at 675-76 ("Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause."). Thus, the critical inquiry under this standard is whether the prosecutorial misconduct was undertaken with the specific "intent to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 676.

Mere "bad faith conduct" or "harassment" on the part of the prosecution is insufficient to preclude re-trial. *See Kennedy,* 456 U.S. at 679. Rather, the state court must determine whether prosecutor actually intended to provoke a mistrial. *Id.; accord United States v. Pavlovianis,* 996 F.2d at 1474 (requiring "deliberate" prosecutorial misconduct); *see also United States v.. Huang,* 960 F.2d 1128, 1133 (2d Cir.1992) ("Negligence, even if gross, is insufficient [to preclude retrial under the Double Jeopardy clause]."). This exacting standard "calls for the court to make a finding of fact." *Kennedy,* 456 U.S. at 675.

The Court has reviewed all of the transcripts of the proceedings had in Welch's criminal case. Nowhere in them has the Court found *any* evidence of prosecutorial or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

judicial misconduct. Indeed, throughout the proceeding, the trial judge took pains to safeguard Welch's constitutional rights, and the prosecutor conducted himself in a commendable fashion. There is no evidence of negligence, "bad faith conduct," or "harassment," let alone deliberate misconduct that was *intentionally* committed in order to provoke Welch into asking for a mistrial. This claim is lacking in a factual or legal basis and should not provide a basis for habeas relief.

**Point Fifteen: Selective prosecution**

Prior to trial, on September 6, 1999, Welch moved to dismiss the indictment on the basis that he was "selectively singled out for prosecution in this case while others who were present such as Mark Simmons and two females present [sic] who were not prosecuted or charged." Pet'r Appellate Br. at 143, App. A to Pet. (Docket No. 1). The trial court denied the motion without a hearing, despite the allegedly "substantial basis set forth in the moving papers." *Id.* On direct appeal, the Appellate Division rejected Welch's contention that he was victim of selective prosecution:

> **\*54** A defendant has a heavy burden of establishing that he was a victim of unconstitutional selective enforcement of the penal laws[.] To establish such a claim, a litigant must ... show that the law was not applied to others similarly situated and that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification. We conclude that defendant has failed to meet that heavy burden in this case.

*People v. Welch,* 2 A.D.3d 1354, 770 N.Y.S.2d at 234-35 (internal citations and quotation marks omitted).

It is well-settled that the "Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 1486 (1996) (internal citations omitted). The Supreme Court has noted that in the ordinary case, as long as the prosecutor has "

'probable cause' " to believe that the accused committed an offense defined by statute, " 'the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' " *Id.* (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668 (1978)). Of course, a prosecutor's discretion in this regard is subject to constitutional constraints such as the Due Process Clause of the Fifth Amendment, which forbids the prosecutor from making a decision to prosecute based on an unjustifiable standard such as race, religion, or other arbitrary classification. *United States v. Al Jibori,* 90 F.3d 22, 25 (2d Cir.1996) (citation omitted).

In the context of a claim based on selective prosecution or enforcement, the plaintiff must demonstrate (1) that, "compared with others similarly situated, [he] was selectively treated; and (2) [that] such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Crowley v. Courville,* 76 F.3d 47, 52-53 (2d Cir.1996). *Accord Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001); *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000). No evidentiary hearing or discovery is mandated unless the district court, in its discretion, finds that both prongs of the test have been met. *United States v. Sun Myung Moon,* 718 F.2d 1210 (2d Cir.1983) (holding that the district court did not abuse its discretion in holding that appellants failed to demonstrate the necessary factual predicates for their claim of selective prosecution) (citing *United States v. Ness,* 652 F.2d 890, 892 (9th Cir.), *cert. denied,*454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981); *United States v. Catlett,* 584 F.2d 864, 866 (8th Cir.1978); *United States v. Berrios,* 501 F.2d 1207, 1211-12 (2d Cir.1974); *accord United States v. Fares,* 978 F.2d 52, 59 (2d Cir.1992). A plaintiff's burden of proof in such a case is quite heavy. *Armstrong,* 517 U.S. at 464 ("Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a *demanding* one.") (emphasis supplied).

**\*55** Welch's claim is that the police officers who originally arrested him engaged in selective prosecution by not similarly prosecuting the other three individuals who

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

were present in the house at the time of the drug task force's raid. However, the mere fact that one person is prosecuted for a crime while another is not does not support a claim of selective prosecution, and Welch is unable to satisfy either prong of the pertinent test. First, Welch, Simmons, Jones, and Johnson were all black, thus belying any claim that the basis for selecting whom to prosecute was racial. Nor can he point to any other impermissible basis on which prosecutor chose to charge him but not those other individuals. The selective prosecution test is phrased in the conjunctive; Welch's inability to demonstrate that the state's decision to prosecute him was based on some impermissible factor is thus fatal to his claim. With respect to the second prong, as to Simmons and Johnson, it is very doubtful that they and Welch were "similarly situated" since the contraband seized was found in a safe to which Welch had a key and in the house where Welch resided; Simmons and Johnson did not live there. That factor made the case against Welch far stronger than that against those individuals, and hence provided a legitimate reason for treating them differently. It is perhaps a closer question as to whether Jones, Welch's girlfriend, was "similarly situated," since she shared the McKoon Avenue residence with Welch. However, Welch's claim that it was improper for the police not to arrest Jones and the others is belied by his question to the police, after being read the *Miranda* warnings, about whether his girlfriend or anyone else would go to jail if "someone" took responsibility any drugs found in the house, and his subsequent admission that all of the drugs and money were his. In light of those statements to the police, Welch's selective prosecution claim is disingenuous, to say the least.

Welch has not come close to articulating a *prima facie* case of selective prosecution. The trial court was well within its discretion in denying Welch's request for a hearing. The Court accordingly recommends that habeas relief be denied on this claim.

**Point Sixteen (Appellate Brief): Right to counsel of choice**

This claim is addressed above in this Court's discussion of Welch's "Point I," which deals with the trial court's failure to appoint a fourth substitute counsel of Welch's choosing.

**Point Sixteen (Supplemental Memorandum of Law): Denial of hearing on C.P.L. § 440.10 motion**

Welch also complains about the trial court's failure to conduct an evidentiary hearing on his C.P.L. § 440.10 motion alleging that there were improper *ex parte* contacts among the trial judge, the prosecutor and the FBI. However, the failure of a state court to hold a hearing is not, in an of itself, an independent ground for habeas relief. "[F]ederal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." *Jones v. Duncan,* 162 F.Supp.2d 204, 217 (S.D.N.Y.2001) ("[Petitioner's] remaining habeas ground, that the trial court's denial of his post-conviction CPL §§ 330.30 and 440.10 newly discovered evidence motions without holding a hearing constituted a denial of his constitutional due process rights (Pet.¶ 12(B)), is not cognizable on habeas review[.]") (collecting cases); *Turner v. Sullivan,* 661 F.Supp. 535, 540 (E.D.N.Y.1987), *aff'd,* 842 F.2d 1288 (2d Cir.1988) (holding that a writ of habeas corpus may not issue on the basis of a perceived error in state law regarding denial of a C.P.L. § 440.10 motion). Accordingly, habeas relief should not be granted on this claim.

**Point Seventeen: Improper introduction of expert chemist's testimony**[FN36]

> FN36. This claim also appears as Point Eight in Welch's Supplemental Memorandum of Law (Docket No. 21).

**\*56** With regard to the competence of the prosecution's expert forensic chemist, Mark Shaw ("Shaw"), the Court finds that Welch has mischaracterized the witness' testimony. Welch claims that Shaw failed "to test the known standard of cocaine used by him" in the analysis of the drugs seized. However, Shaw confirmed that the standard used in the present case was tested prior to it being used to analyze the samples, and "the standard ha[d] passed as being cocaine pursuant to [his] own independent testing." T.1192. Welch places particular emphasis on the fact that Shaw admitted that he, personally, "may not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 48

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

have" tested the known standard on March 5, 1999, the date on which the cocaine at issue was analyzed. *See* T.1193. However, Shaw stated that someone in the laboratory had tested the known standard on that day but he would have to check his records to ascertain who that was. T.1192-93. Welch did not question Shaw any further.

Questioning a state court's application of state evidentiary rules does not, in and of itself, amount to a basis for a constitutional challenge. As the Second Circuit has explained, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue only where the petitioner can show that the error deprived him of a fundamentally fair trial." *Rosario v. Kuhlman,* 839 F.2d 918 (2d Cir.1988) (quoting *Taylor v. Curry,* 708 F.2d at 891) (emphasis in original)). First of all, "there is no inherent reason why the admission of expert testimony, even if improper, would ordinarily deprive a defendant of a fundamentally fair trial." *Boyd v. Keane,* No. 89 CIV.2040,1990 WL 43930, at *4 (S.D.N.Y. Apr. 9, 1990) (citing *Barefoot v. Estelle,* 463 U.S. 880, 900, 103, S.Ct. 3383, 3398 (1983). As the Supreme Court explained, "If the experts are so obviously wrong and should be discredited, there should be no insuperable problem in doing so." *Barefoot,* 463 U .S. at 900. Moreover, Welch cannot show that the forensic chemist's testimony was infirm. If anything, Welch's additional questioning of the chemist only strengthened the chemist's testimony that the known standard was carefully tested to confirm that it was cocaine. Simply put, this is not a proper basis for habeas relief. *See Boyd v. Keane,* 1990 WL 43930, at *4 ("[Petitioner] argued that the chemists' testimony was improperly admitted because the prosecution failed to lay a proper foundation. Specifically, he argued that before the chemists could testify as to their opinion, the prosecution had to establish the reliability of their tests, which could only be done by showing that the white powder was scientifically compared to a known sample of cocaine. [Petitioner]'s claim is without merit."). The Court therefore recommends that this claim be denied.

**Point Eighteen: *Batson* violation**

Welch contends that he established a *prima facie* case of racial discrimination in the prosecutor's peremptory strike Juror No. 8, a black female, and that the prosecutor's proffered race-neutral reason for excusing her was "quite clear [sic] a pretext." *See, e.g.,* Pet'r Supp. Mem. at 39-42 (Docket No. 21). On direct appeal, the Appellate Division held as follows:

**\*57** We further conclude that, contrary to defendant's contention, the prosecutor's exercise of a peremptory challenge did not constitute a *Batson*[FN37] violation. Even assuming, *arguendo,* that defendant made a *prima facie* showing that the juror was challenged based upon her race, we conclude that the prosecutor provided a race-neutral explanation that was consistent with the prosecutor's other peremptory challenges.

FN37.*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L. Ed .2d 69 (1986).

*People v. Welch,* 2 A.D.2d 1354, 770 N.Y.S.2d at 235 (citation omitted).

In *Batson v. Kentucky,* the Supreme Court set forth a three-part burden-shifting analysis to determine whether the use of a peremptory challenge constitutes discrimination in violation of the Fourteenth Amendment's Equal Protection Clause. First, a trial court must decide whether the party challenging the strike has made a *prima facie* showing that the circumstances give rise to an inference that the prospective juror was struck because of his or her race. 476 U.S. at 84;*accord Galarza v. Keane,* 252 F .3d 630, 636 (2d Cir.2001). Second, if the trial court finds that the party making the *Batson* challenge has established a *prima facie* case, it must require the non-moving party to proffer a race-neutral explanation for striking the potential juror. *Id.* Finally, if the non-moving party proffers a race-neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving by a preponderance of the evidence that the strike was "motivated by purposeful discrimination." *Id.* Where, as here, an explanation is given for the contested challenge and the trial judge rules on the ultimate issue of intentional discrimination, the preliminary issue of whether the moving party made a *prima facie* showing becomes moot. *Hernandez v. New*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

*York,* 500 U.S. 352, 359 (1991); *accord United States v. Franklyn,* 157 F.3d 90, 97 (2d Cir.1998). Thus, in reviewing the trial court's denial of Welch's *Batson* challenge, I am only concerned with whether the prosecutor's proffered race-neutral explanation was in fact pretextual.

According to Welch, Juror No. 8 (Davetta Phelps) was the only black juror in the first panel of the venire. The trial judge noted that she had not "indicated she would be unfair or anything approaching cause[,]" and asked the prosecutor for a "race neutral explanation[.]" T.93. The following colloquy occurred:

Mr. Joerg: The reason being, Your Honor, her presence during the possession and sale of cocaine, she indicates it's occurred on multiple occasions, last being approximately a month ago and the person she was with that [sic] called her over to the house actually engaged in selling cocaine. We didn't go any further because we didn't want to get into the names of the witnesses and the times she was involved in the criminal conduct but she herself has been present when criminal conduct involving cocaine has occurred. That's the same reason I excused Juror Number 2 and Juror Number 6, young people previously within the past that have been involved in the possession of cocaine.

*58 Mr. Welch: Your Honor, she clearly stated she didn't use cocaine, she was merely present. Jurors Numbers 1 [Jesse Calato], 2 [Andrea Getty], 8 [Davetta Phelps], 13 [Linda Guette], 14 [Audrey Beasock], 15 [Michael Bevacqua], there's numerous [sic] and Number 6 [Christina Cwynar], they all said basically the same thing and he hasn't excused them

The Court: What about 13? She indicated she was present when cocaine was sold.

Mr. Joerg: The reason I didn't challenge that, it was sixteen years ago.

The Court: Okay.

Mr. Welch: Your Honor-

The Court: I'll allow the peremptory challenge. It is consistent, in fact, it's the only line of questioning the prosecutor engaged in, in his *voir dire.*

T.93-94.

The Court has reviewed the *voir dire* transcript in its entirety. As an initial matter, the Court finds that the prosecutor's stated race-neutral reason for striking the one black juror, Juror No. 8, was amply supported by the record: Juror No. 8 stated that the last time she had seen cocaine used and sold was about a month and a half ago at a friend's home. T.79, 80-81. At that time, the three friends she was with used cocaine; she did not, even though it was offered to her. T.80-81.

With respect to Welch's argument that the prosecutor's reason was pretextual because he allegedly failed to peremptorily strike other similarly situated jurors, the Court notes that several of Welch's statements on the record regarding this issue are totally inaccurate. First, he alleges that the prosecutor did not peremptorily dismiss Juror No. 1, Mr. Calato, even though this juror said that he had had experiences with cocaine.[FN38] However, just moments earlier, *Welch* himself had exercised a for-cause challenge with respect to Juror No. 1, which the trial court granted.

FN38. Juror No. 1 stated that "a couple months ago" he was at a party when other people were using cocaine; he testified that he did not use cocaine (although he had used it once about five years ago) and that "[t]hey kn[e]w better than to offer it to [him]." T.74-75.

Second, Contrary to Welch's argument, the prosecutor *did* excuse Juror No. 2 and Juror No. 6, who both had testified to having observed cocaine being used recently. Juror No. 6, a college student, testified that has "just seen it

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

[cocaine] out at places" and her most recent experience was "[a] few weeks ago" when "a kid" whom she knew came out a house "with cocaine on his nose, didn't wipe it off." T.76. She stated that she had never used cocaine. Juror No. 2 stated that she had "been to parties where it's been used." T.83. The most recent occasion was "[t]wo months" ago. *Id.*

What Welch neglected to mention at the time that he made his *Batson* challenge was that the trial court was only considering the first thirteen jurors, so the prosecutor had not yet had the occasion to peremptorily challenge Juror No. 14 and Juror No. 15.[FN39] However, when that time came, he did exercise peremptory challenges against them. T.97.

> FN39. Juror No. 14, Ms. Beasock stated that she saw a friend use it "about sixteen years ago." T.82. Juror No. 15, Mr. Bevacqua, a college student, testified that "last weekend" he saw cocaine used at his friend's house. T.82. He testified that he "never used cocaine in [his] life." *Id.*

Finally, the Court turns to Juror No. 13, Ms. Guette, a white female whom the prosecutor did not dismiss from the panel, despite her experience with cocaine. However, the fact that she was not dismissed does not raise an inference of discrimination since there was a material difference between her and Juror No. 8, Ms. Phelps. Ms. Guette stated that the last time she saw cocaine being used was "seventeen, eighteen years ago, a long time ago" at a party. T.81-82. The cocaine-related experiences of all of the other jurors, with the exception of Ms. Beasock (Juror No. 14), were much more recent and in fact occurred between only days and a couple of months before voir dire. Although Ms. Beasock's experience with cocaine was sixteen years ago, the context was different than that experienced by Ms. Guette. Ms. Beasock saw "a friend" use it, while Ms. Guette said she witnessed it being done at a party and gave no indication that she had a relationship with the person who had used the cocaine.

*59 A trial judge has broad discretion in determining whether the prosecution's stated reasons for exercising a peremptory challenge are legitimate or pretextual. *See Miller-El v. Cockrell,* 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Deference in this context is particularly appropriate because a determination of pretext will often hinge on the trial judge's observation of the challenged juror, the overall voir dire proceedings, and the prosecutor's credibility-criteria that are exceptionally difficult to review on a written transcript of *voir dire* questioning. *See id.* Here, the trial court was well within its discretion in accepting the prosecutor's reasons, which were supported by the transcript. Moreover, the Court has found no basis for questioning the trial court's credibility determination as to the prosecutor's stated reason for not dismissing Ms. Guette. Accordingly, the Court cannot find that Welch has sustained his burden of proving that the prosecutor's reason for dismissing Ms. Phelps (Juror No. 8) was but a pretext for racial discrimination. The Court recommends that this claim be dismissed.

**Petitioner's Motion for Bail**

On August 29, 2006, Welch submitted a motion for enlargement on recognizance or bail while his petition for habeas corpus was pending. *See* Docket No. 19. This motion was referred to the undersigned on December 5, 2006. *See* Docket No. 20.

It is settled law in the Second Circuit that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction. *Ostrer v. United States,* 584 F.2d 594, 596 n. 1 (2d Cir.1978) ("A district court has inherent power to enter an order affecting the custody of a habeas petitioner who is properly before it contesting the legality of his custody."); *Argro v. United States,* 505 F.2d 1374, 1377-78 (2d Cir.1974); *Grune v. Coughlin,* 913 F.2d 41, 43-44 (2d Cir.1990); *Iuteri v. Nardoza,* 662 F.2d 159, 161 (2d Cir.1981); *accord Mapp v. Reno,* 241 F.3d 221, 226 (2d Cir.2001) (explicitly reaffirming *Ostrer* and its progeny). Even as the Second Circuit has "acknowledged the authority of the federal courts to grant bail to habeas petitioners," however, it also has "consistently[ ] emphasized that this power is a limited one, to be exercised in special cases only." *Mapp,* 241 F.3d at 226. Bail should be granted to habeas petitioners " 'only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

bail necessary to make the habeas remedy effective.' " *Id.* (quoting *Ostrer,* 584 F.2d at 596 n. 1 (internal quotation marks and citation omitted in original)); *see also Grune,* 913 F.2d at 44 (explaining that "[t]he standard for bail pending habeas litigation is a difficult one to meet: The petitioner must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective.") (internal quotation marks omitted) (alterations in original); *accord, e.g., Mapp,* 241 F.3d at 226, 230;*Galante v. Warden, Metropolitan Correctional Center,* 573 F.2d 707 (2d Cir.1977) (citing *Calley v. Callaway,* 496 F.2d 701, 702 (5th Cir.1974)).

\*60 When district courts have applied the standards set forth in the foregoing Second Circuit decisions, "[a]n essential factor ... [has been] the necessity that the petition present merits that are more than slightly in petitioner's favor." *Richard v. Abrams,* 732 F.Supp. 24, 25 (S.D.N.Y.1990) (citing *Rado v. Manson,* 435 F.Supp. 349, 350-51 (D.Conn.1977) (holding that petitioner must be (1) "an exceptionally strong candidate for bail" and (2) claims of a "substantial nature upon which [he] has a high probability of success"); *Rado v. Meachum,* 699 F.Supp. 25, 26-27 (D.Conn.1988) (holding that the relevant factors are whether (1) "substantial claims" are set forth in the petition; (2) there is a "demonstrated likelihood the petition will prevail"; and (3) there are "extraordinary circumstances" attending the petitioner's situation which would "require" the grant in order to make the writ of habeas corpus "effective," presumably if granted) (citing *Stepney v. Lopes,* 597 F.Supp. 11, 14 (D.Conn.1984)); *accord Harris v. United States,* No. 97 Civ.1904, 1997 WL 272398, at \*1 (S .D.N.Y. May 21,1997).

Based upon this Court's review of Welch's pleadings, he has failed to meet the difficult standard imposed upon habeas petitioner seeking to be admitted to bail. As discussed above, none of Welch's habeas claims is substantial, and many of them are not federal constitutional claims cognizable on habeas review. *Compare with Richard v. Abrams,* 732 F.Supp. at 25-26 (denying bail where petitioner raised a *Brady* violation; even though this was a "serious constitutional matter,") it did "not appear to be a case in which victory for petitioner can be predicted with confidence"). In this Court's

opinion, Welch cannot demonstrate any likelihood that his petition ultimately will prevail. If the Court is mistaken on this point, and Welch's habeas petition should eventually succeed, the fact that his post-petition incarceration will have been without a justified basis does not constitute an extraordinary, circumstance entitling him to bail. *Iuteri v. Nardoza,* 662 F.2d at 162;*accord Harris,* 1997 WL 272398, at \* 1 (cited in *Mapp v.. Reno,* 241 F.3d at 226). In sum, Welch's petition does not present the type of "unusual" case where a grant of bail is necessary in order to make the remedy of habeas corpus effective. Accordingly, the Court recommends that Welch's motion for bail be denied.

## CONCLUSION

For the reasons set forth above, the Court recommends that petitioner's petition for a writ of habeas corpus be **DENIED.** Furthermore, the Court believes that Welch has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). Therefore, the Court recommends that no Certificate of Appealability should issue with respect to any of Welch's claims. In the event that the District Court agrees that the petition should be dismissed, this Court recommends that Welch be denied *in forma pauperis* status because any appeal from an order dismissing the petition would not be taken in good faith. *See*28 U.S.C. § 1915(a); *Coppedge v. United States,* 369 U.S. 438, 444 (1962).

\*61 Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)
(Cite as: 2007 WL 949652 (W.D.N.Y.))

which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985, 990-91 (1st Cir.1988).*

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection .**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

W.D.N.Y.,2007.
Welch v. Artus
Not Reported in F.Supp.2d, 2007 WL 949652 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.